197

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - X
3
    NILSON SACARDI,              :   10-CV-5605(BMC)
4                                :
              Plaintiff,         :   U.S. Courthouse
5                                :   Brooklyn, New York
                                 :
6        -against-               :   TRANSCRIPT OF
                                 :   TRIAL
7                                :
                                 :
8                                :   January 17, 2012
    GREEN FIELD CHURRASCARIA,    :   10:00 a.m.
9   INC, ET AL,                  :
                                 :
10         Defendant.
    - - - - - - - - - - - - - X
11
    BEFORE:
12            HONORABLE BRIAN M. COGAN, U.S.D.J.

13  APPEARANCES:

14  For the Plaintiff:     LAUREN GOLDBERG, ESQ.

15

16  For the Defendant
    Green Field and
17  Young Dae Kim:         DAVID HONG, ESQ.

18

19  Hudson Kim:            DANIEL D. BAEK, ESQ.

20  Daniel Lee:            DANIEL LEE, PRO SE

21

22  Court Reporter:    Holly Driscoll, CSR
                       Official Court Reporter
23                     225 Cadman Plaza East
                       Brooklyn, New York 11201
24                     (718) 613-2274

25  Proceedings recorded by mechanical stenography, transcript
    produced by Computer-Assisted Transcript.

198

1          THE CLERK:  Sacardi versus Green Field, docket
2     number 10-CV-5605.
3          Counsel, please state your appearances, starting
4     with the plaintiff.
5          MS. GOLDBERG:  Lauren Goldberg for the plaintiff,
6     Your Honor.
7          MR. HONG:  David Hong for defendants Mr. Young Dae
8     Kim and Green Field Churrascaria, Inc.
9          MR. BAEK:  Daniel Baek for Mr. Hudson Kim.
10          MR. LEE:  Daniel Lee representing myself.
11          THE COURT:  Let me address the dispute that we ended
12     with on Friday.
13          First of all, Mr. Baek, you must have said four or
14     five times during this case so far that you apologize for your
15     inexperience.  You have to stop doing that, it is really not
16     appropriate, all right.  This is not law school, it's not a
17     training exercise, this is a federal court.  Either try the
18     case or get someone who can, okay.
19          MR. BAEK:  Yes, Your Honor.
20          THE COURT:  Now, the notebook about which
21     Mr. Sacardi testified was not requested in discovery, neither
22     in the deposition nor in any of the written discovery that was
23     propounded, so there has been no discovery violation, that is
24     absolutely clear.  That does not mean that the witness can't
25     be questioned about the notebook.  He can be questioned,

1    unless the questions are irrelevant.  The last question that

2    Mr. Baek asked, as far as I can recall, was would you be able

3    or willing to bring the notebook to court on Tuesday.  The

4    objection to that question is sustained because it's

5    irrelevant whether he can bring the notebook to court on

6    Tuesday because this is not discovery.  In addition, just

7    because a party doesn't request documents during discovery

8    doesn't mean they can't secure their production at trial or

9    question about them at trial.  You know, it may be a surprise

10   to some lawyers but the fact of the matter is you can try a

11   case with no discovery, you're not restricted because you

12   didn't ask for documents during discovery, so we're going to

13   do the trial like trials were meant to be done one question at

14   a time and if the question is appropriate, it will be

15   answered.  All right.

16            Anything further on that?

17            MS. GOLDBERG:  No, Your Honor.

18            MR. BAEK:  No, Your Honor.

19            THE COURT:  Okay.  Let's proceed with Mr. Sacardi's

20   testimony.

21            Ms. Goldberg, we have a new interpreter today?

22            MS. GOLDBERG:  We do, Your Honor.

23            THE COURT:  Okay.

24            MS. GOLDBERG:  The other interpreter had a

25   commitment at 12:30 today and obviously we couldn't confirm

*Sacardi - cross - Baek*                                    200

1   that we would be done so that's why we got a new interpreter.

2          THE COURT:  Okay.

3          (Portuguese interpreter sworn by the clerk.)

4          THE CLERK:  Please state and spell your name for the

5   record.

6          THE WITNESS:  Marilia Vinson, M A R I L I A,

7   V I N S O N.

8          THE COURT:  All right.  We were on

9   cross-examination.

10         MR. BAEK:  Yes, Your Honor.

11         THE COURT:  Proceed.

12  N I L S O N    S A C A R D I,   having been previously

13  duly sworn was examined and testified as follows:

14  CROSS-EXAMINATION (CONT'D.)

15  BY MR. BAEK:

16  Q    Good morning, Mr. Sacardi.

17  A    Good morning.

18  Q    I think we left off with my last question could you bring

19  the notebook tomorrow -- on Tuesday.  Did you bring the

20  notebook today?

21         THE COURT:  All right.  I've sustained the objection

22  to that question.  Are you asking him if he brought the

23  notebook today?

24         MR. BAEK:  Yes.

25         THE COURT:  Mr. Sacardi, did you bring the notebook

1    today?

2              THE WITNESS:  Yes.

3              THE COURT:  Okay.

4    Q    May I please see your notebook?

5    A    My lawyer has it.

6              MS. GOLDBERG:  Objection, Your Honor.  Your Honor,

7    he's testified to the list that he made in the notebook and if

8    Your Honor obviously feels that it is relevant and he's

9    entitled to it, we are certainly prepared for him to look at

10   the list of which I made copies.

11             THE COURT:  Is the objection relevance?  What is the

12   objection?

13             MS. GOLDBERG:  Your Honor, relevance in terms of the

14   whole notebook, yes.

15             THE COURT:  Well, I don't know what you mean by the

16   whole notebook.  The notebook contains a list --

17             MS. GOLDBERG:  Correct, Your Honor.

18             THE COURT:  -- the witness said he created where he

19   essentially counted up the number of employees.

20             MS. GOLDBERG:  Right.

21             THE COURT:  If there's anything else in that

22   notebook, none of us but you know anything about it.

23             MS. GOLDBERG:  Your Honor, as I said, he testified

24   to the list, the list is in the notebook.  I'm absolutely

25   prepared for -- I've made copies of that list.  The rest of

*Sacardi - cross - Baek*                                    202

1    the notebook contains confidential and private information of

2    Mr. Sacardi.

3              THE COURT:  Stop.  Please stop.  There's been no

4    request for the rest of the notebook.  Mr. Baek asked for the

5    notebook only because for all we all knew the only thing in it

6    is the list to which the witness testified.  Now, if what

7    you're saying is there's more in that notebook, there's been

8    no request for more.  All you have you to do is give Mr. Baek

9    the list from the notebook.

10             (Pause in the proceedings.)

11             MR. BAEK:  Miss Clark, can I please borrow your

12   exhibit tab?

13             THE CLERK:  (Handing.)

14             MR. BAEK:  Thank you very much.

15   Q   Mr. Sacardi, I'm showing you what's been marked as

16   Defendant's Exhibit E.

17             MR. BAEK:  May I approach, Your Honor?

18             THE COURT:  You may.

19   Q   Please take a look at it.

20             (Pause.)

21             Can I have it back please?

22             Mr. Sacardi, is this the notebook that you were

23   referring to on Friday?

24   A   Yes.

25   Q   Are (sic) this your handwriting?

1   A    Yes.

2            MR. BAEK:  One moment, Judge.

3            (Pause.)

4            MR. BAEK:  Your Honor, I ask to admit this in

5   evidence as Defendant's Exhibit E.

6            THE COURT:  Any objection?

7            MS. GOLDBERG:  No, Your Honor.

8            THE COURT:  It is received.

9            (Defendant's Exhibit E received in evidence.)

10  Q    Mr. Sacardi, can you name the 52 to 53 employees top of

11  your head?

12  A    Not off the top of my head.

13  Q    Of the 52 and 53 people did you include Mr. Hudson Kim?

14  A    No.

15  Q    And did you include Mr. Young Dae Kim?

16  A    Yes.

17  Q    What is Mr. Young Dae Kim's title?

18  A    Can you repeat the name please?

19  Q    What is the title of Mr. Young Dae Kim?

20  A    John?

21  Q    No, Young Dae Kim, one of the defendants?

22  A    He's a manager.

23  Q    Did you include Freddy Kim?

24  A    Fred, no.

25  Q    Did you include Mr. James Lee?

*Sacardi - cross - Baek*                                              204

1   A    No.  James, no.

2   Q    Jaime?

3   A    Jaime, no.

4   Q    You're making $1,050 per week, correct?

5   A    Yes.

6   Q    Is that a fixed salary regardless of how many hours you

7   worked?

8   A    It's a fixed salary.

9   Q    And you would take bonuses for holidays, correct?

10  A    Only for Mother's Day.

11  Q    What about Valentine's Day?

12  A    Sometimes.

13  Q    And you received that amount in cash, correct?

14  A    Correct.

15  Q    All of the kitchen employees have to punch in and punch

16  out to record the number of hours they work, correct?

17  A    Correct, but recently we haven't been punching in and

18  out.

19  Q    When you say recently, when are you talking about?

20  A    The kitchen staff wasn't punching in.

21  Q    All of the floor employees clocked in and clocked out,

22  correct?

23  A    Correct.

24  Q    On Friday you testified that Mr. John Lim was the kitchen

25  manager, correct?

*Sacardi - cross - Baek*                                                    205

1   A    Yes.

2   Q    I'm sorry, it was actually January 11th, I apologize.

3        Wasn't he the floor manager, not the kitchen

4   manager?

5   A    Not recently because recently Gaspar was the kitchen

6   manager.

7   Q    We're talking about 2010?

8   A    2010.

9   Q    In 2010 wasn't John Lim the floor manager?

10  A    Yes.

11  Q    Not the kitchen manager?

12  A    No, Gaspar was the kitchen manager.

13  Q    What is -- what are Gaspar's responsibilities?

14  A    What responsibilities?

15  Q    Would you agree with me that he was the maintenance guy?

16       MS. GOLDBERG:  Objection.

17       THE COURT:  What's the objection?

18       MS. GOLDBERG:  Vague.  Maintenance guy, what does

19  that mean.

20       THE COURT:  Overruled.

21  A    Recently Gaspar wasn't taking care of maintenance, he was

22  really a manager.

23  Q    Are you saying he managed the kitchen staff?

24  A    Yes.

25  Q    Did manager John Lim clock in and clock out?

1   A    I cannot say, I don't know, I'm not sure.

2   Q    Let me read a page from your deposition.  That's page 67,

3   line six, counsel.

4        THE COURT:  Why don't you give a copy to the

5   interpreter so that she can translate from the deposition.

6        MR. BAEK:  I will, Judge.

7   Q    That's page 67, line six, you were asked these questions

8   and you give these answers:

9        "Question:    Do you know the manager of the floor

10  staff?

11       "Answer:    I do.

12       "Question:    Who is that?

13       "Answer:    John Lim.

14       "Question:    Do you know if he clocked in and

15  clocked out?

16       "Answer:    Before it was someone else but that one

17  was fired and John took over.

18       "Question:    Thank you for that information but my

19  question is did John Lim clock in and clock out?

20       "Answer:    He did."

21       Did I read it right?

22  A    Yes.

23  Q    Do you know how much John Lim was making per week?

24  A    No.

25  Q    Do you know whether or not manager Gaspar Allende also

1    clock in and clock out?

2    A    I don't know that either.

3    Q    Do you know how much Mr. Gaspar Allende was making per

4    week?

5    A    I don't know his salary either.

6    Q    Okay.  You did not clock in and clock out, correct?

7    A    I didn't either.

8    Q    You started working for Green Field on May 23rd, 1995,

9    correct?

10   A    Correct.

11   Q    You started as a kitchen helper, correct?

12   A    Correct.

13   Q    You worked as a kitchen helper from 1995 to 1997,

14   correct?

15   A    Yes, I was a kitchen helper.

16   Q    You had to punch in and punch out when you were a kitchen

17   helper, correct?

18   A    Yes, there was a clock in the kitchen.

19   Q    Your job was to help the chef of the restaurant, correct?

20   A    Yes.

21   Q    At that time the name of the chef was Celso, C E L S O?

22   A    Yes, that's it, he was the cook.

23   Q    Would it be fairly accurate to say Celso was your boss?

24   A    No.

25   Q    I'm going to read a page from your deposition.

1                Page 60, line 13, counsel.

2                You were asked this question and you gave this

3     answer:

4                "Question:    Would it be fairly accurate to say

5     Celso was your boss?

6                "Answer:    Correctly."

7                Did I read it right?

8     A     I was a kitchen helper so Celso was my boss.

9     Q     You worked for Celso in the kitchen, correct?

10    A     I was a kitchen helper, the person who used to work for

11    Celso was the wife.

12    Q     So, is the answer no?  Did you work for Celso in the

13    kitchen?

14    A     I did.

15    Q     Okay.  And there were other people working for Celso in

16    the kitchen, correct?

17    A     There were five people in the kitchen.

18    Q     So, you, Celso's wife and three others worked for Celso

19    in the kitchen, correct?

20    A     Correct, there was the guy who washed the pans, the

21    frying cook, Angelo, and I did the rest of the work.

22    Q     So, you would follow his orders?

23    A     I did.

24    Q     In 1997 you were promoted to Celso's position of chef,

25    correct?

1   A    Yes.

2   Q    That's when you stopped clocking in and clocking out?

3   A    As a cook, yes.

4   Q    Do you know Dr. Bae, B A E, the Korean doctor?

5   A    A Korean doctor?

6   Q    Yes, a Korean, at Green Field?

7   A    I know a Korean doctor that used to be part of Green

8   Field but I don't know his name.

9   Q    Is it correct that all the employees got a free flu shot

10  every winter?

11  A    Yes, that's correct.

12  Q    Is it also true that managers, that is manager Gaspar

13  Allende, manager John Lim, Mr. Hudson Kim, Young Dae Kim and

14  you five people would go to Dr. Bae in case of any medical

15  treatments, correct?

16       MS. GOLDBERG:  Objection.

17       THE COURT:  What is the objection?

18       MS. GOLDBERG:  Speculation.  How can he testify to

19  what four other people did.

20       THE COURT:  He may know.  If he doesn't know, he'll

21  say so.

22       THE INTERPRETER:  Would you please just tell me the

23  names again, Gaspar Allende, John Lim.

24  Q    Mr. Young Dae Kim, Hudson Kim and Mr. Sacardi would go to

25  Dr. Bae for medical treatments?

*Sacardi - cross - Hong*                                      210

1    A    Yes, correct, I would look for him sometimes.

2    Q    Did you have -- withdrawn.

3         Did you ever pay Dr. Bae's bills?

4    A    Yes, sometimes I will pay for the appointment.

5    Q    How much would you pay?

6    A    60.

7    Q    $60?

8    A    Yes.

9    Q    Isn't it correct that the restaurant, the Green Field

10   Churrascaria paid for all the named five managers' medical

11   bills?

12   A    Yes, they paid a few times.

13   Q    But not all the time?

14   A    Not always.

15   Q    Okay.

16        MR. BAEK:  No further questions, Your Honor.

17        THE COURT:  Anyone else?

18   CROSS-EXAMINATION

19   BY MR. HONG:

20   Q    Good morning, Mr. Sacardi.

21   A    Good morning.

22   Q    As I stated earlier before, my name is David Hong and I

23   represent Green Field Churrascaria and Mr. Young Dae Kim.

24        Mr. Sacardi, you never managed, did you?

25   A    I've never been a manager.

1   Q    So, if anyone called you a manager, you would disagree,

2   correct?

3            MS. GOLDBERG:  Objection.

4            THE COURT:  Sustained.

5   Q    Mr. Sacardi, do you remember attending an Unemployment

6   hearing on April 21st, 2011?

7   A    April 21st 2011, an Unemployment meeting?

8   Q    Yes, it was a hearing where you testified in order to

9   receive Unemployment benefits?

10  A    Yes.

11  Q    And you were the claimant at that hearing, correct?

12  A    Yes.

13  Q    And a judge was present and asked you questions, correct?

14  A    Yes.

15  Q    And a Portuguese interpreter translated for the hearing,

16  correct?

17  A    Yes, a lady translated.

18  Q    And a court reporter took down everything that was said,

19  correct?

20  A    Yes, he did.

21  Q    And you raised your right hand --

22           THE COURT:  He was under oath, let's get to it.  Go

23  ahead.

24  Q    Do you remember that Mr. Hudson Kim attended as well?

25  A    Yes.

1    Q    And he testified?

2    A    He testified along with Gaspar.

3    Q    Okay.  Mr. Sacardi, I'm going to read from the transcript

4    of that hearing and with the assistance of the interpreter I'd

5    like you to follow along to make sure I read the questions and

6    answers correctly.

7                MR. HONG:  May I approach the interpreter to give

8    her a copy?

9                THE COURT:  You may.

10   Q    Let's start at page seven, starting with line 17.

11   Mr. Hudson Kim having been duly sworn testified as follows --

12               THE COURT:  No, no, no, please just ask the

13   questions and answers.

14               MR. HONG:  Okay.

15               THE COURT:  Question, answer, then at the end when

16   you've read the entire passage you say to him, "Were you asked

17   those questions and did you give those answers."

18               MR. HONG:  Oh, Your Honor --

19               THE COURT:  You're reading him Kim's testimony?

20               MR. HONG:  Yes.

21               THE COURT:  Why?

22               MR. HONG:  Because the relevant portion of his

23   questioning is in response to what Mr. Kim said in this very

24   short excerpt.

25               THE COURT:  Can I see the transcript please?

*Sacardi - cross - Hong*                                    213

1           MR. HONG:  Yes, Your Honor.

2           THE COURT:  What is the -- you don't have another

3    copy?

4           MR. HONG:  I do.

5           THE COURT:  What is the portion you're going to ask

6    him about concerning his testimony, what page and line is

7    that?

8           MR. HONG:  Page 39, line three.

9           I'm sorry.  I'm sorry, Your Honor, one moment.

10          (Pause.)

11          MR. HONG:  Page 39, line 19 and 20.

12          THE COURT:  All right.  I'm not going to allow this

13   line of questioning.  This is appropriate for an

14   administrative hearing but we do not allow one witness to

15   comment on the testimony of another witness.  If there's

16   anything you want to impeach him with from his own testimony

17   that's in this transcript, you are, of course, free to do that

18   but that would mean that he's given inconsistent answers today

19   with his testimony there.

20          MR. HONG:  Your Honor, he's -- he testified that he

21   is not a manager and this -- the testimony from this certified

22   transcript would tend to show that or tend to --

23          THE COURT:  Where does he say in the certified

24   transcript that he is a manager?  Show me the page and line.

25          MR. HONG:  On page 39 lines I guess 17 through 20 he

*Sacardi - cross - Hong*                                          214

1    indicates that he agrees to the job title that Mr. Kim which

2    whose testimony I tried to read into said he was.

3              THE COURT:  No, that's too vague.  When you ask a

4    witness to comment on a general question as to another

5    witness, there's no telling what you're going to get.  I will

6    not allow that by way of impeachment.

7              Let's go on to something else please.

8    Q    Mr. Sacardi, you traveled to Brazil in October 2010,

9    correct?

10   A    Correct.

11   Q    You left on October 21st, 2010, correct?

12   A    Correct.

13   Q    And you bought your ticket only one day before, correct?

14   A    Correct.

15   Q    You left without receiving permission from the

16   restaurant, correct?

17   A    Yes.

18   Q    And you decided on your own that you needed to go to

19   Brazil, correct?

20   A    Because I asked them several times and they wouldn't give

21   me an answer, I was feeling very bad and I had to go to have

22   my treatment.

23   Q    So, the answer is yes?

24   A    Yes.

25             THE COURT:  Mr. Hong, look, I'm hearing everything

*Sacardi - cross - Hong*                                             215

1   in the case so I heard his prior testimony about how he asked

2   repeatedly I've got to go, I've got to go and he couldn't get

3   a response.  I'm not saying I agree with that but I heard that

4   testimony so when you go and ask him the question, so you left

5   without asking, right, it doesn't really undercut from what I

6   heard from him before because I have the whole story, not the

7   little piece you're pulling out of it, so it's not really

8   probative for me, okay.

9             I understand his story of what the facts are and it

10  doesn't do any good to try to make a point by saying, ah ha,

11  you didn't ask, when he's already testified he asked

12  repeatedly before that, so don't break it off into little

13  pieces taken out of context because it's not going to persuade

14  me.

15            MR. HONG:  Yes, Your Honor.

16            THE COURT:  Go on please.

17  Q    So, no one told you you needed to go to Brazil, correct?

18  A    Yes, I asked several times and nobody would give me

19  answer, they would only ask me how I was doing in the kitchen,

20  Daniel Lee.

21  Q    When you landed in Brazil, your grandson, Wellingson

22  Mantini picked you up from the airport, correct?

23  A    Yes, correct.

24  Q    Did you receive medical attention the day you landed?

25  A    No, it was two days, on the weekend.

*Sacardi - cross - Hong*                                      216

1          THE COURT:  Mr. Hong, I kind of have this from the

2    prior testimony and I understand the defendant's point that if

3    he was so sick, why didn't he go right to the doctor, why did

4    he wait, I have that; do we need to do it again?

5          MR. HONG:  I have a reason for it.

6          THE COURT:  Okay.

7          MR. HONG:  And I'm getting to it.

8          THE COURT:  Okay.

9    Q    Again, I'd like to turn to the Unemployment hearing

10   transcript and with the assistance of the interpreter I'd like

11   you to follow along and make sure that I read your -- the

12   questions and your answers correctly.

13         Please turn to page 54, line 19.

14         "Question:    When you went to Brazil did you seek

15   medical attention there?

16         "Answer:    Immediately in the same say."

17         Did I read that correctly?

18         THE INTERPRETER:  I'm sorry, in the same say?

19         MR. HONG:  That's how it reads.

20         THE INTERPRETER:  May I interpret as day?

21         THE COURT:  No, you have to say "say."

22         THE INTERPRETER:  Okay.

23         (Pause.)

24         THE WITNESS:  No, I may have been confused because I

25   arrived on the weekend -- because I arrived there on the

1   weekend and the doctors don't work on the weekend.  I arrived

2   there on a Friday and I looked for the doctor on a Monday.

3            MR. HONG:  Your Honor, I'd like to move to have that

4   whole answer stricken.  I asked if I read the answers to the

5   questions correctly.

6            THE COURT:  The motion is granted.  Mr. Sacardi,

7   he's only asking you if he read your prior testimony

8   correctly.

9            THE WITNESS:  Yes.

10           THE COURT:  Mr. Hong, how long is a say?

11           MR. HONG:  Your Honor, I wanted to stipulate that in

12  line 21 which reads "immediately in the same say" is obviously

13  a typographical error and should be read "immediately in the

14  same day" not only for coherence purposes but because S and D

15  are right next to each other on the computer keyboard.

16           THE COURT:  But we don't know what was translated to

17  the witness at the deposition.  There are ways of correcting a

18  deposition transcript, they all occur prior to trial.

19           So, are you asking me for any relief?

20           MR. HONG:  Yes, I'd like to move for a judicial

21  notice that it should be read same day, not same say.

22           THE COURT:  Any objection to my taking judicial

23  notice of that?

24           MS. GOLDBERG:  Your Honor, I think the transcript

25  speaks for itself and if there was --

1          THE COURT:  It really doesn't because it makes no

2    sense what it says unless someone can define for me how long a

3    say is.

4          MS. GOLDBERG:  Your Honor, I think actually if you

5    were to review the Unemployment transcript, you would see that

6    there were translation issues on that day, there's many things

7    that are not coherent actually throughout the whole testimony.

8    So, given that, I can't -- I'm not going to stipulate that it

9    should have said that based on what went on this day.

10         THE COURT:  Okay.  I can't arrive at that conclusion

11   Mr. Hong.  Go ahead.

12         MR. HONG:  Your Honor, I have nothing further.

13         THE COURT:  Okay.

14         Mr. Lee, any questions?

15         MR. LEE:  Yes, Your Honor.  Can I take a recess?  I

16   just need to go to the bathroom real quick.

17         THE COURT:  Five minutes.

18         (Recess taken.)

19

20         THE COURT:  Stay seated please.

21         Okay, Mr. Lee.

22   CROSS-EXAMINATION

23   BY MR. LEE:

24   Q    Good morning, Mr. Nilson Sacardi, my name is Daniel Lee

25   and I am representing myself.

*Sacardi - cross - Lee*                                    219

1          Mr. Sacardi, is it fair to say -- how many times

2     have we met personally, 20, 22 times?

3     A    Correct.

4     Q    So, it is fair to say we really don't know each other?

5          MS. GOLDBERG:  Objection.

6          THE COURT:  Sustained.

7     Q    Mr. Sacardi, are you married?

8     A    Yes.

9          MS. GOLDBERG:  Objection.

10         THE COURT:  Sustained.  You've got to be a little

11    faster, Ms. Goldberg.

12    Q    Mr. Sacardi, are hospitals open on Fridays in Brazil?

13    A    On Friday they are.

14    Q    You have testified that you left for Brazil on Thursday

15    evening, October 21st, 2010; is that correct?

16    A    Correct.

17    Q    It takes approximately eight to nine hours to get to --

18    to arrive to Brazil, correct?

19    A    Correct.

20    Q    So, it is fair to say you arrived in Brazil on Friday

21    morning?

22    A    By the time I got to my home it was 2:30 in the

23    afternoon.

24         MR. LEE:  I respectfully ask the Court to take

25    judicial notice that October 21st, 2010 is a Thursday and

1   October 22 is a Friday when he arrived and he had plenty of

2   time to visit the doctor.

3          THE COURT:  You want me to take judicial notice of

4   the fact that he had plenty of time to visit the doctor?

5          MR. LEE:  He previously testified he had no time to

6   see the doctor.

7          THE COURT:  Answer my question, is that what you

8   want?

9          MR. LEE:  Pardon me, Your Honor?

10          THE COURT:  Do you want me to take judicial notice

11   of the fact that he had plenty of time to visit the doctor?

12          MR. LEE:  Yes.

13          THE COURT:  That's denied.

14          Next question.

15   Q    Who is Wellingson Mantini?

16   A    My grandson.

17   Q    Did your grandson work for Green Field Churrascaria?

18   A    He did.

19          MS. GOLDBERG:  Objection, Your Honor, what is the

20   relevance of this.

21          THE COURT:  The witness already answered he did.

22   The objection is too late.

23   Q    Did you recommend your grandson to work at Green Field

24   Churrascaria, Inc.?

25          MS. GOLDBERG:  Objection.

Sacardi - cross - Lee                          221

1          THE COURT:  Overruled.

2          THE WITNESS:  May I answer?

3          THE COURT:  Yes.

4          THE WITNESS:  Yes.

5   Q    You had prev -- testified that on September 15th you had

6   first approached Hudson Kim to talk about leaving for Brazil;

7   is that correct?

8   A    Not only on the 15th but several times.

9   Q    When was the first time you met me?

10  A    I can't recall.

11  Q    Would it be fair to say the first time you met me or

12  heard me was at that alleged meeting, group meeting with all

13  the staff that introduced myself?

14  A    No, it was before that.

15  Q    So, when did you exactly meet me?

16         MS. GOLDBERG:  Objection.  It's already been asked

17  and answered, he said he couldn't remember.

18         THE COURT:  He's trying to refresh his recollection.

19  Overruled.

20         THE WITNESS:  May I answer?

21         THE COURT:  Yes.

22         THE WITNESS:  I used to see him every day come from

23  the kitchen to the floor every day.

24  Q    When was that first date you saw me in the kitchen?

25  A    I can't remember but I saw you going by the kitchen and

1   greeting us.

2   Q    Do you recall when did you first hear my name?

3   A    I do.

4   Q    When did you first hear my name?

5   A    I asked you what your name was.

6   Q    When was that date?

7   A    It was one day when you passed by the kitchen.

8   Q    So, you never heard my name until you saw me in the

9   kitchen?

10  A    Yes, I used to see you at -- on the floor sitting with

11  Hudson, you were always around there.

12            THE COURT:  Mr. Sacardi, listen carefully to the

13  question.  The question is prior to the day when you first saw

14  Mr. Lee in the kitchen had you ever heard his name from anyone

15  else?

16            THE WITNESS:  No.

17  Q    So, it's fair to say you had never heard my name or seen

18  me until you actually saw me in the kitchen, whenever that day

19  you cannot recollect?

20  A    That's it.

21  Q    When you approached Hudson Kim what did -- when you first

22  approached Hudson Kim that you wanted to take some time to go

23  to Brazil what was his response?

24  A    He said he was going to speak with Daniel Lee and give me

25  an answer but the answer never came.

1      MR. LEE:  Your Honor, I'd like to take judicial

2 notice that he has just testified that he talked to Hudson Kim

3 on September 15th, 2011 and referred to myself to refer to me

4 and I'd like to make it duly noted that I had not even stepped

5 foot at the restaurant until September 27th 2011.

6      THE COURT:  Mr. Lee, you don't appreciate the

7 distinction between judicial notice and argument.

8      MR. LEE:  Okay.

9      THE COURT:  I'm denying your request for judicial

10 notice and you must not argue what everything means to me, now

11 is not the time for that.

12 Q    Do you recall that the first time I stepped into Green

13 Field Churrascaria, Inc. is September 27th, 2010?

14 A    I don't remember.

15 Q    Mr. Sacardi, how is your Spanish?

16 A    My Spanish?  More or less, so so.

17 Q    Does that mean you're conversational?

18 A    I speak a little bit of Spanish and I understand it well.

19 Q    Is it fair to say most of the staff, the kitchen staff is

20 Hispanic?

21 A    Yes.

22 Q    And would it be fair to say most of the kitchen staff

23 does not speak Portuguese?

24 A    Correct.

25 Q    Would it be fair to say that most of the kitchen staff is

1  not too well versed in Brazilian culture?

2  A    Correct.

3  Q    What is fouijada?

4  A    It's a dish made with pig -- with pork actually, the

5  ears, the foot, the --

6        THE INTERPRETER:  I'd like to clarify, the nose of

7  the pig.

8        THE COURT:  Snout.

9  A    Snout, the tail and it's cooked with beans and when it's

10  almost cooked we remove the meat and then it's prepared in a

11  different pan.  We let the beans cook really well and we

12  prepare it in another pan, we season it with onions and garlic

13  and there's also the sauce and --

14        THE COURT:  Mr. Lee, let's get to a point.  We've

15  heard a lot about fouijada, we don't need to hear more.

16  Q    So, you do have -- obviously you have quite an expertise

17  in cooking so would it be fair to say your Hispanic co-workers

18  would not know how to cook fouijada?

19        MS. GOLDBERG:  Objection.

20        THE COURT:  Mr. Sacardi, do you know whether or not

21  your Spanish co-workers know how to cook fouijada?

22        THE WITNESS:  My helper, I taught him, my helper,

23  Alberto.

24  Q    So, it is fair to say you trained Alberto?

25  A    Yes.

*Sacardi - cross - Lee*                         225

```
 1              MR. LEE:  Your Honor, hopefully --
 2   Q    I don't want to go down the previous testimony with all
 3   the fried food you cook but I notice there is a lot of
 4   uniquely Brazilian fried dishes that were being cooked,
 5   correct?
 6              THE COURT:  Mr. Sacardi, do you know whether your
 7   co-workers know how to cook some or all of the Brazilian
 8   dishes that you testified about previously?
 9              THE WITNESS:  My colleagues?
10              THE COURT:  Your co-workers, yes.
11              THE WITNESS:  No.
12              THE COURT:  No, they don't know or, no, you don't
13   know if they know?
14              THE WITNESS:  Only my helper knows a little bit.
15              THE COURT:  Next question.
16   Q    Can I ask you then how did these fryers know how to cook
17   Brazilian cuisine?
18              MS. GOLDBERG:  Objection.
19              THE COURT:  Sustained.
20   Q    When you went to Brazil in August were you given one week
21   paid vacation?
22   A    Yes.
23   Q    Did your helper, Alberto, ever receive one week paid
24   vacation?
25   A    That I don't know, I'm not sure.
```

*Sacardi - cross - Lee*                                    226

1   Q     Do you know if managers John Lim and Gaspar Allende

2   received one week paid vacation?

3   A     I don't know that either.

4   Q     Did you recently go -- I have from the medical records

5   from -- provided by Lauren Goldberg on September 28, 2010,

6   correct?

7            THE COURT:  No, you haven't asked a question.

8            MR. LEE:  Okay.

9            THE COURT:  Ask the question.

10  Q     Did you tell the workers there at the hospital that you

11  were unemployed?

12           MS. GOLDBERG:  Objection.

13           THE COURT:  Sustained.

14  Q     When was the last time you saw your wife?

15           MS. GOLDBERG:  Objection.

16           THE COURT:  Sustained.

17  Q     Are you on Viagra?

18           MS. GOLDBERG:  Objection.

19           THE COURT:  Mr. Lee, you know, just because you're

20  pro se doesn't mean I won't impose a $10,000 sanction for

21  deliberately trying to embarrass a witness and if you ask

22  another question in that vein again you will be $10,000 poorer

23  and I will have the marshal go out and seize your bank

24  accounts if they can find them.  Do you have any more

25  questions of this witness?

1          MR. LEE:  Well, I'm confused, I mean if you could

2    educate me.

3          THE COURT:  No, I'm not here to educate you.

4          MR. LEE:  Okay but because I think a lot of this

5    case is also based on character, no?  In terms of --

6          THE COURT:  No.

7          MR. LEE:  No.  All right, Your Honor.

8          THE COURT:  Anything further?

9          MR. LEE:  Let me -- can you give me a couple of

10   minutes to --

11         (Pause.)

12   Q    You had testified that you have been paid 1,050 weekly in

13   cash?

14   A    Yes.

15   Q    Did you pay your taxes for that?

16         MS. GOLDBERG:  Objection.

17         THE COURT:  Sustained.

18   Q    Did you collect on Medicaid?

19         MS. GOLDBERG:  Objection.

20         THE COURT:  Sustained.

21   Q    Who paid your salary the entire time you were at Green

22   Field?

23   A    I had a manager before Hudson and then later Hudson.

24   Q    Did I ever pay your salary?

25   A    I can't recall, I can't recall.

1  Q     On that list that you hand wrote is my name on it?

2  A     No.

3            MR. LEE:  No further questions, Your Honor.

4            THE COURT:  All right.  Any redirect?

5            MS. GOLDBERG:  Yes, Your Honor.

6  REDIRECT EXAMINATION

7  BY MS. GOLDBERG:

8  Q     Mr. Sacardi, in 1997 why did you stop punching in and

9  punching out?

10  A    Because Mr. Kim, the owner, removed the clock from the

11  kitchen.

12  Q    Did Mr. Kim say anything to you about punching in and

13  punching out?

14  A    No, until that moment there was something but then after

15  that there was nothing.

16  Q    Did anyone ever discuss punching in and punching out with

17  you?

18  A    No, nobody discussed that subject.

19  Q    Prior to -- prior to John Lim being the floor manager was

20  John Lim the kitchen manager?

21  A    Yes.

22  Q    When James Lee was fired is that when John Lim became the

23  floor manager?

24  A    Yes.

25  Q    And when John Lim became the floor manager did Gaspar

1  become the -- did Gaspar Allende become the kitchen manager?

2  A    Yes.

3  Q    Mr. Sacardi, you testified that you arrived in Brazil on

4  a Friday.  How come you did not seek medical treatment until

5  Monday?

6  A    Because I arrived late on Friday, didn't have any more

7  time, I had to schedule an appointment, I didn't have time, I

8  was too tired and then after that it was Saturday and Sunday.

9  Q    Did you have a specific doctor that you wanted to see in

10 Brazil?

11 A    Yes --

12 Q    And who was that doctor?

13 A    -- he treated me.

14       Dr. Alberto Lieberman.

15 Q    When you were in Brazil how many times did you go see

16 Dr. Lieberman?

17 A    I can't recall very well but it seems to have been three

18 times.

19 Q    And how come you went to see him various times?

20 A    Because he asked me to run some tests and I had to return

21 the tests for him to review them.

22 Q    And do you recall what tests he was running?

23 A    It was a urine, blood work, cholesterol, prostate.  He

24 performed lots of tests.

25 Q    Earlier today there was -- there were questions about

1   Dr. Bae.  Can you tell me why you didn't continue seeking

2   treatment with Dr. Bae?

3   A    The Korean, Dr. Bae is the Korean from here?

4           THE COURT:  He's asking you.

5           MS. GOLDBERG:  Yes, yes.

6   Q    That was the doctor that was referred to earlier, asking

7   how come you didn't continue going to that doctor?

8   A    Because he couldn't figure out my disease and a private

9   appointment was very expensive.

10          THE COURT:  Anything else, Ms. Goldberg?

11          MS. GOLDBERG:  Your Honor, bear with me for just a

12  couple of minutes. (Pause.)

13  Q    Mr. Sacardi, was Leila your assistant at one time?

14  A    Yes, for four or five months.

15  Q    Mr. Sacardi, if you -- if other people in the kitchen

16  needed products from Triunfo, would you order those products

17  for them?

18  A    No, the only person who would sometimes need the product

19  was Leila.

20  Q    And if Leila needed something from Triunfo, would she ask

21  you to order it for her?

22  A    Yes.

23  Q    And if you needed something from the place where Leila

24  was ordering from, would you ask Leila to order it for you?

25  A    Yes, I asked some things, hardly ever but sometimes I'll

1   ask for some things.

2   Q    Mr. Sacardi, last week you said that you made sure that

3   the kitchen never ran out of ingredients, can you explain what

4   you meant?

5   A    That the kitchen will never run out of ingredients?

6   Q    Yes.

7            THE INTERPRETER:  May I clarify -- interpreter would

8   like to clarify a word with defendant -- I'm sorry, with the

9   plaintiff.

10           (Pause.)

11  A    I used to calculate the purchases and I would never let

12  anything lack so I would buy a little bit but there was never

13  any food lacking.

14  Q    Did you keep track of the ingredients for the dishes that

15  other people made?

16  A    No.

17  Q    So, the ingredients that you kept track of, were those

18  for your dishes?

19  A    I didn't understand the question.

20  Q    So, the ingredients that you kept track of, those were

21  for your dishes?

22  A    Yes, that I used.

23  Q    Did anyone keep track of the hours that you worked at

24  Green Field?

25  A    No.

1   Q     Were you ever disciplined at Green Field?

2   A     No.

3            THE COURT:  We're on redirect now.

4            MS. GOLDBERG:  Yes, Your Honor.

5   Q     Mr. Sacardi, why did you provide a false Social Security

6   number on your job application?

7   A     The first work that I had which was in construction

8   company in Manhattan in '89 demanded me to get a fake Social

9   Security.

10  Q     Mr. Sacardi, did you recommend anyone to Green Field?

11  A     Yes.  I'd like to apologize to the judge because he asked

12  me the question and I answered no but I didn't -- I hadn't

13  understood the questioned asked me.

14  Q     So, last week when you said on cross-examination that

15  you -- how come then on cross-examination last week you said

16  that you did not recommend anyone?

17  A     I didn't understand the question very well.  I got

18  confused by the question.

19  Q     And my last question, Mr. Sacardi, of the names that

20  were -- the 52 to 53 names that were on the list that you

21  wrote that defendants admitted, how many of those individuals

22  do you believe were full-time?

23  A     I think that everybody except for two people, one was the

24  cashier that only worked three times, three days per week and

25  the other one I don't remember the name, so I think it was two

1    people that didn't work full-time.

2             MS. GOLDBERG:  Nothing further, Your Honor.

3             THE COURT:  All right.  Anything else?

4             MR. BAEK:  Recross, Your Honor?

5             THE COURT:  Briefly.

6             MR. BAEK:  Thank you, Your Honor.

7    RECROSS-EXAMINATION

8    BY MR. BAEK:

9    Q    In 1997 the clock was removed from the kitchen, correct?

10   A    Yes.

11   Q    Is that the reason why you stopped clocking in and

12   clocking out?

13   A    I don't know, they told me that I shouldn't clock in and

14   out anymore.

15   Q    Who told you?

16   A    It had been going on for a while and they removed the

17   clock and I didn't clock in anymore and then Hudson told me

18   that I shouldn't, that I didn't have to clock in or out.

19   Q    Would you agree that in 1997 Hudson Kim wasn't working

20   there?

21   A    Yes.

22   Q    Where did the clock go?

23   A    I don't know, he removed it and I don't know where it

24   went.

25   Q    Do you know if the clock was removed -- withdrawn.

1           Do you know if that clock was installed in the floor

2    section of the restaurant?

3    A    No.  No, it wasn't because it was one of those old ones

4    that you need the card.

5    Q    Did the device you used to clock in, clock out --

6    withdrawn.

7           After the clock was removed from the kitchen were

8    there any other kitchen employees that clocked in and clocked

9    out at that time?

10   A    Yes.

11   Q    Where did they clock in and clock out?

12   A    I don't remember.

13          MR. BAEK:  No further questions, Your Honor.

14          THE COURT:  Okay.  Anything else?

15          MR. HONG:  No, Your Honor.

16          MR. LEE:  Your Honor, could I ask a couple of

17   questions?

18          THE COURT:  Okay, Mr. Lee.

19          Mr. Lee, you're confined in your questioning to the

20   answers -- the questions and answers that the witness just

21   gave on redirect examination.

22          MR. LEE:  Okay.  No thank you.

23          THE COURT:  So, you're passing?

24          MR. LEE:  Yes.

25          THE COURT:  Okay.  Nothing further, right?

235

1          MS. GOLDBERG:  Nothing further, Your Honor.

2          THE COURT:  Mr. Sacardi, you may step down.

3          Any further witnesses from plaintiff?

4          MS. GOLDBERG:  Your Honor, we have no further

5     witnesses.

6          THE COURT:  So, you are resting?

7          MS. GOLDBERG:  I'm not resting yet, Your Honor,

8     because I have additional exhibits that I would like.

9          THE COURT:  Okay.  You may proceed.

10         MS. GOLDBERG:  Your Honor if, Mr. Sacardi sits in

11    the audience next to his son-in-law can his son-in-law

12    translate for him what's going on during trial or no?

13         THE COURT:  I'm not sure why that would be an issue.

14         MS. GOLDBERG:  Well, Your Honor, obviously it will

15    require him to be talking to Mr. Sacardi.  I'm asking

16    permission from Your Honor whether that's --

17          THE COURT:  Your concern is that it will disrupt

18    proceedings if there's conversation going on?

19         MS. GOLDBERG:  Well, yes, Your Honor.

20         THE COURT:  Okay.  Well, let's try it and see.  If

21    I'm disrupted, I'll let you know.

22         MS. GOLDBERG:  Okay.  Thank you, Your Honor.

23         (Pause.)

24         THE COURT:  Off the record.

25         (Discussion held off the record.)

236

1        MS. GOLDBERG:  Your Honor, may I have one moment?

2        THE COURT:  Yes.

3        (Pause.)

4        MS. GOLDBERG:  Your Honor, before I had asked that

5    the portions of the deposition transcript that had been marked

6    be admitted.  I believe Your Honor had admitted them subject

7    to them being crossed -- marked with their cross-designations.

8    I have them now with all the designations, I'd like to hand

9    them up to the Court.

10        THE COURT:  Okay.

11        MS. GOLDBERG:  I have added one new designation for

12   Hudson Kim on page 37, line 17 to 22.  I did tell counsel and

13   he's had an opportunity to cross-mark the designation.  I

14   don't know if Your Honor for the record wants me to indicate

15   who's highlighted in what color, it's a little -- I can tell

16   Your Honor that plaintiff has highlighted in yellow, that's

17   probably the most significant part, and defense counsel has

18   marked in different colors obviously.

19        THE COURT:  Everyone state your color.

20        MR. HONG:  Orange.

21        MR. BAEK:  Green but on that last edition I didn't

22   put cross-designation, I actually put objection.

23        THE COURT:  Okay.

24        MR. LEE:  Blue.

25        THE COURT:  Are you going to mark each one of those

237

1    transcripts as an exhibit?

2              MS. GOLDBERG:  I guess so, Your Honor, yes, I'll

3    mark them each as an exhibit.

4              THE COURT:  I think that's the best way to do it if

5    we're not reading them into the record.

6              MS. GOLDBERG:  Okay.

7              THE COURT:  Is the objection to which Mr. Baek just

8    referred, is that the only objection in the markings?

9              MS. GOLDBERG:  I believe I saw --

10             MR. HONG:  Yes, Your Honor.

11             MS. GOLDBERG:  -- one or two, I didn't go through

12   and count, I noted that there was one or two of them.

13             MR. BAEK:  Your Honor, I didn't put objection, I put

14   repeated.  I don't know if that's considered an objection,

15   meaning Ms. Lauren Goldberg was trying to establish the number

16   of employees by submitting to the Court the names but then

17   some of the names were repeated.

18             THE COURT:  That's for argument, Mr. Baek, not for

19   admissibility.

20             MR. BAEK:  Okay.

21             THE COURT:  You're saying she's double-counting?

22             MR. BAEK:  That's right.

23             THE COURT:  You'll argue that later.

24             Okay.  So, let's have those marked.

25             MS. GOLDBERG:  Your Honor, I had -- if Your Honor

238

1  could just give me one moment because there are a couple of

2  things that need to be marked and I believe -- does Your Honor

3  have exhibit 19 in front of him?  Or you just have 18?  18,

4  Exhibit 18 was the flight itinerary.

5          THE COURT:  Okay, I have 18.

6          MS. GOLDBERG:  All right, Your Honor, then I will

7  mark Mr. Hudson Kim as Exhibit 19.

8          THE COURT:  No, you've got a 19.

9          MS. GOLDBERG:  Oh, I do oh, you do have a 19 in

10  front of you.

11          I'm going to mark him as Exhibit 20.

12          THE COURT:  Okay.  No, I've got a 20.

13          MS. GOLDBERG:  You've got a 20, I had handed up to

14  you the affidavits as well.

15          THE COURT:  That's right, that goes through 21.

16          MS. GOLDBERG:  Okay.

17          THE COURT:  So, Hudson Kim will be 22, right?

18          MS. GOLDBERG:  Hudson Kim will be 22.  Daniel Lee

19  will be 23.  And Young Dae Kim will be 24.

20          THE COURT:  All right those are received.

21          (Plaintiff's Exhibits 22, 23, 24 so marked in

22  evidence.)

23          MS. GOLDBERG:  May I approach, Your Honor?

24          THE COURT:  Yes.  Mr. Baek's objection is to 22?

25          MS. GOLDBERG:  Well, Your Honor, it is one portion

239

1   that's marked.

2            THE COURT:  Right.

3            MS. GOLDBERG:  I believe, yes, yes.

4            THE COURT:  What page was that, Mr. Baek?

5            MR. BAEK:  That should be page 37, line 17, Your

6   Honor.

7            THE COURT:  Ms. Goldberg, that's the portion that

8   deals with paying employees in cash; why is that relevant?

9            MS. GOLDBERG:  Your Honor, I will -- that's relevant

10  simply because it goes to the record keeping of the

11  defendants.  And in a minute I'm going to ask that Exhibit 19

12  be admitted which is the quarterly federal tax return for

13  Green Field Churrascaria, I listed that on the pretrial order,

14  there were no objections and I was hoping that we could

15  stipulate and so that could be entered as Exhibit 19.

16           THE COURT:  Well, if there were no objections in the

17  pretrial order, it's admitted.

18           MS. GOLDBERG:  Okay.

19           THE COURT:  19 is in.

20           (Plaintiff's Exhibit 19 so marked in evidence.)

21           THE COURT:  This portion of the testimony seems to

22  me to anticipate the defendant's offering some form of records

23  to substantiate something, I'm not sure what, and that you

24  want to put this in to show that the records are not all that

25  reliable because they were paying people in cash, is that it?

240

1    MS. GOLDBERG:  They were paying people in cash and

2  specifically not paying taxes on the people in cash, so to

3  whatever they were reporting obviously on their tax return, it

4  shows that there were people who were not obviously even

5  indicated in the taxes.

6    THE COURT:  And why does that matter?

7    MS. GOLDBERG:  Again, this all goes to the number of

8  employees at the restaurant.

9    THE COURT:  Wouldn't it tend to boost the number of

10  employees -- yes, which is what you want.

11    MS. GOLDBERG:  It would reflect that actually this

12  number should be higher --

13    THE COURT:  Yes.

14    MS. GOLDBERG:  -- than what's already indicated.

15    THE COURT:  Okay.  Why wouldn't I take it for that

16  limited purpose, Mr. Baek?

17    MR. BAEK:  For that limited purpose I have no

18  objection.

19    THE COURT:  Okay.  That's all I'll receive it for.

20  I will not receive it to show that the defendant is a bad

21  business or paying people in cash.

22    MS. GOLDBERG:  That's not what I was offering it

23  for, Your Honor, just for the record.

24    THE COURT:  Okay.  Anything further, Ms. Goldberg?

25    MS. GOLDBERG:  Yes, so 19 is -- 19 is in, correct,

241

1    Your Honor?

2            THE COURT:  19 through 24 are all in.

3            MS. GOLDBERG:  You've just admitted the affidavit --

4    I have asked that certain paragraphs on the affidavit of

5    Hudson Kim, which is Exhibit 20, and certain paragraphs of

6    Young Dae Kim's affidavit be admitted as Plaintiff's Exhibit

7    21.

8            THE COURT:  Yeah, I spoke too quickly, I've not

9    heard from the defendants as to those two affidavits.

10           MR. LEE:  Your Honor, can I put an objection to

11   those two affidavits?

12           THE COURT:  What are they being offered for,

13   Ms. Goldberg?

14           MS. GOLDBERG:  Your Honor, in the paragraphs that I

15   have selected to be admitted both Young Dae Kim and Hudson Kim

16   give various admissions -- I should say give various

17   statements as to Daniel Lee's responsibilities at the

18   restaurant which are quite relevant and have significance in

19   this case.

20           THE COURT:  Okay.  First of all, I don't know which

21   paragraphs you are referring to, my copies are not marked.

22           MS. GOLDBERG:  Oh, Your Honor, I apologize, I think

23   I have unmarked -- your copy should have been marked.  But

24   it's paragraphs on Exhibit 20, affidavit of Hudson Kim, it is

25   paragraphs eight, ten, eleven and fourteen.  Do you want --

1    Your Honor, should I mark another copy?

2              THE COURT:  No, I'm marking the ones.

3              MS. GOLDBERG:  Okay.

4              THE COURT:  I am bracketing paragraphs eight through

5    fourteen on Exhibit 20.  And which ones on Exhibit 21?

6              MS. GOLDBERG:  On Exhibit 21 it was paragraphs

7    seven, ten, I think that was it, Your Honor.  I'm sorry, and

8    also eight.  Paragraphs seven, eight, actually it looks like

9    there's no nine.

10             THE COURT:  Nine is missing.  So, you want seven,

11   eight and ten, right?

12             MS. GOLDBERG:  And eleven.

13             THE COURT:  Seven, eight, ten and eleven?

14             MS. GOLDBERG:  Yes, Your Honor.

15             THE COURT:  All right.  Now, Mr. Lee is objecting to

16   those?

17             MR. LEE:  Yes, Your Honor.

18             THE COURT:  Another objection?

19             MR. HONG:  Yes, Ms. Goldberg only listed originally

20   paragraphs seven, ten and nine, I don't know what paragraph

21   eight is about in Mr. Young Dae Kim's affidavit.

22             THE COURT:  "From October of 2010 until June of this

23   year (right before Father's Day) I instructed my son Hudson to

24   stop by Green Field two or three times per week in order to

25   assist Daniel Lee in assuming his role as the operator of the

243

1  establishment but I have no documents to this effect."  That's

2  eight.  Okay.

3          So, who's objecting to what?  Mr. Lee is objecting

4  to all of the designated paragraphs, right?

5          MR. LEE:  Yes, Your Honor.

6          THE COURT:  Okay.  That's all, right?  Hang on.

7  Mr. Hong, what are you objecting to, if anything?

8          MR. HONG:  Your Honor, because Your Honor has read

9  the text in, while you were reading Ms. Goldberg provided me

10 an actual copy so I've been apprised of what it says, I

11 withdraw my objection.

12         THE COURT:  Okay.

13         MR. BAEK:  Your Honor.

14         THE COURT:  Yes.

15         MR. BAEK:  Similar objection, Your Honor, in the

16 letter dated January 11th I did not raise any objection

17 because she only put paragraph eight and ten and now I think

18 she's adding two more paragraphs.

19         THE COURT:  Yes, seven and eleven.

20         MR. BAEK:  Seven and eleven.

21         THE COURT:  So, you're objecting to 21, paragraphs

22 seven and eleven?

23         MR. BAEK:  I don't know what they are, just one

24 moment, Judge.

25         (Pause.)

244

1          MR. BAEK:  I withdraw my objection.

2          THE COURT:  Okay.

3          Ms. Goldberg, how can I take any of these statements

4    as against Daniel Lee?  Aren't they hearsay as to Daniel Lee?

5    I mean for what they're worth, and I think they're not worth

6    much, they're statements by a party so I can admit them

7    against the party, but how can I admit a party's statements to

8    be considered against another party when those statements

9    inculpate the other party and that party has not

10   cross-examined the witness because it is in the form of an

11   affidavit?

12         MS. GOLDBERG:  Your Honor, all of these affidavits

13   were done prior to the deposition of all the defendants and

14   they could have been questioned on these affidavits.  I

15   again --

16         THE COURT:  Even if they had been questioned on the

17   affidavits, what I'm saying to you is if you have a deposition

18   of either of the Mr. Kims -- well, I'll think about that.

19   Because it does seem to me that if this were deposition

20   testimony where Mr. Lee had been present, then I think it

21   would come in.  I'm not sure why the form of the testimony

22   changes the outcome but it may.

23         I think what's troubling me is these are statements

24   by both Mr. Kims that implicate Mr. Lee but the statements

25   themselves in this form are not subject to cross-examination.

245

1   So, I can receive them as admissions as to the Kims but I am

2   sceptical that I can receive them as evidence against Mr. Lee.

3           I'm going to sustain Mr. Lee's objection to the

4   extent you're offering them against him.  I'll reconsider that

5   ruling if you get me a letter brief explaining why I should.

6           MS. GOLDBERG:  Okay, Your Honor.

7           THE COURT:  All right.  Anything else?

8           MS. GOLDBERG:  Your Honor, I do have one final item

9   that I just recently decided that I wanted to admit.  It is

10  another affidavit, it is actually an affidavit by Daniel Lee.

11  I would like to admit it as Exhibit 25.

12          There's only one select paragraph that I'm offering

13  and I am going to highlight it in pink.  May I approach, Your

14  Honor?

15          THE COURT:  You may.

16          MS. GOLDBERG:  I'm going to provide copies now for

17  the defendants.

18          (Pause.)

19          THE COURT:  Defendants have any objection to

20  receiving this exhibit, the marked portion?

21          MR. BAEK:  The defendant Hudson Kim objects to this

22  paragraph.

23          THE COURT:  I think it's the same problem,

24  Ms. Goldberg.

25          MS. GOLDBERG:  Your Honor, again my intent is to use

1  it against Daniel Lee.

2          THE COURT:  Okay.  I will accept it for that

3  purpose.  Okay.

4          Anything further?  That's Exhibit 25 received for

5  the limited purpose and limited portion as identified.

6          (Plaintiff's Exhibit 25 so marked in evidence.)

7          MS. GOLDBERG:  Nothing further, Your Honor.

8          THE COURT:  All right.  What's the parties

9  preference, you want to break for lunch now or do you want to

10  start the case for about half an hour.

11          MR. BAEK:  Your Honor, before we start, if I may

12  respectfully move for judgment on partial findings pursuant to

13  FRCP 52(c) on the FMLA claim.

14          THE COURT:  52(c)?

15          MR. BAEK:  Yes, that's the judgment on partial

16  findings for bench trial.

17          THE COURT:  Okay.

18          Anything further about that?

19          MR. BAEK:  If I can make an argument?

20          THE COURT:  Sure, go ahead.

21          MR. BAEK:  First of all, Ms. Goldberg fails to make

22  a prima facie case for the FMLA claim.  At a minimum, she has

23  to prove by a preponderance of the evidence that the Green

24  Field Churrascaria employer employed 50 or more employees in

25  20 or more work weeks in any given period.  She hasn't even

247

1    stated one sentence regarding 20 or more work weeks.

2         THE COURT:  Well, she has the testimony from

3    Mr. Sacardi just now that he thought all but one or two of the

4    52 or 53 were full-time.

5         MR. BAEK:  On that issue, Your Honor, let's say the

6    Green Field Churrascaria just hired 20 new full-time

7    employees, doesn't mean we've had those 20 full-time employees

8    for 20 or more calendar weeks.

9         THE COURT:  I see your point.

10        All right.  Anything else?

11        MR. BAEK:  And also, if I may, Ms. Goldberg failed

12   to prove by a preponderance of the evidence the serious health

13   condition part of the FMLA claim.  I'm looking at the exhibits

14   14 through 15 -- 14 through 16 which were admitted in evidence

15   and all I see from, for example, Plaintiff's Exhibit 14,

16   seventh page, it says depression:  Patient states he is

17   worried about his family in Brazil but doesn't give further

18   information.  Patient denies S/H ideation, denies A/V

19   hallucinations.  Patient is scheduled to see his doctor next

20   week.  Patient has no other complaints.  At this time the

21   degree of severity is mild.

22        Then I'm looking at the Plaintiff's Exhibit 15, the

23   fourth page, the diagnosis final primary:  Palpitation.

24   Disposition discharge:  Home.  Condition:  Stable.

25        Then I'm looking at Plaintiff's Exhibit 16, page

1  three, description under result information:  Benign essential

2  hypertension.

3       Upon information and belief, those conditions do not

4  meet the statutory definition of serious health condition.

5  For those two reasons defendant Hudson Kim respectfully moves

6  for Your Honor's judgment of partial findings.

7       THE COURT:  All right.  Any other -- anything else

8  from the other defendants?

9       MR. HONG:  Your Honor, I would just like to

10  supplement that last point that Mr. Baek made regarding the

11  notice that Ms. Goldberg failed to show that Mr. Sacardi put

12  any of the defendants on notice of any sort of health

13  condition during that time that would have put them on notice

14  that the leave that he was seeking was covered by the FMLA.

15       THE COURT:  Okay.  Anything else?  Anything from

16  you, Mr. Lee?

17       MR. LEE:  I don't know, I'd just like to follow -- I

18  mean ride on his motion.

19       THE COURT:  All right, I'll take that as a joinder

20  in the motions.

21       Anything, Ms. Goldberg, anything you want to say

22  about that motion?

23       MS. GOLDBERG:  Yes, Your Honor, I do believe at this

24  stage we have met our burden.  First, in terms of the notice

25  element, Your Honor has already received -- Your Honor has

249

1  heard the testimony that Mr. Sacardi asked for permission to

2  go to Brazil a couple of times, I don't want to regurgitate

3  the testimony I believe Your Honor has just heard.  He never

4  heard back.  Finally, when he felt that his health condition

5  was such that he had no choice, that's when he went.

6            THE COURT:  Did he have any obligation under the

7  FMLA to be specific about why he needed to leave?  By that I

8  mean did he have an obligation to say, here is my health

9  problem?

10           MS. GOLDBERG:  Well, Your Honor, he in fact did

11 that, he told Hudson Kim he's dizzy, he's having heart

12 palpitations, he's not able to stand up.  He gave the

13 description, he testified, he stated all those things to

14 Hudson Kim.  And the case law talks about given the totality

15 of the circumstances for what the plaintiff relays to the

16 defendant, you know, looking at a totality, is there enough

17 there to believe that he had a serious medical condition and I

18 think actually Barnett, Barnett v. Revere Smelting and

19 Refining Corporation which is 67 F.Supp.2d 378, while

20 admittedly not all the points are exactly the same in our case

21 and in their case, in that case the court noted that what the

22 plaintiff had relayed in terms of his symptoms was adequate

23 and they were in some ways very similar symptoms that you

24 heard from Mr. Sacardi in terms of his symptoms.

25           In terms of the number of employees, as Your Honor

1  just mentioned, you heard Mr. Sacardi testified, also in the

2  deposition transcript which Your Honor now has I did ask

3  Mr. Young Dae Kim whether there were 50 employees needed at

4  Green Field for it to operate efficiently and he answered yes

5  to that question.

6           In addition, Your Honor has --

7           THE COURT:  I need 30 law clerks to operate

8  efficiently but I do the best I can.

9           MS. GOLDBERG:  True, Your Honor, I understand it is

10  certainly not definitive but yet just one other piece of

11  evidence.  In the quarterly federal tax return that is

12  submitted as Exhibit 19, under the number of employees that's

13  acknowledged, 57; again, I understand that maybe they're not

14  all full-time.  Arguably, even assuming that, as Your Honor

15  just admitted the deposition transcripts, the defendants had

16  admitted that they did not take taxes from any of the

17  employees such that 57 is not even the accurate number in

18  total, that's just what they reported.

19          So, I would certainly say given everything, given

20  all the evidence that's out there in terms of the number, we

21  have met at least a prima facie case at this point.

22          THE COURT:  Let me ask you this in terms of the

23  seriousness of the medical condition, your view, and you think

24  it is supported by Barnett, is that if an employee comes and

25  says, I need leave because I am dizzy and that's all there is,

1    is that enough for FMLA leave?

2            MS. GOLDBERG:  Just dizzy?

3            THE COURT:  Just dizzy.

4            MS. GOLDBERG:  Not dizzy -- not just dizzy, Your

5    Honor.

6            THE COURT:  And so what else do we have here on top

7    of dizzy?

8            MS. GOLDBERG:  We have dizzy, we have heart

9    palpitations, we have not being able to stand up and I

10   believe, I believe, I'm not -- I think those were the three

11   primarily cited.

12           THE COURT:  Okay.  All right.  Thank you.

13           Yes, Mr. Baek.

14           MR. BAEK:  Your Honor, my understanding is that that

15   goes to the constructive notice of the employer.  If the

16   employee is always dizzy, he's falling and being unconscious

17   all the time, of course the employer is on constructive notice

18   that that employee in question is in need of serious medical

19   attention but what Ms. Goldberg fails to establish is that

20   whatever those conditions are, they are serious health

21   conditions.

22           According to the statute, there are seven elements

23   that she, Ms. Lauren Goldberg must establish; number one was

24   plaintiff was eligible for leave, i.e. he worked for FMLA

25   employer, that's in dispute here; number two, plaintiff had

252

1  certain conditions; number three, that certain condition was a

2  serious health condition.  Then it goes on.

3          THE COURT:  Well, I guess the issue that I don't

4  fully understand is there's certain things the employee needs

5  to say to the employer in order to put the employer on notice

6  that there's a potentially qualifying FMLA leave request.  But

7  then is it the case that, in addition to that, the employee

8  must at trial prove that he actually had a serious medical

9  disease which may be a more onerous standard than what's

10  required just to give notice?  I think that is the case,

11  right?

12          In other words, the notice is a less -- could be a

13  description of symptoms which may or may not be a serious

14  medical disease.  It has to turn out when the employee is

15  finally diagnosed that, in fact, he did have a serious medical

16  condition because if that were not required, then any employee

17  could say, I'm dizzy and I can't stand up, and then he'd be

18  entitled to leave even if a doctor said later there's nothing

19  wrong with you.

20          MS. GOLDBERG:  Your Honor, also I think it is

21  important to note that one obviously can say dizzy and have

22  other symptoms as well when one has vertigo and it rises to a

23  different level where one really can't stand up, it's not the

24  same as one just complaining about dizziness, but I think also

25  you have here the fact that he was -- he went to three

1  different hospitals between September and October and then

2  obviously went to Brazil and had another series of treatment

3  with Dr. Lieberman in Brazil.

4          THE COURT:  But does the statute cover -- and I'm

5  not at all suggesting this about Mr. Sacardi -- does it cover

6  hypochondriacs?  What if somebody is really not sick but they

7  think they really are and so they relate a symptomatology to

8  the employer which on its face gives sufficient notice and

9  appears to warrant leave and then they go to all these doctors

10  and the doctors say there's really nothing wrong with you,

11  would the employee be entitled to leave in that circumstance?

12  If the employee is then -- it really opens the door, again not

13  suggesting that Mr. Sacardi is doing this, but it opens the

14  door to employees just making up symptoms and getting leave if

15  they don't have to medically substantiate it.

16          MS. GOLDBERG:  Your Honor, I think though an

17  employee, you know, simply saying to his employer, oh, I'm

18  dizzy, I need medical leave, is a very different circumstances

19  than what we have here where, you know, even if -- in the

20  deposition transcript that's been admitted it was acknowledged

21  it was common knowledge around the restaurant that Mr. Sacardi

22  was not doing well.

23          THE COURT:  Well, but I  -- he gave -- I am inclined

24  to find that he gave adequate notice.  I'm going to think

25  about all this over the lunch hour but let's say I get there,

254

1    he gave adequate notice, what if I find I just don't know

2    what's wrong with him and I'm not sure I do from the medical

3    records.  What is his problem?

4              MS. GOLDBERG:  Well, I think, as the medical

5    records -- when you review the medical records, the medical

6    records will show that he had various issues going on actually

7    but among them, among the top certainly was the vertigo and

8    dizziness but it was combined with, you know, serious heart

9    palpitations, having trouble breathing and, you know, not

10   being able to stand up.

11             THE COURT:  But you're giving me all his self-

12   reporting.  What I'm looking for in some of those medical

13   records is a metabolic or organic trigger for those and that's

14   where you may come up short, assuming that I'm right and I

15   think I am, that the statute requires an actual serious

16   medical condition, not merely a perceived one on the part of

17   the employee, but let me think about that.

18             All right.  Anything else?

19             MR. BAEK:  Your Honor, just on that point, if I

20   could just have a moment to talk about legislative intent of

21   requiring why plaintiff must prove that whatever condition

22   plaintiff has must be a serious health condition.

23             THE COURT:  Well --

24             MR. BAEK:  I'm sure Your Honor would know better.

25             THE COURT:  No, don't be sure of that but unless I

255

1    find that there's something ambiguous about the statute, I

2    don't see why I would go any further to look for legislative

3    intent, all right.  Let me think about it while we're having

4    lunch.  We'll reconvene here at 1:30, we'll say 1:30.  I'll

5    give you a ruling then and then we'll proceed with at least

6    the rest of the case.

7              All right.  Thank you.

8              MR. BAEK:  Thank you, Your Honor.

9              (Time noted:  12:15 p.m.)

10             (Luncheon recess taken.)

11             (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

256

1          (Whereupon, the afternoon session began at 1:35 p.m.)

2          MR. HONG:  Your Honor, my first witness is here in

3     the courtroom right now.  I ask him to leave while you make

4     your ruling?

5          THE COURT:  Yes.

6          With regard to the defendant's motion on the FLMA

7     claim, dealing first with the number of employees, I think the

8     plaintiff has barely but adequately made out a prima facie

9     case.  If it were just the one employee and Mr. Sacardi

10    testifying as to their general impression as to the number of

11    other employees, and that's really all I heard from them, that

12    would not be sufficient for me but when I take that testimony

13    and I couple it with the tax return that says 57 employees, it

14    seems to me that is enough, barely enough but enough for

15    plaintiff's prima facie case.

16         At that point with nothing else, an inference could

17    be drawn that there is 50 or more employees.  I'm not saying

18    as factfinder that I would draw such an inference because the

19    testimony still is thin and the documents aren't much greater

20    but legally for the purpose of making out a prima facie case,

21    I think that is enough to shift the burden to the defendants

22    to show:  Oh, well these 57 employees really were not

23    full-time or the number was lesser or they only worked part of

24    the year or whatever the defendants would show.

25         Now having said that, based upon my ruling, I don't

1    mean it matters because I cannot find based on the medical

2    evidence that I have that Mr. Sacardi has what the statute

3    terms a serious medical condition.

4          I accept the fact that a confirmed diagnosis of

5    depression and anxiety could be a serious medical condition

6    but I don't really have any evidence that his condition rises

7    to that level.

8          Essentially, he went to an emergency room two or

9    three times, he saw an emergency room doctor, he described

10   dizziness and heart palpitations and the emergency room doctor

11   said essentially oh, depression and anxiety.

12         If I were going to find depression and anxiety as a

13   serious medical condition then it seems to me I would have to

14   find that Mr. Sacardi is being treated on a regular basis by a

15   psychiatrist or psychologist receiving a regular regime of

16   drugs to treat a known condition, not a one off even if it

17   occurs a few times shot by an emergency room doctor saying

18   here's what it might be.

19         The occasional panic attacks which is really all

20   this record shows plus Mr. Sacardi's self-reporting of those

21   attacks does not rise to a serious medical condition in my

22   view and no factfinder could find reasonably that it does.

23   I'm therefore granted the motion as to the FLMA claim.

24         MS. GOLDBERG:  Your Honor, I do just want to add one

25   thing.  In the medical record, there is the diagnosis of

1  ischemia disorder.

2  　　　　THE COURT:  Who is making the diagnosis?  It's a guy

3  who saw him for one half hour and says here's what I think it

4  might be.

5  　　　　If an emergency room doctor sees somebody coming in

6  in a panic complaining of the symptoms, that's what he is

7  going to write down.  That is not a reliable diagnosis of a

8  medical condition.  I would expect somebody who really has

9  that to be seeing a psychiatrist on a regular basis being

10  treated with at least behavioral or pharmacological therapy to

11  overcome that and I'm not seeing that anywhere.

12  　　　　So I'm granting that motion.

13  　　　　Let's go on with the defendant's case.

14  　　　　Who is going first?

15  　　　　MR. HONG:  Green Field and Mr. Young Dae Kim are.

16  　　　　THE COURT:  You may call your first witness.

17  G U I D O N G   L I M,   having been called as a witness,

18  first being duly sworn, was examined and as follows:

19  　　　　THE CLERK:  Please state and spell your name for the

20  reporter.

21  　　　　THE WITNESS:  G-U-I-D-O-N-G   L-I-M.

22  　　　　THE CLERK:  You may be seated.

23  　　　　THE COURT:  You may inquire.

24  DIRECT EXAMINATION

25  BY MR. HONG:

*Lim/Direct/Hong*                                          259

1    Q    Good afternoon.

2         Mr. Lim, do you have an American name?

3    A    Yes.

4    Q    What is that name?

5    A    John.

6    Q    And were you sometimes known as John Lim?

7    A    Yes.

8    Q    Mr. Lim, where do you live?

9    A    In Flushing.

10   Q    Would you say your address for the record, please.

11   A    33-24 Parsons Boulevard, apartment 1B, Flushing, New York

12   11354.

13   Q    How long have you been living at that address, Mr. Lim?

14   A    3 years.

15   Q    Are you employed, Mr. Lim?

16   A    Yes.

17   Q    Where do you work?

18   A    Intercargo Logistics in Jamaica, Queens.

19   Q    What kind of company is Intercargo?

20   A    A freight forwarding company.

21   Q    What do you do for that company?

22   A    I handle export shipments.

23   Q    How long have you been worked there?

24   A    A little over a year now.

25   Q    Where did you work before Intercargo Logistics?

*Lim/Direct/Hong*                                                    260

1   A     Green Field Churrascaria.

2   Q     When did you start working at Green Field?

3   A     2002.

4   Q     When did you stop working?

5   A     2010.

6   Q     What was your role at Green Field during that time?

7   A     I was the manager for the floor.

8   Q     Could you please describe your responsibilities as

9   manager for the floor?

10  A     I was responsible for hiring and firing floor staff,

11  ordering and disciplining, taking reservations, resolving any

12  complaints from the customers, doing payroll, making schedules

13  and scheduling the distribution of the teams for each section

14  for the restaurant.

15  Q     Did you make schedules for all the employees of the

16  restaurant?

17  A     Just the floor.

18  Q     You mentioned just now different sections of the

19  restaurant?

20  A     Yes.

21  Q     Would you be describe the physical layout of the

22  restaurant?

23  A     It was divided into seven sections.

24  Q     Were the seven sections numbered, colored, lettered?

25  A     Lettered.

1   Q    What were the letters of the sections?

2   A    A through F.

3   Q    Were there any other areas of the restaurant besides

4   these sections marked A through F?

5   A    No.

6   Q    Was the kitchen part of sections A through F?

7   A    No.

8   Q    Mr. Lim, how much did you earn from Green Field in your

9   role as manager?

10  A    I received up to a thousand dollars per week.

11  Q    Were you the only manager at the restaurant?

12  A    No.

13  Q    What were the other managers?

14  A    Up to my tenure was Gaspar and Nilson.

15  Q    When you say Gaspar, do you mean Mr. Gaspar Allende?

16  A    Yes.

17  Q    Do you know how much Gaspar earned?

18  A    Around 800, 900, I think.

19  Q    Do you know how much Mr. Sacardi earned?

20  A    Around that area, like 900 to a thousand as well.

21  Q    Mr. Lim, did you ever manage the kitchen?

22  A    No.

23  Q    Why not?

24  A    Because I was hired as a manager for the floor.

25  Q    So then who was tasked with managing the kitchen?

*Lim/Direct/Hong*                                               262

1    A    When I first started working, Nilson was the head chef.

2           THE COURT:  That's not what he asked you.  He asked

3    you who was tasked with managing the kitchen?

4           THE WITNESS:  It was Nilson Sacardi.

5    Q    And --

6           THE COURT:  What is the difference between managing

7    the kitchen and being the head chef?

8           THE WITNESS:  I think it's the same thing.

9           THE COURT:  The same thing?

10          THE WITNESS:  Yes.

11   Q    As manager of the kitchen, do you know what Mr. Sacardi's

12   responsibilities were?

13   A    Hiring and firing for the kitchen staff, making schedules

14   for the kitchen staff, taking inventory control, placing

15   orders and making sure that all the foods are served, cooking

16   the food.

17          THE COURT:  You said making sure that all the foods

18   are served?

19          THE WITNESS:  At the time of opening.

20          THE COURT:  At the time of opening.

21   Q    Let's discuss making the schedule.

22          Did Mr. Sacardi make the schedule just for the

23   kitchen employees?

24   A    Yes.

25   Q    So no one else?

*Lim/Direct/Hong* 263

1  A     No.

2  Q     And how often did he do this?

3  A     Only when there was a personnel change.

4  Q     And during your time at Green Field, how often were there

5  personnel changes?

6  A     I can only remember five or six times but it's much more

7  than that.

8  Q     Did Mr. Sacardi have to receive approval for the

9  schedules every single time he changed it?

10 A     No.

11 Q     Why not?

12 A     Because he was the head chef of the kitchen so he knew

13 best the manpower that he needed to work around the business

14 of the restaurant.

15 Q     You also mentioned that Mr. Sacardi placed orders.

16           What types of things did he order?

17 A     Most of the raw materials that was needed for the

18 preparation of the food.

19 Q     Do you know if he placed the orders himself?

20 A     He would and he would have us fax it in or call it in.

21 Q     I'm sorry, you said he would and --

22 A     He would do it himself and other times he would hand the

23 orders to us to fax it in or make the call or place the order.

24 Q     When would he place the orders through you or other

25 people at the restaurant?

*Lim/Direct/Hong*                                                    264

1  A    When either we had to fax it in or if we had to place the

2  order with Korean vendors.

3  Q    Why couldn't he fax it in himself?

4  A    He didn't know how to use the fax machine.

5  Q    And when would he place the orders directly himself?

6  A    When it was a vendor for the Brazilian products, he would

7  talk directly in Portuguese.

8  Q    Did you witness, did you ever witness Mr. Sacardi placing

9  these orders?

10 A    Yes.

11 Q    How often would you say he did this?

12 A    Once a week.

13 Q    Mr. Lim, do you know if Mr. Sacardi trained workers?

14 A    Yes.

15 Q    Did you witness Mr. Sacardi ever training a kitchen

16 employee?

17 A    Yes.

18 Q    Do you remember any of those names?

19 A    Only by first name.

20 Q    Okay.

21       What were -- what was one of those names?

22 A    Alberto.

23 Q    What was Alberto's job in the kitchen?

24 A    He was assistant cook.

25 Q    What did you witness Mr. Sacardi training Alberto?

*Lim/Direct/Hong* 265

1  A    When he first came into work, he showed him how to cook

2  the menus that was supposed to be served at the restaurant.

3  Q    Was there anyone else that Mr. Sacardi trained?

4  A    Yes.

5  Q    Who was that?

6  A    Sergio.

7  Q    I'm sorry?

8  A    Sergio.

9  Q    Did you witness Mr. Sacardi actually training Sergio?

10  A    Yes.

11  Q    And what was he training -- what was Mr. Sacardi training

12  Sergio to do?

13  A    Assistant cook as well.

14  Q    Anyone else?

15  A    Alejandro.

16  Q    Same question with Mr. -- with Alejandro?

17  A    Yes, assistant cook.

18  Q    Anyone else?

19  A    That's all that I can remember for now.

20  Q    Did Mr. Sacardi ever give instructions to any of the

21  kitchen staff?

22  A    Yes.

23  Q    Do you remember any of the employees that Mr. Sacardi

24  would give instructions to?

25  A    It would be most of the kitchen staff.

1  Q    Do you remember any specific names?

2  A    Yes.

3  Q    Would you name one of them?

4  A    There was Alberto.

5  Q    What did you witness Mr. Sacardi instructing Alberto to

6  do?

7  A    Preparing the food.

8  Q    I'm sorry?

9  A    Preparing the food.

10  Q    Anyone else?

11  A    Julian, J-U-L-I-A-N.

12  Q    And what did you observe Mr. Sacardi telling Julian to

13  do?

14  A    He would ask him to make the basic preparations for

15  preparing the food, like chopping the carrots, chopping the

16  onions.

17  Q    Any others?

18  A    Simone.

19  Q    Simone?

20  A    Yes.

21  Q    Same question, what did you observe Mr. Sacardi

22  instructing Simone to do?

23  A    To bring in certain parts of the meat that he needed or

24  like to grind ground beef for him and to bring in the meat

25  materials for the preparation for the food.

1    Q    Any other workers?

2    A    Cita, C-I-T-A.

3    Q    What did Mr. Sacardi instruct Cita to do?

4    A    She was part of the laundry, cleaning the linens but

5    whenever she had time, he would ask her to do the preparation

6    for the food as well, to take out the sauces and wrapping it

7    up so it would be faster and easier for him to use.

8    Q    Was there anyone else?

9    A    There was more but I don't recall the names.

10   Q    Did Mr. Sacardi -- did you ever witness Mr. Sacardi

11   correct workers when they weren't doing their jobs properly?

12   A    Yes.

13   Q    Do you remember any of them?

14   A    Yes.

15   Q    Would you please tell us the name of one of them?

16   A    Armando.

17   Q    Why did Mr. Sacardi have to correct Armando?

18   A    Because some of the dishes that came from the dish

19   washing machine, it came out dirty so he instructed him to

20   clean it again.

21   Q    Anyone else?

22   A    Alberto.

23   Q    And how did Mr. Sacardi correct Alberto?

24   A    It was with the food that he prepared, if it was too

25   salty or if it didn't have any taste, he would correct him and

1  tell him to make a new batch.

2  Q    Anyone else?

3  A    Alejandro as well.

4  Q    How did Mr. Sacardi correct Alejandro?

5  A    Same thing, it was about the cooking.

6  Q    Anyone else?

7  A    Sergio.

8  Q    How did Mr. Sacardi correct Sergio?

9  A    Same thing, he would teach him again how to prepare the

10 food.

11 Q    You said that you managed the floor and not the kitchen,

12 correct?

13 A    Yes.

14 Q    So how were you able to witness everything that you just

15 testified to?

16 A    Because I'm in and out of the kitchen every time.

17 Q    How long would you say on a given work day you were in

18 the kitchen?

19 A    At least half a day, half of the time when I'm there.

20 Q    Why would you need to go into the kitchen?

21 A    Because it was part of my job.  I had to go in and out of

22 the kitchen to at least bring dirty dishes or talk to Nilson

23 about the items of the food or go into the office which is in

24 the basement as well so I would go in and out of the kitchen

25 every time.

*Lim/Direct/Hong*                                                   269

1   Q     You testified earlier that Mr. Sacardi hired workers?

2   A     Yes.

3   Q     Do you know about how many workers he hired?

4   A     Most of the kitchen staff.

5   Q     Do you know what the kitchen staff hiring process was

6   like?

7   A     It was, if there was a vacancy in a position, he would

8   either call or have us call the employment agency or he would

9   ask somebody working already if they knew anybody that needed

10  work.

11  Q     Did Mr. Sacardi ever bring new staff himself?

12  A     I believe so.

13  Q     Do you know the names of any employees that -- I'm sorry,

14  do you remember any names of kitchen staff that Mr. Sacardi

15  hired?

16  A     Yes.

17  Q     Who are think?

18  A     Leila.

19  Q     What was her job?

20  A     She was responsible for preparing the salads.

21  Q     Anyone else?

22  A     Geralda.

23  Q     What was her job?

24  A     Assistant cook.

25  Q     Anyone else?

1   A    I don't remember the rest.

2   Q    Do you know if Mr. Sacardi ever witnessed -- do you know

3   if Mr. Sacardi ever interviewed any of these workers?

4   A    Yes.

5   Q    How do you know?

6   A    Because I saw some of the interviews.

7   Q    And whose interviews did you see?

8   A    Alberto, Sergio, Leila.  That's all I remember seeing.

9          THE COURT:  When you say you saw them?

10         THE WITNESS:  Yes.

11         THE COURT:  What do you mean you saw them, what

12  exactly did you see?

13         THE WITNESS:  Well, when there was a vacancy in the

14  position, that he would bring somebody in the kitchen to have

15  an interview.  I wasn't there to hear what it was but since

16  I'm in and out of the kitchen, I saw that was a new person

17  applying for that position.

18         THE COURT:  Thank you.

19  Q    And how would you know finally if this prospective person

20  was officially a member of the kitchen staff?

21  A    Nilson would bring me the employee application form to

22  put it in the payroll system.

23  Q    Did you ever question him on any person's application he

24  brought?

25  A    No.

*Lim/Direct/Hong*                                                    271

1   Q     Was he ever denied his choice?

2   A     No.

3   Q     Why not?

4           MS. GOLDBERG:  Objection.

5           THE COURT:  Sustained.

6   Q     Mr. Lim, did Mr. Sacardi ever fire any workers?

7   A     Yes.

8   Q     Do you know who he fired?

9   A     Yes.

10  Q     Who did he fire, Mr. Lim?

11  A     He fired Angel.

12  Q     Why did he fire Angel?

13  A     Because he came in intoxicated to work.

14  Q     Did he fire anybody else?

15  A     Yes, I believe it was Claudio.

16  Q     Why did Mr. Sacardi fire Claudio?

17  A     The reason, I don't know why.  Most of the people that

18  are let go are because of the poor work that they do.

19          THE COURT:  How do you know he fired Claudio?

20          THE WITNESS:  Because Nilson is the manager for the

21  kitchen so he had the authority to let people go.

22          THE COURT:  Did you see him fire Claudio?

23          THE WITNESS:  No.

24          THE COURT:  Okay.

25  Q     Mr. Lim, would Mr. Sacardi directly fire anybody?

*Lim/Direct/Hong*                                                  272

1   A    Yes.

2   Q    Did Mr. Sacardi -- departure who he directly fired?

3   A    I don't recall the name who he directly fired.

4   Q    Did Mr. Sacardi ever ask someone else to fire somebody on

5   his behalf?

6   A    Yes.

7   Q    Do you know any of these individuals?

8   A    Yes.

9   Q    Who were they?

10  A    There was Angel.

11  Q    Do you know who Mr. Sacardi asked to fire Angel on his

12  behalf?

13  A    Excuse me?

14  Q    Do you know who he asked to fire Angel?

15  A    He asked me.

16  Q    Mr. Sacardi asked you to fire Angel?

17  A    Yes.

18  Q    Nip else?

19  A    I don't recall.

20       THE COURT:  When he asked you to fire Angel, did you

21  say to him why don't you do it yourself?

22       THE WITNESS:  I already knew Nilson's personality.

23  He didn't want to be on bad terms or he wasn't strong in

24  saying negative things to the employees around them.

25       THE COURT:  But why did you take on the burden of

1   doing it?

2           THE WITNESS:  Because I didn't have any problem

3   letting people go.

4   Q    Mr. Lim, when you reported to work at Green Field, did

5   you have to punch in and punch out a time clock?

6   A    No.

7   Q    Why not?

8   A    Because managers, we don't use the time clock to punch in

9   and punch out.

10  Q    You mentioned that Gaspar Allende was another manager,

11  correct?

12  A    Yes.

13  Q    Do you know if he had to punch in and out a time clock?

14  A    No.

15  Q    Same question for Sacardi, do you know if he had to punch

16  in and out the time clock?

17  A    No.

18  Q    Mr. Lim, I have here what has already been admitted into

19  evidence and marked as Plaintiff's Exhibit 10 and I would like

20  to show it to you for your review.

21          MR. HONG:  Your Honor, may I approach the witness?

22          THE COURT:  You may.

23  Q    Mr. Lim, if you would direct your attention to receipt

24  number 380858.

25          Did managers ever receive extra pay at the

1    restaurant?

2    A    What do you mean by extra pay?

3    Q    Money on top of their regular salary?

4    A    He received bonuses.

5    Q    And when would managers receive bonuses?

6    A    When was the busier than usual.

7    Q    Could you give me some examples of those types of days?

8    A    Major holidays like Mother's Day, Valentine's Day,

9    Father's Day.

10   Q    And would the hours of the restaurant for those days be

11   extended?

12   A    No, they would be the same.

13   Q    Then what would make it busier?

14   A    Because there were more customers coming in on that day

15   so we had to work more than usual -- more than a usual

16   business day.

17   Q    Mr. Lim, do you recognize receipt number 380058?

18   A    Yes.

19   Q    What is it?

20   A    It's a receipt for cash.

21   Q    And do you recognize the handwriting?

22   A    Yes.

23   Q    Whose handwriting is it?

24   A    It's my handwriting.

25   Q    What date did you write at the top of receipt 380858?

1   A     February 18, 2008.

2   Q     For whom did you write this receipt?

3   A     Nilson Sacardi.

4   Q     What is the description that you wrote on this receipt?

5   A     Over time February 14, 2008.

6   Q     Whose signature appears -- I'm sorry, is there a

7   signature at the bottom of that receipt?

8   A     Yes.

9   Q     Do you recognize it?

10  A     Yes.

11  Q     Whose signature is that?

12  A     It's Nilson.

13  Q     How do you know it's Mr. Sacardi's signature?

14  A     Because I have seen him sign other paperwork at the

15  restaurant.

16  Q     You said earlier that managers would receive bonuses not

17  overtime, correct?

18  A     Yes.

19  Q     Why did you write overtime for this receipt?

20  A     I was writing the overtime for the hourly employees from

21  the kitchen and there were so many that I accidently wrote

22  overtime on Nilson's receipt.

23  Q     Do you know how many hours Mr. Sacardi actually spent

24  cooking at the restaurant each day?

25  A     I don't know the exact hours.

1          THE COURT:  Mr. Hong, did you want to offer that

2     receipt in evidence?

3               MS. GOLDBERG:  I believe.

4               MR. HONG:  I believe it's already in evidence.

5               THE COURT:  Is that your understanding too, Ms.

6     Goldberg?

7               MS. GOLDBERG:  Yes, your Honor.

8               THE COURT:  Go ahead.

9     Q    What time would the restaurant open for business?

10    A    For the public or?

11    Q    For the public, yes?

12    A    11:00.

13    Q    Do you know when Mr. Sacardi would typically arrive at

14    the restaurant?

15    A    Around 9:00.

16    Q    Do you know what he would be doing from the time he

17    arrived at 9:00 to the time it opened at 11:00?

18    A    Me?

19    Q    No, Mr. Sacardi, do you know?

20    A    He would start preparing for the food for the restaurant.

21    Q    What do you mean by he would start preparing?

22    A    He would start preparing the hot food to be served to the

23    customers.

24    Q    Did he cook?

25    A    Yes.

1  Q    Once the restaurant opened at 11:00, what would you

2  observe Mr. Sacardi doing for the rest of the day?

3  A    He would take his break after opening, he would take naps

4  in the back, then take the inventory and place orders.

5  Q    Would he walk around the kitchen and make sure everybody

6  was doing his or her job?

7             MS. GOLDBERG:  Objection.

8             THE COURT:  Sustained.

9  Q    In addition to taking a break, naps in the back and

10  ordering things, what else would you see Mr. Sacardi doing?

11             MS. GOLDBERG:  Objection.

12             THE COURT:  Overruled.

13  Q    You may answer.

14  A    He would make sure that everything in the kitchen was

15  running smoothly.

16  Q    And how did he do that?

17  A    He would be ordering people under him to prepare the

18  preparation for the food, making sure that the kitchen is

19  clean for the food department and just making sure that

20  everything was running smoothly.

21  Q    You mentioned that Mr. Sacardi took naps in the black?

22  A    Yes.

23  Q    How long were these naps?

24  A    I don't know.  Like half an hour to an hour, maybe more.

25  I don't know.  I didn't keep time.

1  Q    Would anyone else take naps in that area where he took a

2  nap?

3  A    No.

4  Q    Why not?

5  A    We weren't supposed to take naps.

6  Q    Do you know why Mr. Sacardi was allowed to take naps but

7  no one else was?

8  A    Because we knew he worked hard the whole day and he had

9  the privilege to take his break like that.

10 Q    Do you know why he was afforded this particular

11 privilege?

12 A    Because he is the manager I suppose.  It was already like

13 that when I started working.

14 Q    Mr. Lim -- withdrawn.

15      Mr. Lim, Green Field is a Churrascaria, correct?

16 A    Yes.

17 Q    Was there a set menu at Green Field?

18 A    What do you mean by set menu?

19      THE COURT:  Was the menu fixed or did it change from

20 time to time?

21      THE WITNESS:  It changed from time to time.

22 Q    And so who determined the changes in the menu each time?

23 A    Nilson.

24 Q    Did anybody question his decisions about the menu?

25 A    No.

*Lim/Cross/Goldberg* 279

1  Q    Why not?

2  A    Because he was the chef.  He decided on the menu that was

3  going to be served for that day.

4  Q    Whenever the menu changed, did Mr. Sacardi ever have to

5  retrain or give additional instructions to the employees

6  because the menu was different?

7  A    No, the first -- the assistant cooks has been there for a

8  long time so they were trained already for any specific menus

9  that Nilson requested.

10        THE COURT:  Mr. Hong, you have to pick up the pace a

11  bit.  We have very long pauses between questions.

12        MR. HONG:  Your Honor, I have nothing further.

13        THE COURT:  I don't have it up here.  Can I see

14  Defendant's Exhibit 10.

15        MR. HONG:  Sure.

16        May I take it from the witness?

17        THE COURT:  Sure.

18        It's the receipt.  If it's plaintiff's, then I have

19  that.

20        You may cross-examine.

21  CROSS-EXAMINATION

22  BY MS. GOLDBERG:

23  Q    Mr. Lim, Mr. Sacardi was primarily physically cooking at

24  the restaurant, isn't that correct?

25  A    That was only part of his duty as the head chef.

1  Q    Do you remember attending your deposition?

2  A    Yes.

3  Q    Do you remember at the deposition you swore to tell the

4  truth, do you remember that?

5  A    Yes.

6  Q    And on your deposition do you recall being asked on

7  page 29 line 7.

8        Is it fair to say that's how he spent the overall

9  majority of the time?

10       THE COURT:  Question:  Is it fair to say?

11  Q       "Question:  Is it fair to say that's how he spent

12  the overall majority of his time, physically cooking the food?

13       "Answer:  Yes.

14  A    Yes.

15  Q    You remember testifying to that?

16  A    Yes.

17  Q    Now, you testified that Mr. Sacardi was responsible for

18  hiring most of the kitchen staff, that's what you just

19  testified to, is that correct?

20  A    Yes.

21  Q    And your belief that Mr. Sacardi hired most of the

22  kitchen staff is based on the fact -- is based on the belief

23  that he gave you sheets that contained information on

24  prospective employees, is that correct?

25  A    I'm sorry, can you repeat that again.

1  Q    Your belief that he hired most of the kitchen staff is

2  based on the fact that he would give you some documents, is

3  that correct?

4  A    It's a fact.  I don't believe, I know that he gave me the

5  paperwork, the application for the employment.

6  Q    So based on your belief that he gave you those documents,

7  it's your belief that he hired them?

8  A    No, they had to have an interview with the manager before

9  being hired, so one way or another, the new personnel had to

10 talk to Nilson.

11 Q    That is not my question.

12       My question is:  You believe that those individuals

13 were hired because he gave you certain documents?

14 A    What do you mean by belief?

15 Q    Well, for instance, you believe that he hired Julian, is

16 that correct?

17 A    I know Nilson hired Julian.

18 Q    Were you present when Nilson offered Julian a job?

19 A    I don't remember.  I don't think I was present.

20 Q    So how is it that you know that Nilson hired Julian?

21 A    Because he was part of the kitchen staff.

22 Q    So because he was part of the kitchen staff, you believed

23 that Nilson must have hired him?

24 A    No, I know it for a fact that he had to -- through Nilson

25 for a kitchen staff to get hired.

1  Q    Please tell me how do you know it for a fact if you did

2  not observe it?

3  A    Because he is the manager for the kitchen.

4  Q    So again, based on your assumption that he is the manager

5  of the kitchen, that is what you are basing your belief that

6  Mr. Sacardi hired Julian?

7           MR. HONG:  Objection.

8           THE COURT:  Overruled.

9  A    No, I know it for a fact because I hire for the -- staff

10 for the floor and I mean there is nobody else that is going to

11 be hiring for the floor staff.  Same thing for the kitchen.

12 Nilson had the final say on which personnel to hire.

13 Q    Were you present at any time when Nilson offered someone

14 a job?

15 A    When he offered, no, but I saw him bringing Leila for an

16 interview with Hudson.

17 Q    Let's talk about the interviews.

18        Were you present at any of those interviews?

19 A    I went to some of them but I wasn't basically there to

20 hear what the interview was about.

21 Q    Isn't it true you also weren't listening to what was

22 being said during the interviews that you are talking about?

23 A    Yes, I didn't hear what the interview was about.

24 Q    So you didn't hear any of the interviews and you were

25 never physically present when Nilson Sacardi offered anyone a

*Lim/Cross/Goldberg*                                    283

1    job, is that correct?

2              MR. HONG:  Objection.

3              THE COURT:  Overruled.

4    A    I witnessed the interview because I knew that there was a

5    vacancy for a position in the kitchen, so whenever there

6    was -- I mean anybody that we didn't know couldn't enter the

7    kitchen without anyone's approval.  And after I saw that

8    person, the new person in the kitchen, then after they would

9    have the interview with Nilson, then he would bring in the

10   application.  That's why I knew that Nilson was responsible

11   for hiring people.

12   Q    But you didn't hear any questions that Mr. Sacardi asked

13   at any interviews, did you?

14   A    No.

15   Q    And you didn't hear any responses that were given into

16   any possible questions that Mr. Sacardi might have asked, did

17   you?

18   A    No.

19             THE COURT:  Why did he give the applications to you?

20             THE WITNESS:  Because I had to put it in the

21   computer and he didn't know how to use the computer and I was

22   responsible for the payroll.

23   Q    Mr. Lim, you testified that you spent half your day in

24   the kitchen, correct?

25   A    Yes.

1  Q    And yet you testified that your responsibilities were

2  hiring and firing for the floor, disciplining, overseeing the

3  customer complaints, doing the payroll and doing the schedule

4  for the floor -- doing the schedule for the floor, is that

5  correct?

6  A    Yes.

7  Q    What would be the reason that you would go into the

8  kitchen?

9          MR. HONG:  Objection.

10         THE COURT:  I don't recall the answer so I'll

11 overrule it.

12 A    If there was some problem with the food or if there were

13 some items missing or it finished, then I would talk to

14 Nilson.  If not, when it was busy, I had to bring in the

15 plates as well just to help out.  There was an office in the

16 basement that I had to go do some bookkeeping in, writing

17 checks, and I had to go through the kitchen to go to the

18 basement to talk to Leila about missing salads and stuff, so I

19 would be in and out constantly.

20 Q    If there was a problem with the salad bar, you would go

21 and you would talk to Leila about the salad bar, is that

22 correct?

23 A    Yes.

24 Q    And if there was a problem with the grilled meat being

25 too dry, you would talk to the grillers?

1   A     Yes.

2   Q     And if the grilled meat wasn't coming out well, you would

3   go and talk to the grillers, is that correct?

4   A     Yes.

5   Q     And if there was something spoiled on the salad bar, you

6   would talk to Leila, correct?

7   A     Yes.

8   Q     And if there was a problem with the sushi -- withdrawn.

9          If there was a problem with the sushi that was

10  coming out, you would talk to the person responsible for

11  making the sushi?

12  A    I would either talk to them directly or I would tell

13  Nilson.

14  Q     Mr. Lim, you were not present when Claudio was fired, is

15  that correct?

16  A    I don't recall.

17  Q     You can't recall whether you were present or not?

18  A    Yes.

19  Q     And you were the one to say to Angelo that the restaurant

20  no longer wanted him to work there, is that correct?

21  A    Yes.

22  Q     And you had actually spoken with Angelo four to five

23  times about his drunkenness, isn't that correct?

24  A    Yes.

25  Q     Mr. Hong asked you about correcting individuals in the

1  kitchen.

2          Isn't it true you can't remember any specific

3  incidents where Mr. Sacardi corrected Leila, is that fair to

4  say?

5  A    Yes.

6  Q    And you can't recall any corrections that he ever made to

7  the grillers?

8  A    Yes.

9  Q    And you can't recall any time when he corrected the sushi

10 guy?

11 A    Yes.

12 Q    And there is only one correction that you remember with

13 Sergio, is that correct?

14 A    Yes.

15 Q    And that had to do with plantains, is that correct?

16 A    Yes.

17 Q    Now, at your deposition, I had asked you about what

18 individuals Nilson Sacardi had corrected and you had indicated

19 that Leila, you couldn't remember any about Leila, you only

20 remembered one about Sergio, you couldn't recall any about the

21 grillers, nor could you remember any with regard to the sushi

22 guy, correct?

23 A    Yes.

24 Q    And at that time, you recall there was four to five times

25 where you remember him correcting Armando, correct?

1   A     I don't know if I said four or five times.  I don't

2   remember that part.

3   Q     On that day I asked you whether there were any other

4   specific people or specific incidences where you remember that

5   Nilson Sacardi correcting anyone.

6              Do you recall that?

7   A     Can you repeat the question.

8   Q     On that day, I had asked you whether there were any other

9   specific incidences that you could remember where Mr. Nilson

10  Sacardi had corrected someone.

11             Do you recall that?

12  A     Yes.

13  Q     And you recalled, you said that there was no other

14  specific instances that you could recall?

15  A     Yes, because it wasn't nothing major.  It was little

16  things so it's not on my mind.

17  Q     Yet today during your testimony you membered Alejandro

18  and Sergio, is that correct?

19  A     Yes.

20  Q     So at your deposition which was on October 21st, 2001,

21  you couldn't remember it but for trial today, you could

22  remember those two names, is that correct?

23             THE COURT:  2011?

24             MS. GOLDBERG:  2011, October 21, 2011.

25  A     Yes.

1   Q    If a plate was dirty, you also would tell the dishwasher

2   that plate had come out dirty, is that correct?

3   A    Directly I would say, yes.

4   Q    And if there needed to be more meat, you would talk to

5   the butcher about having more meat on the floor, is that

6   correct?

7   A    Yes, I would help Nilson out, I wouldn't go to Nilson for

8   little things like dirty dishes because I know that he is

9   busy.

10  Q    I would ask that you answer my question.

11        That was not responsive to my question.

12  A    What was the question?

13        MS. GOLDBERG:  Could you please read back the

14  question, Mr. Reporter.

15        THE COURT:  Is it correct that you would talk to the

16  butcher about having more meat on the floor?

17        THE WITNESS:  I think I said yes to that.

18  Q    So if there were problems with the food on the floor, you

19  would go talk to the individuals who were responsible for

20  those items, is that correct?

21  A    Not all the time.  Only when he was busy.

22  Q    Do you know James Lee?

23  A    Yes.

24  Q    Wasn't James Lee floor manager before you?

25  A    He was a floor manager as well.

1   Q     So is it your testimony today that you and James were

2   both floor managers?

3   A     Yes, we worked in shifts.

4   Q     Did you leave the restaurant or were you terminated?

5   A     I was forced out.

6   Q     How were you forced out?

7   A     I was treated badly by the new owner.

8   Q     And who are you referring to when you say the new owner?

9   A     Daniel Lee.

10            MR. LEE:  Objection, your Honor.

11            THE COURT:  Let's think about that.

12            I'll sustain the objection to the extent that I'll

13   strike the word new owner.

14            I'll leave that he says that he was forced out by

15   Daniel Lee.

16   Q     When you say you were not treated well, can you explain

17   what you mean by that?

18   A     He would yell, slam the door and things like that.

19   Q     And that is why you left the restaurant?

20   A     Yes.

21   Q     Who was supervising you when you left the restaurant?

22   A     At the time there was already change in ownership and

23   Daniel was managing me.

24            MR. LEE:  Objection to form.

25            THE COURT:  He is giving his understanding.  You can

*Lim/Cross/Goldberg*                                              290

1    cross-examine him on it.

2    Q    How was Daniel Lee managing you?

3    A    He treated me poorly.

4    Q    I'm sorry?

5    A    He asked me, since it was his first time running the

6    restaurant, he asked me to get a list of the vendors to

7    make -- to show him how to do the payroll, to show him how to

8    do the scheduling.  He was gathering information about the

9    restaurant.

10   Q    Did Daniel Lee make any changes to the restaurant?

11   A    When I was there?

12   Q    Yes.

13   A    No, not that I know of.

14   Q    Since leaving the restaurant, you've spoken with Hudson

15   Kim approximately four to five times, is that correct?

16   A    Yes.

17   Q    Fair to say you are friends with Hudson Kim?

18   A    Yes.

19   Q    And fair to say that you are still on good terms with

20   Hudson Kim, correct?

21   A    Yes.

22   Q    Fair to say that if you ever felt like you needed him for

23   a reference, you could use Hudson Kim as a reference?

24   A    Yes.

25   Q    And is it fair to say that the four to five times that

1  you talked after you left, it was for the purpose of catching

2  up?

3  A     Yes.

4  Q     Would you talk about your personal lives with each other?

5  A     Just basic stuff, how I was doing, how was work.

6  Q     When you left, Hudson Kim authorized severance pay for

7  you, is that correct?

8  A     Yes.

9  Q     And he gave you three weeks salary, is that correct?

10  A     Yes.

11  Q     You hired Wellinson Mantini, is that correct?

12  A     Yes.

13  Q     And is it accurate to say that you and Nilson would be

14  the key people to talk about food and food matters for the

15  restaurant, is that accurate?

16  A     Yes.

17  Q     When you did the schedules on the computers --

18        Withdrawn.

19        THE COURT:  Ms. Goldberg, are we getting there?

20        MS. GOLDBERG:  We are.  If I can just have a moment,

21  I'm probably almost done.

22  Q     Mr. Lim, Cita did the laundry for the restaurant,

23  correct?

24  A     Yes.

25  Q     How often did you observe Mr. Sacardi take naps of the

1  restaurant?

2  A    Almost every day.

3  Q    And it's your testimony that those naps would be 30

4  minutes to an hour, is that your testimony?

5  A    I really don't know how many, the time that it took but

6  I'm guessing it's like half an hour to an hour.

7  Q    So you are guessing?

8  A    It can be more or less, I'm not sure.

9  Q    So it could have been 50 minutes?

10 A    Yes.

11 Q    It could have been 10 minutes?

12 A    Yes.

13             (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION (CONT'D.)

2    BY MS. GOLDBERG:

3    Q    Did you open the restaurant on the Valentine's Day that

4    you wrote the receipt for Nilson for, Exhibit 10?

5    A    I don't remember if I opened.

6    Q    Do you recall when Nilson Sacardi arrived that day?

7    A    I don't recall the time.

8    Q    Did Mr. Sacardi cook most of the dishes for the hot bar?

9    A    He had other people cook for him as well.

10   Q    Again that's not my question, I'd ask that you answer my

11   question.  Did Mr. Sacardi cook most of the dishes for the hot

12   bar?

13   A    He had his assistant cook.

14        THE COURT:  Just answer her question.  Did he cook

15   most of the dishes for the hot bar?

16        THE WITNESS:  Yes.

17        THE COURT:  If you don't know, you can say you don't

18   know.

19        THE WITNESS:  Yes, it is fair to say.

20   Q    And do you know whether any of the foods that he cooked

21   required one or two days preparation?

22   A    I wouldn't know, I don't know about cooking so.

23        MS. GOLDBERG:  I have nothing further, Your Honor.

24        THE COURT:  All right.  Any other defendants to

25   examine?

1              Mr. Lee?

2              MR. BAEK:  No questions, Your Honor.

3              THE COURT:  Thank you, Mr. Baek.

4    CROSS-EXAMINATION

5    BY MR. LEE:

6    Q    I'm Daniel Lee, one of the defendants in this case

7    representing myself.

8              John, would you say it is fair to say this may be

9    the tenth time we met?

10   A    I don't remember.

11   Q    Would you say under twenty?

12   A    I really didn't keep count, I don't know how many times

13   we met.

14   Q    When is the first time you met me?

15   A    You want the exact date or --

16   Q    That would be helpful?

17   A    I don't know the exact date but the first time that we

18   met was when you came into the restaurant to get a copy of the

19   liquor license I believe.

20   Q    When was that?

21   A    I don't know that date.

22   Q    Did you teach me payroll?

23   A    I showed you how to do the payroll.

24   Q    So, when we discussed payroll to learn the business, who

25   were the salaried employees?

1   A    It was myself, Gaspar and Nilson and the officers.

2   Q    Who were the officers?

3   A    Hudson, Mr. Kim and Mrs. Kim.

4   Q    So, those were the only ones who were salaried employees?

5   A    Yes.

6   Q    Why were -- why were they the only salaried employees?

7   A    Because they were managers.

8   Q    Did you pay me a salary?

9   A    No.

10  Q    When I was learning the business and asked you for

11  recommendation who could train me to learn the business on the

12  front, which staff members did you recommend?

13  A    I don't remember that question.

14  Q    So, you don't recall recommending a waiter, a meat runner

15  and a bus to train me to learn the business?

16  A    I believe you asked me -- I don't really recall the

17  question but I remember me referring to Efrain, Coco, Johnny

18  for the meat runners, Oswaldo.

19  Q    So, it is fair to say we had a short time together?

20  A    Yes.

21  Q    And in your own words you said I was there gathering

22  information, correct?

23  A    Yes.

24  Q    In your professional opinion, how long does it take to

25  learn a restaurant like Green Field Churrascaria, Inc.?

1          MS. GOLDBERG:  Objection.

2          THE COURT:  Sustained.

3   Q    During my due diligence and when I asked you who were the

4   decision makers, what was your response?

5   A    I don't understand the question.

6   Q    Who were the managers of the restaurant?

7          THE COURT:  He already answered that, go on to

8   something else.

9   Q    Do you have intimate knowledge of what goes in feijoada?

10  A    The basic ingredients I know.

11  Q    But it is fair to say you are not a cook?

12  A    No.

13         MR. LEE:  Okay.  That's it, Your Honor.

14         THE COURT:  All right.  Any redirect?

15         MS. GOLDBERG:  Your Honor, is there any possibility

16  I could do one more question on cross?

17         THE COURT:  Yeah.

18         MS. GOLDBERG:  One.  One question.

19         THE COURT:  Okay.

20  CROSS-EXAMINATION (CONT'D)

21  BY MS. GOLDBERG:

22  Q    Mr. Lim, is it fair to say that at your deposition you

23  testified that Mr. Sacardi during the week worked 9 a.m. to

24  4 p.m.; is that correct?

25  A    Yes.

1              MS. GOLDBERG:  Thank you.

2              Thank you, Your Honor.

3              THE COURT:  Any redirect?

4              MR. HONG:  Yes, Your Honor.

5    REDIRECT EXAMINATION

6    BY MR. HONG:

7    Q    Mr. Lim, you told Ms. Goldberg that Mr. Sacardi spent

8    much of his time physically at the restaurant cooking,

9    correct?

10   A    Yes.

11   Q    Did he do other things?

12   A    Yes.

13   Q    Such as?

14             MS. GOLDBERG:  Objection.

15             THE COURT:  No, I think it is fairly responsive.  I

16   mean it's probably going to be repetitive, you probably got

17   this out but if you want to, it's okay, you asked him mostly,

18   he's asking the rest.

19   A    That was just one part of his duties as head chef.

20   Q    And while he was physically cooking was he able to do --

21   withdrawn.

22             While he stood in the kitchen physically cooking was

23   he able to perform some of the other responsibilities as the

24   head chef?

25             MS. GOLDBERG:  Objection.

1        THE COURT:  What is the objection?

2        MS. GOLDBERG:  I don't understand that question, it

3    is a completely vague question, able to do some of the other

4    responsibilities.

5        THE COURT:  I'll sustain the objection.  Rephrase it

6    please.

7    Q    While Mr. Sacardi would cook in the kitchen did you ever

8    observe him giving out orders?

9    A    Yes.

10   Q    While he was cooking in the kitchen did you ever observe

11   Mr. Sacardi correcting other kitchen employees?

12   A    Yes.

13   Q    You also testified to Ms. Goldberg that you would at

14   times tell the butchers that the floor needed more meat?

15   A    Yes.

16   Q    Did other floor employees do that as well?

17   A    No.

18   Q    None of the waiters did?

19   A    No.

20   Q    Busboys didn't do it?

21   A    No.

22       MR. HONG:  I have nothing further.

23       THE COURT:  Anything else?

24       All right.  I have one question.  Did you get the

25   same kind of -- I don't mean the same amount but the same

1  occasions for bonus payments as Mr. Sacardi did, like on

2  Valentine's Day did he get one and you'd get one?

3             THE WITNESS:  Yes.

4             THE COURT:  Why is it that you're giving him a

5  receipt for the bonus payment that you mistakenly labeled

6  overtime in Plaintiff's Exhibit 10 but he's not giving you a

7  receipt?

8             THE WITNESS:  Because I was in charge of making the

9  payroll and any payment that's going out, it would be either

10 on a cash receipt for cash payments or in a computerized

11 payroll check I guess.

12            THE COURT:  Okay.

13            MS. GOLDBERG:  Your Honor, I have a couple of

14 questions based on redirect.

15            THE COURT:  That's fine but don't repeat yourself.

16            MS. GOLDBERG:  I'm not going to repeat myself, just

17 on this.

18 RECROSS-EXAMINATION

19 BY MS. GOLDBERG:

20 Q    What are some of the -- you just testified a moment ago

21 that while Mr. Sacardi was cooking he would also be correcting

22 the employees.  What specific individual as you sit here today

23 do you recall him correcting while he was cooking?

24 A    I don't remember the specific names.

25 Q    What percentage of Mr. Sacardi's time do you believe was

1   spent cooking?

2   A      At least 60 or 70.

3              MS. GOLDBERG:  Nothing further, Your Honor.

4              THE COURT:  Okay.  All right.  You may step down.

5   Thank you very much.  Let's take short break we'll reconvene

6   at 3:05.

7              (Time noted:  2:50 p.m.)

8              (Recess taken.)

9

10

11             (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Be seated please.

2          All right.  Mr. Hong, any further witnesses?

3          MR. HONG:  Yes, Your Honor.

4          THE COURT:  Okay.

5          (Witness takes the stand and is sworn by the clerk.)

6    G A S P A R    A L L E N D E, having been first duly

7    sworn was examined and testified as follows:

8          MR. HONG:  Your Honor, would it be okay if my

9    previous witness stays and waits for --

10         THE COURT:  Yeah, he's fine.

11         THE CLERK:  Please state and spell your name for the

12   reporter.

13         THE WITNESS:  Allende, Gaspar, G A S P A R, last

14   name A L L E N D E.

15         THE CLERK:  You may be seated.

16         THE COURT:  You may inquire, Mr. Hong.

17   DIRECT EXAMINATION

18   BY MR. HONG:

19   Q    Good afternoon, Mr. Allende.  Would you state for the

20   record your address.

21   A    Yes, 1160 North Cornwall Avenue, apartment 224, Covina,

22   California, zip 91722.

23   Q    And how long have you been living there?

24   A    Around five months.

25   Q    Where did you live before that?

 1              THE COURT:  Does this matter?

 2              MR. HONG:  I guess it's not really important but --

 3              THE COURT:  If it is at all important, feel free to

 4    ask it.  I just can't imagine what his housing history has to

 5    do with the case but if it has something, please continue.

 6              MR. HONG:  Sure.  Thank you, Your Honor.

 7    Q    Are you employed now, Mr. Allende?

 8    A    Yes.

 9    Q    Where do you work?

10    A    In Green Field in California.

11    Q    And who is your boss?

12    A    Hudson Kim.

13    Q    Does that make your testimony here biased?

14    A    No.

15              MS. GOLDBERG:  Objection.

16              THE COURT:  Sustained.

17              Mr. Hong, get to it.

18    Q    Mr. Allende, did you ever work at Green Field

19    Churrascaria in Corona, New York?

20    A    Yes.

21    Q    When did you start working there?

22    A    Around 1997 until 2011.

23    Q    And when you began in 1997 what was your job?

24    A    A butcher.

25    Q    How long were you a butcher?

1   A      Around three to four years.

2   Q      And then after that what was your next job?

3   A      Supervisor.

4   Q      And how long were you a supervisor?

5   A      From 19 -- 2001 to around 2009.

6   Q      And then from 2009 to 2011 what was your job title?

7   A      Manager.

8   Q      What were your responsibilities as butcher at Green Field

9   in Corona, New York?

10  A      I cut the meat, prepare the meat for cooking and marinate

11  and sometimes order the meat supply.

12  Q      What about your responsibilities as supervisor?

13  A      Fixing things, like everything, if something broken in

14  the restaurant I'm in charge, also the cleaning.

15  Q      And your responsibilities as the manager?

16  A      Watching the people on the floor.

17  Q      Did you also make sure that things were working properly

18  as manager?

19  A      Yes.

20  Q      Mr. Allende, as a manager did you punch in and out a time

21  clock?

22  A      No.

23  Q      Why not?

24  A      Because we had the salary.

25  Q      And were there other managers at Green Field besides you?

1    A    Yes.

2    Q    Who were they?

3    A    John Lim, Nilson Sacardi and Hudson Kim.

4    Q    And do you know if any of them had to punch in and out a

5    time clock?

6    A    No.

7    Q    What was your salary as manager at Green Field?

8    A    $1,050.

9    Q    Do you know what Mr. Sacardi's salary was?

10   A    Around the same, $1,050.

11   Q    Did you ever manage the kitchen?

12   A    No.

13   Q    Who was the person responsible for managing the kitchen?

14   A    The chef, cook.

15   Q    Who was that?

16   A    Nilson.

17   Q    What were some of Mr. Sacardi's duties and

18   responsibilities?

19   A    Manage the kitchen, order the supply.

20   Q    Mr. Allende, do you know if Mr. Sacardi trained anybody

21   in the kitchen staff?

22   A    Yes.

23   Q    Did you witness this personally?

24   A    Yes.

25   Q    Who did he train?

1  A    Okay, specifically I remember Alberto.

2  Q    And what did Mr. Sacardi train Alberto in?

3  A    How to cook like specific Brazilian dish like black

4  beans, spaghetti, rice.

5  Q    Did Mr. Sacardi train anybody else?

6  A    Yes.

7  Q    And who was that?

8  A    I can't remember all of the names because they pass a lot

9  of people.

10       THE COURT:  Just answer his question as best you

11  can.

12  A    Gislania, Alberto.

13  Q    What did you witness Mr. Sacardi train Gislania in?

14  A    How to prepare, to cook also.

15  Q    Do you know if Mr. Sacardi trained anybody else?

16  A    Yes.

17  Q    Who?

18  A    Evilio?

19  Q    How did Mr. Sacardi train Evilio?

20  A    How to make bread.

21  Q    Did Mr. Sacardi train anybody else?

22  A    Yes.

23  Q    Who?

24  A    Mario.

25  Q    How did he train Mario?

Allende - direct - Hong                                    306

1   A    In how to cook the vegetable, potatoes, meat.

2   Q    Anyone else?

3   A    I don't remember the others' name.

4   Q    Okay.  Do you know if Mr. Sacardi gave orders or

5   instructions to any of the kitchen staff?

6   A    Yes.

7   Q    Can you name any of them?

8   A    To Evilio.

9   Q    And what directions or instructions did you see or did

10  you witness Mr. Sacardi giving to Evilio?

11  A    In how to prepare the bread and also tell him to bring

12  stuff from the basement for him to cook.

13  Q    Who else did Mr. Sacardi give orders to?

14  A    Alberto.

15  Q    And what sort of instructions or orders did he give to

16  Alberto?

17  A    In how to prepare also the food and how much salt he had

18  to add for cooking the rice.

19  Q    How much -- I'm sorry?

20  A    Amount for cooking the rice, the salt.

21  Q    Salt, okay.

22  A    Yeah.  And how long they had to cook the black beans.

23  Q    Anyone else?

24  A    Sergio.

25  Q    And what sort of orders did Mr. Sacardi give Sergio?

1   A      Also prepare the vegetable for him and bringing the stuff

2   from the basement also.

3   Q      Anyone else?

4   A      Gislania.

5   Q      What instructions would he give Gislania?

6   A      How to cook the specific Brazilian food.

7   Q      Anyone else?

8   A      Mario.

9   Q      And how did he instruct Mario?

10  A      Also how to cook the vegetable and how to fry it like

11  chicken.

12  Q      Anyone else?

13  A      I don't remember those names.

14  Q      Do you know if Mr. Sacardi ever hired workers?

15  A      Yes.

16  Q      Do you know who he hired?

17  A      Yes.

18  Q      Who did he hire?

19  A      Gislania.

20          THE COURT:  When you say he hired Gislania, what do

21  you mean by that?

22          THE WITNESS:  What do you mean?

23          THE COURT:  What do you mean he hired Gislania, how

24  did he do that?

25          THE WITNESS:  Okay.  He do -- okay.  First he told

1    me he need assistant cook, okay.

2              THE COURT:  Yeah.

3              THE WITNESS:  And he told me he had a friend and he

4    is going to bring to the restaurant for helping him to cook

5    and the next day she was there.

6              THE COURT:  Well, do you know if he made her the

7    offer to work there as opposed to somebody else making her the

8    offer to work there?

9              THE WITNESS:  No.

10             THE COURT:  So, when you say he hired her, you mean

11   he recommended her and next thing you know she was working?

12             THE WITNESS:  Yeah, actually he mentioned to me he

13   need assistant cook and he met her outside and the next day he

14   bring to the restaurant, because he's in charge of the

15   kitchen, he manage the kitchen and he needed people, he can

16   hire.

17             THE COURT:  Okay, fine.

18   Q    Did Mr. Sacardi hire anybody else besides Gislania?

19   A    Yes.

20   Q    Who was that?

21   A    Sergio.

22   Q    How do you know that Mr. Sacardi was the one who hired

23   Sergio?

24   A    Because say like when he need somebody in the kitchen he

25   mention actually I'm a friend of Nilson and he always mention

*Allende - direct - Hong*                                      309

1   when he need somebody, he mention to me I'm going to bring

2   somebody to help me in the kitchen, so he's in charge of the

3   kitchen so he can bring anybody when he need it.

4           THE COURT:  Let's suppose he wanted to bring 50

5   people, 50 friends of his to work in the kitchen.

6           THE WITNESS:  I mean not like that because, okay,

7   when somebody left or got fired and he need it he can bring

8   it.

9           THE COURT:  But what if he wanted to bring more?

10          THE WITNESS:  He know how many people we needed so.

11          THE COURT:  What if he wanted to pad the payroll and

12  bring more than was needed, would anybody stop him or would he

13  say I'm hiring 20 more people for the kitchen, could he do

14  that?

15          THE WITNESS:  If we need it, yes.

16          THE COURT:  If he thought you need it?

17          THE WITNESS:  Okay but definitely no.

18          THE COURT:  So, in your understanding of his role,

19  if he thought he needed 50 more people in the kitchen, he had

20  the complete ability to bring in 50 people and nobody could

21  argue with him?

22          THE WITNESS:  No.

23          THE COURT:  Okay.  Thank you.

24  Q    And he never did bring 50 employees?

25  A    No.

1   Q    Mr. Allende, do you know if -- I'm sorry -- did he hire

2   anybody else besides Gislania and Sergio?

3   A    Yes.

4   Q    Who else?

5   A    Geralda.

6   Q    And do you know how she was hired?

7   A    By always the same because he met her outside.  Actually

8   when he needed somebody like an assistant cook, somebody else

9   left or they get fired and he bring it, so he met her outside,

10  I don't know, and they told me we are friends and he need

11  somebody and he's going to bring so, and when he told me the

12  person was working so and that mean he supposed to do the

13  interview already so.

14  Q    Did he hire anybody else?

15  A    I don't remember right now.

16  Q    Do you remember if anybody Mr. Sacardi brought to be

17  hired wasn't hired?

18  A    No.

19  Q    Did Mr. Sacardi fire anybody?

20  A    Yes.

21  Q    Who do you know that he fired?

22  A    Angel Sangerima (ph).

23  Q    Is that one person?   I couldn't understand that name.

24       Is that one person?

25  A    Yes, one person.

1          THE COURT:  What is the name?

2          THE WITNESS:  Angel -- Angelo.

3  Q    Why did Mr. Sacardi fire Angel?

4  A    Angel came many times drunk.

5  Q    Did he fire anybody else?

6  A    Yes, was -- I don't remember his name, they called

7  Toby -- Mario.

8  Q    And why did Mr. Sacardi fire Mario?

9  A    Because he had argument with Mario about doing his duties

10 and Mario, he didn't did it right away and that's why Nilson

11 get mad and they fired him.

12 Q    What was Mario's job?

13 A    Help in kitchen, kitchen help.

14 Q    Kitchen helper.  Did Mr. Sacardi fire anybody else?

15 A    I don't remember, maybe one more people.  I don't

16 remember the name because a lot of people passing through.

17 Q    Do you know if Mr. Sacardi ever fired these two workers

18 or fired these two workers in particular directly?

19 A    Yes.  I mean directly, when he want to fire somebody,

20 okay, and we deliver the message to them, he doesn't see bad

21 people so they told me or they told John to -- he doesn't need

22 that people anymore so we can fire him.

23         MS. GOLDBERG:  Your Honor, I ask the answer to be

24 stricken, it is unresponsive to the question.

25         THE COURT:  Sustained.  Ask the question again

1   please.

2   Q    Did Mr. Sacardi tell employees directly "you're fired"?

3        MS. GOLDBERG:  Objection.

4   A    Directly, no.

5        THE COURT:  The question is did you ever hear him --

6        THE WITNESS:   Yes.

7        THE COURT:  -- tell an employee "you are fired,"

8   "you may not come back" or words to that effect?

9        THE WITNESS:  Yes.

10       THE COURT:  Okay.

11  Q    Did Mr. Sacardi ever correct kitchen employees?

12  A    Yes.

13  Q    And who did he correct?

14  A    Evilio.

15  Q    Why did he correct Evilio?

16  A    Because also that time the same, Evilio, he doesn't want

17  to do his duties, Nilson tell him to bring stuff from

18  downstairs and right away or sometimes he get upset with

19  Evilio because he didn't do the right cooking on the bread.

20  Q    Who else did Mr. Sacardi correct?

21  A    Alberto.

22  Q    Why did he correct Alberto?

23  A    He corrected him by almost the same but Alberto, how to

24  cook and sometime Alberto mixed some ingredient when he

25  cooking and Nilson corrected him.

1   Q    Did Mr. Sacardi correct anybody else?

2   A    Yes.

3   Q    Who?

4   A    That's -- what's his name, it was Mario.

5   Q    Why did he correct Mario?

6   A    Not Mario, it's Sergio, yes.

7   Q    Why did he correct Sergio?

8   A    Because also how to cut the meat and vegetable.

9   Q    Anyone else?

10  A    Not right now I don't remember those names.

11  Q    Was Mr. Sacardi also responsible for ordering supplies

12  for the kitchen?

13  A    Yes, he did.

14  Q    And what did he order?

15  A    Brazilian food supplies.

16  Q    Do you know how often he ordered these supplies?

17  A    Twice a week.

18  Q    Did he order these directly?

19  A    Yeah.

20  Q    Did he ever order supplies through other people at the

21  restaurant?

22  A    Yes.

23  Q    What would he order through other people?

24  A    With Leila, they order vegetable.

25  Q    Anything else?

1   A    Yes, the butcher guy, what his name, Semel (ph).

2   Q    And what would he order through Semel?

3   A    The meat he would need to prepare for cooking, chicken,

4   beef, pork.

5   Q    Anything else?

6   A    No.

7             MR. HONG:  Just one moment.

8             THE COURT:  Okay.

9             (Pause.)

10  Q    Mr. Allende, did the managers at the restaurant receive

11  any extra pay on special occasions?

12  A    Yes.

13  Q    What special occasions?

14  A    Like Mother's Day, Father's Day, all the holidays.

15  Q    And why would the managers receive extra pay?

16  A    Because we have more customers and so we receive bonus,

17  more sales in the restaurant.

18  Q    Were the hours extended on those days?

19  A    No.

20  Q    Did you ever receive bonuses?

21  A    Yes.

22  Q    Do you know if Mr. Sacardi received bonuses?

23  A    Yes.

24  Q    Do you know if Mr. Sacardi set the kitchen schedule?

25  A    Yes, he did.

1   Q    And how do you know this?

2   A    Because we put in the computer when he do actually write

3   the paper and he give it to me or John and we put it in the

4   computer.

5   Q    And do you know how often would Mr. Sacardi hand you the

6   written schedule for you to put in the computer?

7   A    Not often because on that time all the people stay in the

8   restaurant so it would be once a year, like that, maybe two,

9   three, no more than three.

10  Q    Did Mr. Sacardi ever need to receive approval for the

11  schedule that he made?

12  A    No.

13          MS. GOLDBERG:  Objection.

14          THE COURT:  Sustained.

15          Do you understand, Mr. Hong?

16          MR. HONG:  Yes.

17  Q    Did you ever disapprove of the schedule?

18  A    No.

19  Q    Why not?

20  A    Because he was in charge of the kitchen, he managed the

21  kitchen.

22  Q    Mr. Allende, do you know how often the menu changed at

23  the restaurant?

24  A    The menu change, buffet all the time change.

25  Q    I don't mean the food at the buffet but the food

1   offerings on the sit down menu?

2   A    We don't have menu in the buffet so we prepare the food

3   by like season, like vegetable when it is cheaper in the

4   season we prepare more vegetable or by the way -- or meat or

5   seafood, depend on the season.

6   Q    Okay.  So, you're saying that the menu would change by

7   the season?

8   A    Yes.

9   Q    And who would change the menu every season?

10  A    Nilson.

11  Q    And why would Mr. Sacardi do that?

12  A    Because he's in charge of the kitchen, he's the head

13  chef.

14           MR. HONG:  I have nothing further.

15           THE COURT:  All right.

16           Cross-examination?

17  CROSS-EXAMINATION

18  BY MS. GOLDBERG:

19  Q    Mr. Allende, when you were a butcher you ordered the

20  meat?

21  A    Yes.

22  Q    Now, did you testify that you -- withdrawn.

23           Did you ever manage the kitchen people?

24  A    Manage the people, no.  I managed the kitchen, I mean

25  like anything they need to fix or clean, yes.

*Allende - cross - Goldberg*                                317

1   Q    So, did you manage the kitchen?

2   A    Yes, the kitchen, not the people.

3   Q    How is it that you could manage the kitchen if you're not

4   managing the people?

5   A    I mean manage the kitchen, okay, I'm responsible for the

6   entire restaurant, anything they had to fix, so that's I mean

7   manage the kitchen.

8   Q    So, then would it be fair to say you considered yourself

9   kitchen and floor manager?

10  A    No.

11  Q    No?

12  A    No.

13          MR. HONG:  Objection, argumentative.

14          THE COURT:  Overruled.

15  Q    Mr. Allende, do you remember testifying on October 21st,

16  2001?

17          THE COURT:  2011?

18  Q    2011, excuse me.  Do you remember testifying?

19  A    Yes.

20  Q    And you remember that your deposition was taken?

21  A    Yes.

22  Q    And you remember you swore to tell the truth before your

23  deposition?

24  A    Yes.

25  Q    I'm going to read a part of that deposition, page seven,

Allende - cross - Goldberg                      318

1    line nine.  What were your --

2            THE COURT:  Question.

3    Q     Sorry.

4            "Question:    What were your responsibilities as

5    manager at Green Field Churrascaria?

6            "Answer:  Actually building maintenance.

7            "Question:    Anything else?

8            "Answer:    Yeah, manager of the people on the floor

9    and the people of the kitchen."

10           Do you recall saying that?

11   A     Yes.

12   Q     Were you terminated at Green Field Churrascaria?

13   A     Yes.

14   Q     And who terminated you?

15   A     Daniel Lee.

16   Q     And why did you feel that Daniel Lee terminated you?

17   A     What do you mean why?

18   Q     Why do you feel you were terminated?

19   A     Because I had argument with him and he fired me.

20   Q     And did that argument have to do with the fact that you

21   felt --

22           MR. LEE:  Objection Your Honor.

23   Q     -- individuals --

24           THE COURT:  What is the objection?

25           MR. LEE:  It's outside the scope of this case.

1          THE COURT:  Credibility?

2          MS. GOLDBERG:  Yes.

3          THE COURT:  Overruled.

4          Put the question again.

5   Q    Did that argument have to do with your telling Mr. Lee

6   that you felt that certain employees should have gotten paid

7   more for a holiday?

8   A    Yes.

9   Q    And you brought that to Mr. Lee's attention because you

10  felt certain employees were not compensated adequately enough,

11  isn't that correct?

12  A    That's correct, I spoke with you.

13          THE COURT:  You mean at your deposition you told her

14  this?

15          THE WITNESS:  Not in the -- in the deposition she

16  asked me that but before that I went to see Lauren Goldberg in

17  her office and I told that.

18          THE COURT:  You told that to her?

19          THE WITNESS:  Yes.

20  Q    In fact, you were thinking about suing the restaurant

21  because you felt that you had raised that complaint?

22  A    Not the restaurant, I told you I want to sue Daniel Lee

23  and you asked me also about Nilson.

24  Q    When did you get terminated?

25  A    Mother's Day, after Mother's Day.

*Allende - cross - Goldberg*                              320

1  Q    Was that Mother's Day of 2011?

2  A    Yes.

3  Q    And was your next job working at Green Fields (sic) in

4  California?

5  A    Yes.

6  Q    And when did you start work at Green Fields (sic) in

7  California?

8  A    After I came back from my country was around September,

9  yes, September, October, in September, August -- August and

10 September, those -- yeah, around September.

11 Q    September of 2011?

12 A    Yeah.

13 Q    Were you unemployed from the time that you were fired

14 until the time that you started working at Green Field in

15 California?

16 A    Yes.

17 Q    And who owns the Green Field in California?

18 A    Mr. Kim.

19 Q    And which Mr. Kim are you talking -- are you referring

20 to?

21 A    John Young Kim.

22 Q    And how is it you started working at the Green Fields

23 (sic) in California?

24 A    Okay.  He asked me for long time to go to California and

25 actually I never did because he was the owner over there in

1    Corona, New York so after I get fired and I decide to take a

2    vacation and Hudson Kim offered me a job.

3    Q    So, Hudson Kim called you and asked you whether you

4    wanted to work for the Green Field in California; is that

5    correct?

6    A    Yeah.

7    Q    Did you testify earlier that Hudson Kim is currently your

8    boss?

9    A    Yes.

10   Q    And so, you're still employed at Green Field Churrascaria

11   in California?

12   A    Yes.

13   Q    You testified that Nilson trained Alberto, Gislania and

14   Evilio and Mario; is that correct?

15   A    That's correct.

16   Q    You recall at your deposition you could only recall that

17   he trained Alberto, Gislania and Evilio, correct?

18   A    Yes.

19   Q    So, between the time of your deposition and your

20   testimony today you now recall that he also testified -- he

21   also trained Mario; is that correct?

22   A    That's correct, now I remember more.

23   Q    And how is it that you remember more given that it's

24   later in time?

25   A    Because at that time on deposition when it was the

1   deposition and I couldn't remember that day because something

2   else in my mind.

3   Q     But today you remember?

4   A     Yes.

5   Q     Now, Mario, you said he trained him to cook the

6   vegetables; can you tell me which vegetables he asked him to

7   cook?

8   A     Not to cook, to prepare.

9   Q     To train -- what vegetables he trained?

10  A     Tomatoes, onions.

11  Q     What else?

12  A     Carrot.

13  Q     Carrots?

14  A     Peppers.

15  Q     Peppers.  And do you recall what year did he train Mario?

16  A     It's around two to three years back.

17  Q     So, somewhere around 2008?

18  A     I don't remember specific day -- year.  Let's say before

19  2010.

20  Q     Before 2010?

21  A     Yes.

22  Q     And do you recall how Mr. Sacardi trained Mario with the

23  tomatoes?

24  A     Yes.

25  Q     How did he train him?

*Allende - cross - Goldberg*                                         323

1  A    Mario, the same way how to cut the tomatoes for preparing

2  the -- they call pina greta (ph).

3  Q    Did he show him how to slice the tomatoes?

4  A    Yes.

5  Q    Did he show him how to wash the tomatoes?

6  A    Yes.

7  Q    And with the onions, did he show him how to cut the

8  onions?

9  A    Yes, we have a machine.

10 Q    And peel the onions?

11 A    Say again.

12 Q    And did he show him how to peel the onions?

13 A    Yes.

14 Q    And with the carrots as well, how to wash and cut them

15 and peel them?

16 A    Yes.

17 Q    And he did the same thing with the peppers, is that your

18 testimony?

19 A    That's what I'm saying, yes.

20 Q    So, you recall that right now as you sit here today?

21 A    Yes.

22 Q    Was Gislania -- withdrawn.

23       Wasn't Gislania Nilson Sacardi's assistant cook?

24 A    Yes, she was.

25 Q    Mr. Sacardi was responsible for making the dishes in the

1   hot bar, correct?

2   A    Correct.

3   Q    And would it be fair to say that he spent most of his

4   time cooking?

5   A    Cooking and manage the kitchen, cooking, preparing the

6   food, cooking from 9 a.m.

7   Q    I would ask that you answer my question.  My question is

8   didn't Mr. Sacardi spend most of the time cooking?

9   A    Mostly, yes.  He's the head chef.

10  Q    During your deposition isn't it accurate that when I

11  asked you about -- when you were asked about which individuals

12  did Mr. Sacardi discipline, you recalled only Evilio; is that

13  correct?

14  A    That's correct.

15  Q    And yet today -- and yet today you remember several more

16  people --

17  A    That's correct.

18  Q    -- that he disciplined; is that correct?

19  A    Yes.

20  Q    Did you review any documents prior to today?

21  A    No.

22  Q    No.  Did you do any preparation for today's trial?

23  A    No.

24  Q    Now, you mentioned that with Evilio, he would correct

25  Evilio when Evilio didn't want to bring stuff from the

1   basement?

2   A     Yes.

3   Q     What stuff are you referring to?

4   A     Like rice or oil, heavy stuff.

5   Q     And approximately how many times do you recall

6   Mr. Sacardi disciplining Evilio for not bringing the stuff up

7   from the basement?

8   A     One or two times.

9   Q     And how many times do you recall him correcting Evilio on

10  the bread?

11  A     One time I saw him.

12  Q     And how many times do you recall him correcting Alberto?

13  A     Alberto he correct around maybe three to four times.

14  Q     And how many times do you recall him correcting Sergio?

15  A     Maybe the same, three to four.

16  Q     And can you tell me what exactly did he say to Sergio?

17  A     He tell a bad word first and then tell him you don't want

18  to do what I say and I'm going to fire you in bad words.

19  Q     Is that -- are those the words that he used to correct

20  Sergio?

21  A     Yes.

22  Q     And did you hear him say that three to four times?

23  A     Yes -- not all the four times but one time I hear.

24  Q     One time you heard that?

25  A     Yes.

1  Q    And what other comments do you recall Mr. Sacardi making

2  when he was correcting Sergio?

3  A    I don't remember specific words.

4  Q    Is it correct to say that Leila ordered the vegetables

5  for the restaurant?

6  A    Yes.

7  Q    So, if Nilson needed vegetables for his dishes he would

8  go to Leila, correct?

9  A    Yes, Leila, yes.

10  Q    When Mr. Sacardi would make out his schedules, what

11  exactly would he write down on the piece of paper that he gave

12  to you?

13  A    The date what they needed the people and the hours.

14  Q    I'm sorry, the day?

15  A    The date and the hours.

16  Q    The date and the hours?

17  A    Yes.

18  Q    Anything else?

19  A    No.

20  Q    You also had to talk to Angelo about his drinking two to

21  three times; is that correct?

22  A    That's correct.

23  Q    Did you fire any individuals from Green Field?

24  A    When Daniel Lee came, yes.

25  Q    What individuals did you fire?

1   A    Directly I didn't fire but Daniel Lee, they told me to

2   fire, it was Jose, the first -- the floor people.  I don't

3   remember the names but there were a few people, I mean more

4   than five.

5   Q    But --

6   A    Actually directly I didn't fire, I brought the message.

7   Q    Well, how many people did you bring the message to?

8   A    Maybe three, four, five maybe.

9   Q    And what?

10  A    I don't remember exactly.

11  Q    I'm sorry, I'm sorry, what did you just say?

12  A    I don't remember exactly.

13  Q    You don't remember the names as you sit here?

14  A    No.

15  Q    And those individuals that you brought the message to,

16  did you do this in November of 2010?

17  A    No.

18  Q    When did you bring the message to these people?

19  A    In 2011, I don't remember the specific -- specific day.

20  Q    Well, what year was it that you brought the message to

21  these people?

22  A    What do you mean?

23  Q    Well, you said that you didn't directly fire but you

24  brought the message to the people that they were being fired?

25  A    Yes.

1  Q   So, what year was it that you told these people they were

2  no longer wanted at Green Field?

3  A   In 2011.

4  Q   2011.  Just to make sure we're on the same page, you know

5  it's January 2012 now?

6  A   Yeah.

7          THE COURT:  So, you mean last year?

8          THE WITNESS:  Yes, last year.

9          THE COURT:  2011?

10          THE WITNESS:  2011.

11          THE COURT:  Okay.

12  Q   So, last year there were approximately four to five

13  people that you told that they were no longer -- they were

14  terminated from Green Field?

15  A   Yes.

16  Q   And today you remember one of those names?

17  A   Yes.

18  Q   And that's Jose?

19  A   Yes.

20  Q   You can't remember the other names?

21  A   No.

22          (Pause.)

23  A   Bruna, I remember that.

24  Q   You told Bruna that she was no longer wanted?

25  A   No, I didn't told her, the other manager told her.

1   Q    What other manager told her?

2   A    He was fired, I don't remember exactly the reason but we

3   just give the message to her.

4              THE COURT:  Who gave her the message?

5              THE WITNESS:  Excuse me?

6              THE COURT:  Who gave her the message?

7              THE WITNESS:  Tim, Tim Kutka was the other manager.

8   Q    So, Tim Kutka told Bruna that she was terminated from

9   Green Field?

10  A    Yes.

11  Q    Do you know why she was being terminated?

12  A    I don't remember.

13  Q    Now, on direct examination you testified that Mr. Sacardi

14  hired various individuals, correct?

15  A    That's correct.

16  Q    Now you're stating that Mr. Sacardi hired those

17  individuals because Mr. Sacardi told you that he was going to

18  bring those individuals to the restaurant; is that correct?

19  A    Yes, correct.

20  Q    So, you never observed him offering employment to

21  anybody; is that correct?

22  A    That's correct.

23  Q    Do you -- it is also true that you cannot recall anyone

24  that Mr. Sacardi interviewed, is that correct?

25  A    That's correct.

1          THE COURT:  Can we pick it up a bit.

2          MS. GOLDBERG:  Yes, Your Honor.

3    Q    Were you present when Mr. Sacardi fired Mario?

4    A    No, I wasn't present that day.

5    Q    So, how is it that you know that Mr. Sacardi fired Mario?

6    A    When I came the next day Mario wasn't there, they told me

7    Mario was fired.

8    Q    And based on what you just said, you believe that Nilson

9    Sacardi fired Mario?

10   A    Of course, because he's head chef, he manage the kitchen.

11   Q    From what period of time did Evilio work at the

12   restaurant?

13   A    I don't remember specific date.

14   Q    Do you remember the years that he worked there?

15   A    No.

16   Q    Approximately?

17   A    No, but after 2010.

18   Q    After 2010?

19   A    Yeah, I mean before.

20   Q    Before 2010?

21   A    From 11 -- I don't remember specifically but it's 2000 --

22   let's say 2005 until 2010, on that time he was hired, Mario,

23   that period on those years.

24   Q    And when did Sergio work at the restaurant?

25   A    Sergio work until 2011.

1   Q    And when did Mario work at the restaurant?

2   A    I don't remember Mario, let's say from back, from 2010.

3   Q    Prior?

4   A    Yeah.

5   Q    How -- how --

6   A    2007, it could be seven, eight or nine.

7   Q    2007, eight or nine?

8   A    Yeah.

9   Q    And what specific orders do you remember Mario -- excuse

10  me, what specific orders do you remember Nilson Sacardi giving

11  Mario?

12  A    Specific orders he told him, because I pass him that day

13  in the kitchen, bring up like rice from the basement.

14  Q    And how many times do you recall Mr. Sacardi telling him

15  to bring up rice from the basement?

16  A    That I hear it, one time.

17  Q    Any other orders that you specifically recall Mr. Sacardi

18  giving Mario?

19  A    Yes.

20  Q    What other orders?

21  A    To cook the -- to fry up potatoes, french fries.

22  Q    To fry french fries?

23  A    Yes.

24  Q    Was Mario a fryer for the restaurant?

25  A    Yes.

1  Q    And how many times do you recall him -- how many times do

2  you specifically remember Mr. Sacardi ordering Mario to make

3  french fries?

4  A    Maybe three or four times a week.

5  Q    Is there anything else that you specifically recall?

6  A    No.

7  Q    And what do you -- what orders do you specifically recall

8  Mr. Sacardi giving Sergio?

9  A    To cut the vegetable to make pina greta.

10 Q    And how many times did you hear Mr. Sacardi order Sergio

11 to --

12         THE COURT:  Ms. Goldberg, I got this.  Do you really

13 feel you need to do this?

14         MS. GOLDBERG:  I don't know, Your Honor.  I'll move

15 on.

16         THE COURT:  Okay.

17 Q    Leila was in charge of the salad bar, correct?

18 A    That's correct.

19 Q    And if there was something missing from the salad bar you

20 would tell Leila, correct?

21 A    Leila and Nilson.

22 Q    Would you tell Leila and Nilson -- would you tell both of

23 them each time there was something missing from the salad bar?

24 A    No.

25 Q    No.  So, how often would you tell Leila that you -- that

1   there was something missing from the salad bar?

2   A    Not too often.

3   Q    Not too often?

4   A    No.

5   Q    So, is it your testimony that you would go to Nilson --

6   A    Yes.

7   Q    -- if there was something missing from the salad bar?

8   A    Yes.

9   Q    When Mr. Lee came to the restaurant in 2010, did he

10  introduce himself as the new owner?

11  A    To me, yes.

12  Q    Was there a meeting where he was introduced as the new

13  owner?

14  A    There was meeting but in that meeting he doesn't mention

15  he's the owner, he say he's a new management.

16  Q    Did you ever hear him say that he was the new owner?

17  A    To me, yes.

18  Q    And when did he say that to you?

19  A    When he came for the first time.

20  Q    And what did he say to you?

21  A    I'm the new owner.

22  Q    Who was the -- withdrawn.

23       Was John Lim -- was John Lim managing the kitchen

24  before he started managing the floor?

25  A    Not the -- not the people, he manage the floor people,

*Allende - cross - Goldberg*                                    334

1   okay, and he manage the kitchen but not the people of the

2   kitchen.

3   Q    Manage the food that's coming out --

4   A    Not the food, like something when we need to clean it, he

5   manage like that.

6   Q    Would it be fair to say that he would oversee and make

7   sure that the food was coming out of the kitchen --

8   A    No.

9   Q    -- properly?

10  A    No.

11  Q    No.

12         So, he would never check to see whether the salad

13  bar was properly supplied?

14  A    No.

15  Q    He would never check the hot bar to see whether there

16  were any dishes missing?

17  A    Of course, yes, I mean even the salad bar and the hot

18  dishes, yes, even me, it was -- something missing and we go

19  and we tell, oh, you're going to cook this for today or not

20  because if something is missing we go we don't have it so the

21  chef got to put it there.

22  Q    So, you're saying if there was something missing from the

23  salad bar, that the chef would replace what was on the salad

24  bar?

25  A    Not the salad bar, the hot dishes or the salad bar.

*Allende - cross - Goldberg*                                    335

1   Q    So, Mr. Sacardi was responsible for replacing the items

2   on the salad bar?

3   A    And the hot buffet.

4           THE COURT:  But she's asking about the salad bar;

5   was he responsible for replacing the dishes on the salad bar?

6           THE WITNESS:  No.  Directly, no.

7   Q    And who was responsible for replacing the items on the

8   salad bar?

9   A    Leila.

10          THE COURT:  I must tell you all these conclusions,

11  whether offered on direct of the witness or cross of the

12  witness, just don't strike me as that probative.  They're like

13  the witness' interpretation and I've got to find what actually

14  happened and what was done and I'm not sure anybody is telling

15  me that.

16          You may continue as much as you want.

17  Q    Who replaced the items from the salad bar when there were

18  items missing?

19  A    Leila.

20          (Pause.)

21          THE COURT:  Ms. Goldberg, you've got to wrap up

22  really.  These three to four minute pauses -- that's an

23  overstatement but the one to two minute pauses, there's just

24  too many and they are too long.

25          MS. GOLDBERG:  Okay, Your Honor, I'm trying my best

1    to hurry as quickly as possible.  I think I'm pretty much

2    done.  (Pause.)

3              No further questions.

4              THE COURT:  All right.

5              Anything from other defendants?

6              Mr. Baek?

7              MR. BAEK:  No questions, Your Honor.

8              THE COURT:  Mr. Lee?

9              MR. LEE:  Yes.

10             THE COURT:  Yes, sir.

11   CROSS-EXAMINATION

12   BY MR. LEE:

13   Q    Good afternoon.  I'm Daniel Lee, representing myself.

14             Gaspar, when did we first meet?

15   A    Actually I don't want to talk with you.

16   Q    When did this alleged firing happen?

17             THE COURT:  I'm sorry, wait.  Sir, you have no

18   choice but to answer his questions.

19             THE WITNESS:  Okay.

20             THE COURT:  Are we clear on that?

21             THE WITNESS:  Yes.

22   Q    I guess I'll ask the question again.  When did we first

23   meet?

24   A    2009 around -- I don't remember specific, September or

25   October when you came.

1    Q    Would it be fair to say 2010?

2    A    I mean -- yes, sorry.

3    Q    When did this alleged firing happen?

4    A    The last fire?

5    Q    When were you fired?

6              THE COURT:  When did he fire you?

7              THE WITNESS:  After Mother's Day, a week after

8    Mother's Day.

9    Q    Of 2011?

10   A    Yes.

11   Q    Was there anybody to witness this?

12   A    No.

13   Q    You don't like me, Gaspar?

14   A    Of course, because you punched me -- not you punched me,

15   you pushed me inside the office so I don't like you, of

16   course, you treat me bad.

17   Q    Do you have witnesses of this alleged pushing, punching?

18   A    No.

19   Q    Do you have a medical report of this alleged pushing?

20   A    No.

21   Q    Shoving?

22   A    No.

23   Q    Did you meet with Lauren Goldberg to sue me?

24   A    Yes.

25   Q    Who introduced you to Lauren Goldberg?

*Allende - cross - Lee*                                     338

1   A     I think it was Murphy.

2   Q     How does Murphy know Lauren Goldberg?

3            MS. GOLDBERG:  Objection.

4            THE COURT:  Sustained.

5   Q     Ultimately why didn't you sue me?

6   A     Because like you say, you pushed me inside the

7   office --

8            THE COURT:  No, he's saying why did you not

9   sue him.

10           THE WITNESS:  Oh, okay.  Sorry.  Because at

11  that time I had other problems with my family so I decide --

12  even I spoke with the lawyer and --

13  Q     Which lawyer, Gaspar?

14  A     Lauren Goldberg, somebody she recommend me, other

15  lawyer but after that I didn't do anything because I was

16  tired.

17  Q     Could it be possible you had no basis to sue me?

18  A     Of course I have basis.

19           THE COURT:  Stop.  Next question.

20  Q     Were you paid one week vacation from Green Field

21  Churrascaria?

22  A     Yes.

23  Q     Was John Lim paid one week vacation?

24  A     When Hudson Kim was there, yes.

25  Q     Was Nilson Sacardi paid one week paid vacation?

1   A     Yes.

2   Q     Was Alberto, the assistant cook of Nilson Sacardi, paid

3   one week paid vacation?

4   A     I don't know about Alberto.

5   Q     Would it be fair to say it was only the managers that

6   received one week paid vacation?

7   A     Yes.

8            MR. LEE:  That's it, Your Honor.

9            THE COURT:  All right.

10           Any redirect?

11           MR. HONG:  Yes, Your Honor.

12  REDIRECT EXAMINATION

13  BY MR. HONG:

14  Q     Mr. Allende, you testified that your job at Green Field

15  Churrascaria was to fix things?

16  A     Yes.

17  Q     Could you explain what you mean by that?

18  A     Okay, when something was need to fix like electricity or

19  any equipment in the kitchen or on the floor I fix it.

20  Q     Yet, you testified during the deposition, your deposition

21  in this trial or in this case that you managed the people in

22  the kitchen and on the floor?

23  A     Yes.

24  Q     Mr. Allende, did you instruct the kitchen employees in

25  any way?

1   A    No.

2   Q    Did you train the kitchen employees in any way?

3   A    No.

4   Q    Did you hire them?

5   A    No.

6   Q    Did you fire them?

7   A    No.

8   Q    Did you correct them?

9   A    No.

10  Q    Mr. Allende, why didn't you hire Lauren Goldberg?

11       MS. GOLDBERG:  Objection.

12       THE COURT:  It depends on the answer.  It could go

13  to credibility, it could rehabilitate him.

14       THE WITNESS:  Say again the question.

15       THE COURT:  I'll take the answer.

16       Go ahead.  Why didn't you hire her?

17       THE WITNESS:  Because she told me she cannot take my

18  case because she had already one case against Green Field and

19  actually I told her I don't want to do anything about Green

20  Field.

21  Q    Why did you tell her that?

22  A    I wanted to do something about Daniel Lee but not on

23  Green Field.

24  Q    Mr. Allende, you testified that you didn't observe

25  Mr. Sacardi offering employment to anybody, correct?

1   A     Say again.

2   Q     You testified that you didn't see Nilson actually

3   offering a job to anybody?

4   A     Directly, no.

5   Q     Why didn't you see that?

6             MS. GOLDBERG:  Objection.

7             THE COURT:  Sustained.

8   Q     Mr. Allende, why would you not observe Mr. Sacardi

9   interviewing anybody?

10            MS. GOLDBERG:  Objection.

11            THE COURT:  Well, I'll allow him to ask why

12  didn't you participate in job interviews that Mr. Sacardi

13  conducted.

14            THE WITNESS:  Okay.  Because he was the manager of

15  the kitchen, he was head chef and also he was my friend and

16  when he need somebody and actually he mentioned to me he need

17  somebody in the kitchen and the next day she was there so he's

18  supposed to talk already with the lady, interview on the

19  outside and he hired.

20            MS. GOLDBERG:  I would ask that answer be stricken

21  as non-responsive.

22            THE COURT:  No, I think it is responsive, I'm not

23  sure it is probative but it is responsive.

24  Q     So, Mr. Allende, by the time you learned about the new

25  hire the interview had already taken place?

1          MS. GOLDBERG:  Objection.

2          THE COURT:  Sustained.

3     Q    Mr. Allende, you testified during cross-examination that

4     Mr. Sacardi didn't replenish the salad bar directly, can you

5     explain that?

6     A    Directly because we have in charge Leila who was in

7     charge on the salad bar but he's chef, cook, he manage Leila

8     also so that's why it's not directly.

9     Q    And you also testified that John or you would check on

10    how clean the kitchen was, correct?

11    A    Yes, correct.

12    Q    And not Nilson?

13    A    Yes.

14    Q    Why is that?

15    A    Because we have food certificate, food qualification

16    certificate and that's why we do.

17    Q    Who had the food qualification certificate?

18    A    John and me and Hudson Kim.

19    Q    Nilson didn't have it?

20    A    No.

21         MR. HONG:  That's all I have, Your Honor.

22         THE COURT:  All right.

23         Anything else?

24         MS. GOLDBERG:  No.

25         THE COURT:  All right.  You may step down, sir.

1  Thank you.

2          (Witness steps down.)

3          THE COURT:  Mr. Hong, any other witnesses?

4          MR. HONG:  No, Your Honor.

5          THE COURT:  You're resting?

6          MR. HONG:  I am resting, Your Honor.

7          THE COURT:  Okay.

8          Mr. Baek, are you calling Mr. Kim?

9          MR. BAEK:  Yes, I am calling Mr. Kim and I have one

10  other witness.

11          THE COURT:  All right.  Let's not break it up.

12  Let's start tomorrow.

13          I'll tell you, Mr. Hong, I certainly will give you a

14  chance to convince me otherwise and I've still, of course, got

15  a completely open mind but in listening to the testimony of

16  these last two witnesses, it sounded to me like they were

17  saying -- the testimony was circular in that we know he hired

18  people because he's the manager, we know he's the manager

19  because he hired people, it was pretty short on specifics but

20  I don't know, maybe I'll hear who really hired these people at

21  some point and I'll know more.

22          All right.

23          Let's adjourn until 4:30 -- I'm sorry, until 9:30

24  tomorrow morning and with any luck we should finish the case

25  tomorrow.   Right?

344

1        Okay.  Start thinking about what you want to do in

2   terms of post-trial briefing.  My suggestion, but I'm open to

3   others, is going to be some short period of time for an

4   exchange, simultaneous exchange of post-trial briefs and then

5   a shorter period of time for an exchange of reply briefs to

6   those.  That's my suggestion but I'll hear from the parties

7   after you've had a chance to think about it.  See you tomorrow

8   at 9:30.

9        MR. HONG:  Thank you, Your Honor.

10        MS. GOLDBERG:  Your Honor.

11        THE COURT:  Yes.

12        MS. GOLDBERG:  Sorry, on this subject, are you --

13   are we prepared to do closing arguments then as well tomorrow

14   or is that going to be part of the written -- are they written

15   summations?

16        THE COURT:  I would recommend to you that you not

17   insist on closing argument, I'm not sure I'll let you close

18   even if you want to, and that the briefing would take the

19   place of that because I think your considered comments in

20   writing, perhaps even if someone would be so bold with the aid

21   of a transcript, is going to be more useful to me than

22   anything you might say based on your recollection of the

23   testimony at this point.

24        That's not to say that if someone feels strongly

25   about it and they really want to do a closing argument I won't

345

1  let them, I may not let them, but anyone who really wants to

2  will make a strong pitch tomorrow and if we finish early

3  enough in the day, and I think we will, if I'm going to allow

4  it then we'll do it tomorrow.

5            MS. GOLDBERG:  Thank you.

6            MR. BAEK:  Thank you.

7            (Time noted:  4:20 p.m.)

8            (Proceedings adjourned as above set forth.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

346

1                           I N D E X

2    WITNESS                                        PAGE

3

4

5          N I L S O N    S A C A R D I

6          CROSS-EXAMINATION (CONT'D.)        200

7          BY MR. BAEK

8          CROSS-EXAMINATION                  210

9          BY MR. HONG

10         CROSS-EXAMINATION                  218

11         BY MR. LEE

12         REDIRECT EXAMINATION               228

13         BY MS. GOLDBERG:

14         RECROSS-EXAMINATION                233

15         BY MR. BAEK

16

17         G U I D O N G    L I M

18         DIRECT EXAMINATION                 258

19         BY MR. HONG:

20         CROSS-EXAMINATION                  279

21         BY MS. GOLDBERG:

22         CROSS-EXAMINATION                  294

23         BY MR. LEE

24         CROSS-EXAMINATION (CONT'D)         296

25         BY MS. GOLDBERG

347

1    REDIRECT EXAMINATION                   297

2    BY MR. HONG

3    RECROSS-EXAMINATION                    299

4    BY MS. GOLDBERG

5

6        G A S P A R   A L L E N D E

7    DIRECT EXAMINATION                     301

8    BY MR. HONG

9    CROSS-EXAMINATION                      316

10   BY MS. GOLDBERG

11   CROSS-EXAMINATION                      336

12   BY MR. LEE

13   REDIRECT EXAMINATION                   339

14   BY MR. HONG

15              E X H I B I T S

16                                     PAGE

17

18   Defendant's Exhibit E                  203

19   Plaintiff's Exhibits 22, 23, 24        238

20   Plaintiff's Exhibit 19                 239

21   Plaintiff's Exhibit 25                 246

22

23

24

25