348

1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
     NILSON SACARDI,              :    10-CV-5605(BMC)
4                                 :
             Plaintiff,           :    U.S. Courthouse
5                                 :    Brooklyn, New York
                                  :
6         -against-               :    TRANSCRIPT OF
                                  :    TRIAL
7                                 :
                                  :
8                                 :    January 18, 2012
     GREEN FIELD CHURRASCARIA,    :    9:30 a.m.
9    INC, ET AL,                  :
                                  :
10          Defendant.
     - - - - - - - - - - - - - X
11
     BEFORE:
12                  HONORABLE BRIAN M. COGAN, U.S.D.J.

13   APPEARANCES:

14   For the Plaintiff:      LAUREN GOLDBERG, ESQ.

15

16   For the Defendant
     Green Field and
17   Young Dae Kim:          DAVID HONG, ESQ.

18
     Hudson Kim:             DANIEL D. BAEK, ESQ.
19

20   Daniel Lee:             DANIEL LEE, PRO SE

21

22   Court Reporter:    Holly Driscoll, CSR
                        Official Court Reporter
23                      225 Cadman Plaza East
                        Brooklyn, New York 11201
24                      (718) 613-2274

25   Proceedings recorded by mechanical stenography, transcript
     produced by Computer-Assisted Transcript.

349

1    THE COURT:  Mr. Baek, are you ready to proceed?

2    MR. BAEK:  I am, Your Honor.

3    THE COURT:  Let's go.

4    MR. BAEK:  We would like to call Ms. Leila Soares.

5    MS. GOLDBERG:  Your Honor, I am going to object.  I

6  found out this morning that Mr. -- it was confirmed to me this

7  morning that Mr. Baek plans to call Ms. Leila Soares by

8  telephone.  We discussed how the testimony would be taken at

9  the pretrial conference and it was agreed that it would be by

10  video conferencing.  I told my client that they had to arrange

11  it and there was -- that was it, that was what was decided.

12  It took a lot of effort and was extremely expensive and you at

13  the pretrial conference asked whether there was any objection

14  to taking the testimony via video conference.  There were no

15  objections and so you said, okay, the proponents will then

16  arrange it.

17        I, as I said, I believe that since it was discussed

18  and agreed upon that it would be by video conferencing that

19  Ms. Soares' testimony should not be taken.  I also do not know

20  whether there is a notary in Brazil that would be able to

21  swear her in for her testimony.

22        MR. BAEK:  Your Honor, I believe that's completely

23  untrue.  I respectfully refer Your Honor's attention to page

24  number six where I wrote:  Defendant seeks the Court's

25  permission to have Leila Soares' testimony to be conducted

350

1    telephonically or via Skype.  That's when the discussion

2    turned to the Court not allowing Skype and I tried --

3            THE COURT:  Mr. Baek, let me just interrupt you.  My

4    clear recollection is that we were talking about video

5    conferencing, not telephone conferencing.

6            MR. BAEK:  Your Honor --

7            THE COURT:  Whether by Skype or some other means, we

8    were talking about my looking at the witness, not having a

9    telephone call.

10           MR. BAEK:  Your Honor, I truly believe it was

11   telephonically and Skype and then the discussion turned to

12   whether or not Skype is allowed and we made it clear that

13   Skype doesn't -- is not allowed.  So, I've been speaking with

14   Mr. Breitman and we were trying to work it out but given that

15   Ms. Soares lives in a suburban area, it would take her two

16   hours by plane to go to where a video conference would be

17   allowed, I provided the telephone number to Ms. Clark two

18   weeks ago and --

19           THE COURT:  That's irrelevant, it's irrelevant, all

20   right.  Whatever you gave to Ms. Clark, I didn't know and

21   apparently Ms. Goldberg didn't know that you were thinking of

22   a phone call and testimony by a phone call to me is a

23   different thing.

24           Let me ask you some questions.  Why was her

25   deposition not taken pretrial?

1          MR. BAEK:  I believe on the JPTO my understanding is

2     that Ms. Goldberg had an opportunity to do so but she chose --

3          THE COURT:  But you want her testimony.  Why didn't

4     you take it pretrial?  (No response.)

5          Okay.  Next question.  Can't she get a visa to come

6     here?

7          MR. BAEK:  No, I don't think so, Your Honor.

8          THE COURT:  Why not?

9          MR. BAEK:  My understanding is that she overstayed

10    in America while working for Green Field and she cannot travel

11    to USA for a while.

12         THE COURT:  All the more reason why you should have

13    taken a deposition of her at the U.S. Embassy in Sao Paolo.

14         MR. BAEK:  I tried that, Your Honor.  She made it

15    clear that the U.S. Embassy will be about two hours by plane

16    from where she lives and --

17         THE COURT:  There's compulsory process in Brazil.

18         (Pause.)

19         THE COURT:  Under Federal Rule of Civil Procedure 43

20    I have the ability to allow testimony by telephone or video

21    conference.  I'm going to exercise my discretion under that

22    rule not to allow this testimony.  First of all, I'm not

23    comfortable evaluating the credibility of a witness, and there

24    are credibility issues in this case, on a telephone.  I don't

25    even know who this person is, I don't know who might be on the

352

1    other end of the phone.  I have to be able to look a witness

2    in the eye in order to evaluate credibility.

3              Number two, I see no effort to get this witness

4    pretrial.  A deposition could have been used to do that.

5              Number three, the fact that the witness has to

6    travel two hours, that's a relatively small inconvenience to

7    me and I think that there's been no showing that process was

8    unavailable in Brazil to get her to do that.

9              So, I see no reason why this testimony could not

10   have been done in a proper way.  I would also note to the

11   extent that the plaintiff might want to cross-examine the

12   witness with regard to documents, there's no ability to do

13   that on the telephone.  So, the testimony is excluded.

14             You may call your next witness, Mr. Baek.

15             MR. BAEK:  Thank you, Your Honor.  We call

16   Mr. Hudson Kim to the stand.

17             (Witness sworn by the clerk.)

18   H U D S O N    K I M, having been first duly

19   sworn was examined and testified as follows:

20             THE CLERK:  Please state your name for the reporter.

21             THE WITNESS:  Hudson Kim.

22             THE COURT:  You may be seated.

23             MR. BAEK:  Your Honor, can I have one moment?

24             THE COURT:  Let me say one more thing about that

25   ruling which is this, if within the next 30 days Mr. Baek is

1  able to obtain the witness' deposition either here or in

2  Brazil and if in Brazil, he pays the travel expenses of

3  Ms. Goldberg to get there to take the deposition, then I would

4  accept the transcript of that deposition into evidence.

5          MS. GOLDBERG:  Your Honor, to clarify, Mr. Baek

6  would have to pay for me to travel to Brazil; is that correct?

7          THE COURT:  Correct.

8          MS. GOLDBERG:  Thank you.

9          THE COURT:  Not your time charges, just your

10  expenses.

11          MS. GOLDBERG:  I understand that, Your Honor.  Thank

12  you.

13          THE COURT:  Go ahead.

14          Coach.

15          You may proceed, Mr. Baek.

16          MR. BAEK:  Thank you, Your Honor.

17  DIRECT EXAMINATION

18  BY MR. BAEK:

19  Q    Just for the record, could you please state your full

20  name.

21  A    Hudson Kim.

22  Q    And your date of birth?

23  A    September 2nd, 1970.

24  Q    Where do you live?

25  A    I live 3 Hunters Lane, Roslyn, New York 11576.

1   Q    And who do you live with?

2   A    I live with my wife and my two children.

3   Q    What do you do for a living now?

4   A    I'm a general manager in Green Field, California.

5   Q    Let's talk about the Green Field restaurant in Corona.

6   You were the general manager at Green Field Churrascaria in

7   Corona, New York, correct?

8   A    That's correct.

9   Q    What were your responsibilities?

10  A    I was responsible for all account payables, account

11  receivables, account cash, do payments, deposits, yes.

12  Q    Are there departments or subdivisions that the restaurant

13  is divided into?

14  A    Yeah, the restaurant is divided basically in floor and

15  kitchen.  The floor consist of everything relate to serve the

16  customers and the kitchen will be anything relate to the

17  preparation of food and receiving food, storing food, that

18  part of the restaurant.

19  Q    And there are managers?

20  A    Yes.

21  Q    Tell us about the managers?

22  A    There is like John Lim, he's the floor manager; there's

23  Nilson Sacardi, he's a head chef in kitchen; there's Gaspar

24  Allende who is the manager responsible for all the

25  maintenance, anything related to fixing, cleaning.

1   Q    And there's you, right?

2   A    Oh, yeah, there's me.

3   Q    Anyone else?

4   A    No.

5   Q    Okay.  Approximately how many customers did the

6   restaurant serve on a daily basis?

7   A    Monday through Friday, in a total combined Monday through

8   Friday would be around 400 to 500 people; Saturday, Sunday

9   when it was actually very busy, Saturday, Sunday combined 700

10  to 800 people in average.

11            THE COURT:  Over the weekend?

12            THE WITNESS:  Over the weekend.

13            THE COURT:  So, 400 to 500 during the week and an

14  additional 700 to 800 over the weekend?

15            THE WITNESS:  Yes.

16  Q    And how many chefs were there?

17  A    One.

18  Q    Who is that?

19  A    Nilson Sacardi.

20  Q    What is the exact title of Nilson Sacardi?

21  A    We call head chef in Portuguese we say chef de cuisine.

22            THE COURT:  It sounds like French.

23  Q    Did Chef Sacardi have any help?

24  A    Yes, he has the whole kitchen to help.

25  Q    How many people helped him?

1   A    Well, we have to count basically the whole kitchen so

2   that would be around 12, 12 to 15, 16 approximately.

3   Q    For the Court, could you -- do you recall -- could you

4   tell us some of their names and their positions and their

5   responsibilities just one by one?

6   A    The names, basically I cannot say exact name for all the

7   peoples but I remember all the -- basically their positions.

8   So, I could start from after Nilson there was --

9           THE COURT:  Before you do that, isn't there some

10  document that contains a list of all the employees that's kept

11  in the regular course of business?

12          THE WITNESS:  A document, the only document we could

13  say was maybe a schedule, they did it for a week or something

14  but nothing that we did that.

15          THE COURT:  Okay.

16  Q    If I showed you the Kitchen Employee Schedule would that

17  help you state the names and the responsibilities for the

18  Court?

19  A    Yes, it would.

20          MS. GOLDBERG:  Objection.

21          THE COURT:  To what?

22          MS. GOLDBERG:  I don't believe he testified that he

23  wouldn't be able to.

24          THE COURT:  Actually he said he wouldn't remember

25  the individuals but he would remember the functions so

1   Mr. Baek said, if I show you the schedule with the names and

2   functions, will that help you remember?

3            MS. GOLDBERG:  Thank you, Your Honor.

4            THE COURT:  He said it would.

5            MR. BAEK:  I'm sorry, Judge, one moment.

6            (Pause.)

7            MR. BAEK:  I'm marking the document called the

8   Kitchen Employee Schedule as Defendant's Exhibit E.  May I

9   approach, Your Honor?

10           THE COURT:  You may.

11  Q    Mr. Kim, I'm showing you what's been marked as

12  Defendant's Exhibit E.  Just please take a moment to take a

13  look at it.

14  A    Uh-huh, okay.

15  Q    Have you had an opportunity to read everything?

16  A    I see the names now.

17  Q    Okay.  I'm going to have it back.

18  A    Oh.

19  Q    Now, just one by one could you tell us the name, position

20  and their responsibilities?

21  A    Okay.  So, in the top there would be Nilson Sacardi, the

22  head chef of the kitchen.  Then direct under him it would be

23  another chef, we call him -- the closest translation would be

24  assistant chef, that his name is Alberto, he was working

25  directly with Nilson and working between schedule, when his

1   day off he would take over.  There would be two helpers,

2   Alejandro, one more, and they're both kitchen helper direct,

3   they work together with Alberto and Nilson in anything relate

4   to the finalizing or preparation of food.  There would be two

5   dishwashers downstairs.  There would be three salad people --

6   I remember one dishwasher's name is Armando, the other one I

7   don't know the name.

8   Q    What are the responsibilities of Armando?

9   A    He's one of the dishwashers.

10  Q    And anything else he would do?

11  A    And three salad people.

12  Q    No, my question was anything else Armando would do

13  besides doing the dishes?

14  A    Anybody in the kitchen is supposed to be helping Nilson,

15  so they're all helpers, we considered them help because like

16  Nilson would ask them to peel shrimp when he's not washing the

17  dishes, so one way or the other everybody was helping.

18          THE COURT:  Do you know of any instances where

19  Armando peeled shrimp?

20          THE WITNESS:  Oh, yes.

21          THE COURT:  Okay.

22          THE WITNESS:  Actually it was one of his duties.

23  Q    Basically you were talking about the salads before I cut

24  you off.

25  A    So, the three people on the salad, that would be Leila,

1    the salad chef, then it would be Mario who is working the

2    salad, help in the kitchen too; another person on the salad

3    but I don't remember his name.

4          Two butchers that are working anything related to

5    meat, they have to receive meat, sometimes order meat, like

6    anything be cut for him so he can prepare in kitchen, he cut

7    it because they have the band saw, the cutting bone machine in

8    the basement.  A laundry lady, her name is Cita, she would do

9    laundry, laundry, and she was doing like small things for

10   Nilson like unwrap separate bullions for the soup and sauce in

11   separate cubes so he can easily put in portion when he need to

12   cook.

13   Q    Anyone else?

14   A    There was the guy who work during the nights, Luis, who

15   would do the cleaning for the kitchen, the floor and even him

16   was helping Nilson to do -- watch overnight cooking like

17   turkeys Nilson has to do overnight so somebody have to stay

18   and look at the turkey, look in the oven, put the sauce over

19   so it doesn't dry up; black beans during the night Nilson

20   would leave overnight cooking so somebody would have to stay

21   looking at the water and filling up, the cooking of the black

22   beans.  Like I say, all these people would be considered

23   helpers in the kitchen.

24          MR. BAEK:  Your Honor, this document in question was

25   put on Mr. Hong's JPTO and it was not objected to.  I

1   respectfully admit this in evidence, Your Honor.

2           THE COURT:  Any objection?

3           MS. GOLDBERG:  No, Your Honor.

4           THE COURT:  Exhibit E is admitted.

5           (Defendant's Exhibit E received in evidence.)

6           MR. BAEK:  I'll just put it right here.

7           THE COURT:  Give it to my clerk please, I'd like to

8   look at it.

9           MR. BAEK:  Okay.  (Handing.)

10          THE COURT:  Okay, proceed.

11          MR. BAEK:  Yes, Your Honor.

12  Q    Mr. Kim, could you tell us about the hiring process of

13  Green Field Churrascaria, if any?

14  A    Yes.  For on the floor, if John need to fill any

15  position on the floor like waiters, meat runners or busboy he

16  would probably call the agents, work agents.

17  Q    Work agency?

18  A    Yeah, work agency.

19  Q    Okay.

20  A    To bring -- to send people to do interviews and but

21  normally he will go through the form that people fill it out

22  when they're looking for jobs personally so they fill it out

23  in the restaurant.  So, John would talk with people probably

24  in a section -- the section of the restaurant where it is very

25  close to the cashier and the office and he will probably talk

1    with those peoples and decide who he decide to add as the new

2    employee.

3              Well, in the kitchen -- well, the kitchen was much

4    simple, whenever somebody needs to work in the kitchen Nilson

5    just hired somebody and the person would be there working with

6    him like -- well, Nilson decided who he needed to work with

7    him so there was not I think a formal interview or anything,

8    at least what I saw.

9    Q    Mr. Kim, like give us an example like how would you know

10   that it was Chef Sacardi who just hired certain, like that

11   individual?

12   A    Well, it's kind of strange answering this question

13   because everybody knew that in the restaurant Nilson have like

14   complete control of the kitchen so he decide who he wants to

15   work in the kitchen with him so he never asked nobody for

16   authorization, he need to ask somebody to work with him.  So,

17   it's kind of funny, that question, and since it was brought up

18   with this lawsuit I kind of feel strange about that.  But

19   anyway, well, Nilson would like work -- be working in the

20   kitchen and have a new person work with him.  Like I was just

21   walking by and suddenly I see new people and Nilson would say,

22   oh, hi, Hudson, this is the new guy I hired, let me introduce

23   him but things like that, it was nothing like he was there

24   doing interview with people, he knew who he wanted to work

25   with.

1  Q    Like in that example, what did you do when Nilson said,

2  this is the guy working, the new guy?

3  A    Well, I say -- like one time like the dish washer, a new

4  dishwasher was working, somebody was working the dishwasher, a

5  new guy, a person that I never saw and Nilson was talking with

6  that person and he stopped me and said, oh, this is the new

7  guy I hired to work in place of someone, who else left the

8  job, and I just say, oh, well, nice to meet you, in Spanish,

9  mucho gusto.

10               THE COURT:  Who was that dishwasher?

11               THE WITNESS:  I don't know because dishwashers, they

12  would change so often but if it wasn't Armando, it was

13  somebody else.

14  Q    Any other time -- was that the only time or has there

15  been any other incidents where Chef Sacardi would just say

16  this is the -- tell you, this is the new guy I just hired?

17  A    Yeah, whenever I was stopping by in the kitchen, whenever

18  I was in the restaurant and for some reason I was just like

19  walking by Nilson or going through the kitchen because I have

20  to go to the office, Nilson was saying, ah, Hudson, come here,

21  this is my new assistant, kitchen assistant, he's going to

22  help me to work here.  Like, for example, one assistant chef

23  Nilson sent to California to work in the new restaurant my

24  father opened in Long Beach and he needed to fill that

25  position and basically after the assistant left the next day

1   there was somebody else already working and he told me like,

2   oh, this is Andre, and in Portuguese they say Ande (ph), he's

3   my new assistant, I just hired him, he's going to work with

4   me.  In that case he didn't work that long because I think --

5   I guess because he was much older than Nilson and he could not

6   handle the pace of the work but things like that were like how

7   I met people there.

8   Q    And, for example, Leila Soares was a kitchen employee,

9   right?

10  A    Yes.

11  Q    Would you say Chef Sacardi hired her?

12  A    Yes.

13  Q    And how would you know that, please tell us?

14  A    The first time I met Leila she and Nilson came to me, I

15  don't know why because -- or maybe I was on the floor or in

16  the office and Nilson just stopped by, say, oh, Hudson, this

17  is Leila, she's my new assistant cook, I just hired her to

18  fill the position, I think it was Geralda, I think it was

19  Geralda, and he just introduced me and I say, oh, nice to meet

20  you Leila; Leila, welcome to Green Field, like this.

21  Q    Have you personally observed Chef Sacardi conduct any

22  interview for the employment at Green Field Churrascaria?

23  A    No.  In terms of like John did it before?

24  Q    Yeah, sitting down --

25  A    No.

1   Q      -- and asking questions?

2   A      Not like that.

3   Q      Did you personally observe Chef Sacardi fire anyone?

4   A      Yes.

5   Q      Who is that?  And tell us about it.

6   A      Well, the whole case, remember Angelo, Angel, because

7   Angel work in the restaurant like almost the same time Nilson

8   was working so he was a very, a very good person, a very good

9   worker but like everybody know, he was fired because he was

10  coming drunk.  It went one or two, three or four times.

11  Nilson was always complaining to everybody that he had to send

12  Angelo to home because he would not handle the work because he

13  was too drunk and one day I heard that Nilson fired him and

14  but the thing, the most was said because Angelo came to me and

15  asked me to ask Nilson to give him another chance and I told

16  Angelo, you know that Nilson gave so many chances, it's not

17  the first time that happened so I cannot do anything about

18  that.

19          MS. GOLDBERG:  Your Honor, I would ask that the

20  hearsay part of that answer be stricken.

21          THE COURT:  Well, it's not really hearsay.  He's not

22  offering it to show that it's true that Nilson gave him more

23  chances.  I'll overrule the objection.

24  Q      Do you recall anyone else?

25  A      Personally, no.

1   Q     Did you personally observe Chef Sacardi supervise anyone?

2   A     Oh, yeah, of course every time, everybody for any type of

3   dish he was preparing the moment or anything he need be

4   prepared so he can cook later on he was giving to almost

5   everybody.

6   Q     Could you give us some specific examples, whom did he

7   supervise and for what matter?

8   A     Well, food preparation, the whole food preparation have

9   to be pre-prepared.  So, this restaurant is like all you can

10  eat restaurant buffet, so people go there, eat their food,

11  it's already served in a hot buffet and so whenever the tray

12  that contain the food is done they have to fill it right away

13  because we cannot be waiting because this is not an a la carte

14  restaurant, so all the food in the kitchen was already

15  pre-prepared.

16          Let me give you an example; the spaghetti, simple,

17  the most simple stuff, like Nilson would ask Alberto, Sergio,

18  whoever was working with him, to cook the whole spaghetti box

19  and they would prepare in a big kettle, big pot and fill up

20  that with the water, they cook.  After that they would remove

21  the big pot to cool it out, the spaghetti, and they put in

22  containers.  Then there's like sauce, probably Alberto would

23  be preparing, he was the most capable to prepare the sauce,

24  cook like -- ask somebody else to chop tomato for him so he

25  can start preparing the sauce and leave everything on the

1  side.  Everything was pre-cooked or prepared and put in the

2  refrigerator, whenever the kitchen need to refill one of the

3  trays like the spaghetti he would --

4  Q    Who is "he"?

5  A    Nilson.  Nilson will probably get the ingredients, the

6  spaghetti is in the refrigerator, put in the pan, like butter,

7  I don't know which one he put, and he finalized everything, he

8  just put his salt and whatever he need to know exactly what is

9  supposed to be the taste and he just asked somebody to put it

10  in a tray outside or he would do it himself.

11  Q    Did you personally observe Chef Sacardi supervise anyone

12  else?

13  A    Yes.  Well, everything depend of the dish what he's doing

14  because if something relate to meat, he has to place a meat,

15  we do ask Simone to cut some meat for him or unfroze (sic) the

16  rabada for him.

17  Q    What's rabada?

18  A    The oxtail.

19         MR. BAEK:  Spelled R A B A D A.

20  Q    And what is rabada?

21  A    The rabada is the dish we call the oxtail.  That would

22  come like frozen, somebody has to unfroze or somebody has to

23  cut it in pieces if it do not come in pieces and then it would

24  be Simone to cut it, then later on bring it to Nilson or to

25  Alberto, whoever was in the kitchen, they would cook the --

1  what do you call -- the rabada for I don't know how many hours

2  and then they would start the clean -- the cleaning probably

3  was Alejandro because he was a very -- took a lot of time.

4  Yeah, he was the one who do the vinaigrette.  So, probably

5  like cutting the fat, cleaning up and taking the fat, putting

6  it on the side and after everything is clean he would put in

7  refrigerator.  The sauce for that rabada probably would be

8  Alberto, Alberto was the one who would make the majority of

9  the dishes, and then he would prepare the sauce, like get the

10  pre-chopped tomatoes and start to cook the tomato sauce so he

11  can have all the substance of the sauce that needed to get

12  ready when Nilson need to actually cook the rabada and put the

13  rabada outside.

14  Q    By the way, who supervised Chef Sacardi?

15  A    Nobody.

16  Q    But somebody must have supervised him?

17  A    Well, the previous chef, cook, what's his name, the

18  person who before hire him and train him.

19  Q    Celso in 1997 --

20  A    Celso, he probably supervised him.

21  Q    I know but in like 2009 and 2010 who would supervise --

22  tell Chef Sacardi what to do, give orders to him?

23  A    Nobody could supervise him because he was the one who --

24  he's the guy who know what the kitchen is about.

25         Well, my father could supervise him but he never

1   did.

2   Q    Was your father at the restaurant in 2010?

3   A    Months -- like he stay like two weeks one time, then he

4   came another time, like maybe another month -- another week,

5   so maybe a month combined.

6   Q    It might be a repetitive question; did you personally

7   observe Chef Sacardi give orders to anyone, do you recall any

8   particular orders?

9            MS. GOLDBERG:  Objection.

10           THE COURT:  Sustained.

11  Q    Did you personally observe Chef Sacardi order supplies

12  for the kitchen?

13  A    Yes.

14  Q    Tell us.

15  A    Well, he order everything from the Brazilian supply

16  through the phone because the supplier always call the

17  restaurant looking for Nilson, so we knew that was the

18  supplier for the Brazilian products because they always look

19  for Nilson.  Well, he order sometimes the cans, he tell me

20  what he needed to -- me to buy for him in Restaurant Depot.

21  He was always ordering something.

22  Q    Did you personally observe Chef Sacardi order someone

23  else to order supplies on his behalf?

24  A    Yes.

25           MS. GOLDBERG:  Objection.

1          THE COURT:  Sustained.

2   Q    Did you personally observe Chef Sacardi tell others to

3   order the kitchen supplies?

4          MS. GOLDBERG:  Objection.

5          THE COURT:  What is the objection?

6          MS. GOLDBERG:  Your Honor, I think that these are --

7   these are leading questions.

8          THE COURT:  Sustained.

9   Q    Did you personally observe Chef Sacardi --

10         THE COURT:  If you're about to suggest the answer,

11  it will be leading again.

12         MR. BAEK:  I know, Your Honor, I apologize.

13         THE COURT:  Start the question with the word "what."

14         MR. BAEK:  Okay.

15         (Pause.)

16  Q    What kitchen supplies would Chef Sacardi tell others to

17  order, if any?

18         MS. GOLDBERG:  Objection.

19         THE COURT:  Overruled.

20  A    Yes, he would ask like Simone to buy meat for him.  He

21  would ask Leila to place order for the cans, like tomato

22  sauce.  He would ask me to buy things from Restaurant Depot

23  because whenever these delivery companies would not bring

24  everything, he would tell me that he's missing something and I

25  need to buy something for him.  Like I say, he ordered a lot

1  of things.

2  Q    By the way, what does the word churrascaria mean?

3  A    Churrascaria, the closest translation would be house of

4  barbecue.

5  Q    And how is that different from regular house of -- houses

6  of barbecue in America?

7  A    Well, barbecue in Brazil actually has a whole different

8  meaning, like here it's completely different from a steakhouse

9  because churrascaria is a place where people go, pay a fixed

10  price for their meal, they have their -- in their fixed price

11  everything included except drinks and desserts, so all the

12  salad bar and the hot food.  The barbecue is the main

13  differentiation of any type of restaurant.  The unique style

14  of this restaurant is people -- a person like a waiter but

15  he's not a waiter, we call them meat runner, we go in each

16  table and serve different style of meat, that is we grill or

17  we bake and we slice portions to each customers and since this

18  is a buffet, there is no regular menu, the hot food, the

19  salads, like it would change like seasonally every time of the

20  year because the whole concept of churrascaria is serve like

21  seasonal foods, seasonal foods, different type of foods in

22  every season of the year so that's why the restaurant never

23  can offer a regular menu for the customers.

24         The only definition of type of food we have is

25  description of what type of meat, even that sometimes the meat

H. Kim - direct - Baek                                    371

1   is not all there because different market or the suppliers

2   don't have any specific meat but normally it's just the meat

3   that follow the same, what can I say, regular menu.

4   Q     Thank you.

5              You said the dishes would change seasonally?

6   A     Yes.

7   Q     Would they change every season?

8   A     Yes.

9   Q     Could you give us -- could you tell us about that?

10  A     Yes, it purely depend like the season.  Like cold

11  weather, like in winter we don't serve that much seafood, one,

12  it is expensive and it is not traditional to eat like seafood

13  in the cold, at least for us in Brazil I mean.  And then in

14  the summer when it's hot people are ready to either like more

15  heavy stuff like -- I mean heavy stuff -- light food, like

16  more salads, more greens, like will completely depend of the

17  market too.

18  Q     And who would decide to change the dishes every season?

19  A     Nilson.

20  Q     Anyone else?

21  A     No.

22  Q     By the way, were you raised in Brazil?

23  A     Yes, I live in Brazil until I was 25, 27 -- 27.

24  Q     And then you came to America?

25  A     Yes.

1   Q     Did all the employees get hourly wages?

2   A     Yes, all the employees, yes.

3   Q     What about the managers?

4   A     Except the managers, yes.

5   Q     Did Gaspar Allende?

6   A     Gaspar Allende, John Lim, James before John Lim, Nilson,

7   I, my father, my stepmom, all these people received a salary.

8   Q     Did you keep the number of hours the non-managers worked?

9   A     Yes.

10  Q     And how?

11  A     We have a punch system that with a computer by the

12  entrance of the kitchen so that would be by the side of the

13  cashier so people who work have to start work, they have to

14  collect their card, their punch card in the wall that was

15  hanging on the wall, they slide the card and put it back, the

16  card, that's how we could know when you start to work and when

17  they are leaving the work.

18  Q     Would managers Gaspar Allende, John Lim, you, your father

19  and your stepmother also --

20  A     No.

21  Q     -- keep track of the number of hours?

22  A     No.

23  Q     And what about Chef Sacardi?

24  A     Of course not.

25  Q     Do you know how much the managers were getting paid

1    approximately?

2    A    Yes, all the same, about a thousand dollars.

3    Q    Chef Sacardi is responsible for making chicken wings,

4    right?

5    A    Yes, he was responsible for chicken wings, anything.

6    Q    What about -- let me just -- I'll just kind of give you

7    all the food.

8    A    Uh-huh.

9    Q    Would he be responsible for making spareribs, oxtails

10   chicken cutlets, paella, codfish, rice dishes, seafood soup,

11   feijoada and spaghetti?

12   A    Yes, of course.

13   Q    But what do you mean by he's responsible?

14   A    Well, one way or the other he has to supervise from the

15   beginning to the end, like receiving or the preparation or the

16   actual cooking, one way or the other he has to supervise that

17   because if we have a complaint in the restaurant, the waiter,

18   the floor manager would tell Nilson because he's the one who

19   know how to prepare that food.

20   Q    How many hours a day would Chef Sacardi spend his time

21   cooking?

22   A    Maybe half of his time, 50 percent maybe.  Maybe less,

23   I'm not sure.

24   Q    Like what would he do when he's not cooking?

25   A    Well, he has a lot of things to do, he have to show the

1   people what they're supposed to be preparing for him, he has

2   to talk with John frequently to find out what is the

3   reservation schedule, how many people are we going to have on

4   the weekend or the next week so he know how much he needs to

5   order.  They have like their regular meetings like every week,

6   almost every day whenever they are together.

7   Q    Well, why would he have a meeting with John -- it is John

8   Lim, right?

9   A    Yeah, John Lim, the floor manager.

10  Q    Why would he have a meeting with John Lim?

11  A    Well, how much he -- how come, he knows how much food he

12  needs to order, how much needs to get pre-prepared for the

13  weekend if he doesn't know how many people are coming in the

14  restaurant.

15  Q    And John Lim would know how many people are coming?

16  A    Yeah, because since he was floor manager he was

17  responsible to take all reservations and would be ready for

18  the customers when they come.

19  Q    And what time would Chef Sacardi come to work?

20  A    We open at 9:00, nine.  On the weekend maybe his schedule

21  is only in the afternoon.  So, normally during the weekdays he

22  would be going in the morning and leave in the afternoon.  On

23  the weekends he would probably come maybe -- Sunday maybe he

24  come early but Saturday I'm pretty sure he would come in the

25  afternoon and leave about 9, 10:00.

1    Q    Now, I want to get the clear picture.  So, Chef Sacardi

2    would come around 9:00, right?

3    A    Yes.

4    Q    What time does the restaurant open to the public?

5    A    Eleven o'clock.

6    Q    Eleven a.m.?

7    A    Yes, 11 a.m.

8    Q    Would that be in time for the lunch hour?

9    A    Yes.

10   Q    And what would Chef Sacardi do from the time he arrived

11   at the restaurant at 9:00 until 11, for example?

12   A    Okay.  So, he would go there, he'd go inside the

13   restaurant, he'd change his clothes, do whatever he need to do

14   to start to get ready to cook.  So, he will go back to the

15   kitchen and start to work with whatever his assistants were

16   working, Alberto, Alejandro, Sergio, whoever was with him in

17   the moment, and they would start to cook the food because they

18   have only two, three hours to just prepare food.

19          So, they would like be getting all this food already

20   pre-cooked, pre-prepared and just meats, everything, and by

21   11:00 was telling this day we have to get french fries because

22   we're going to have that amount of people, we need to have

23   this -- no, no, don't put this because it is dinner time menu,

24   just put like maybe not codfish, put the bulina (ph) -- in

25   English it's -- how do you call it.

1           THE COURT:  Soup stock?

2           THE WITNESS:  No, no, it's dumpling.  And, again,

3    telling people what they're supposed to prepare and he was, of

4    course, cooking because it was a short time so he needed to

5    get ready until 11:00.

6    Q    So, would it be fair to say all the hot buffet would be

7    ready for the customers at 11:00?

8    A    Yes.

9    Q    It would be filled?

10   A    Yes.

11   Q    Then what would Chef Sacardi do from 11 a.m.?

12   A    Well, since the moment he came in the restaurant and

13   finished to fill all the buffet it was very intense, you have

14   to work hard, he would go in the back, take a rest, take his

15   lunch or whatever he do, he go to the back section and do his

16   thing in the back.

17   Q    Where is this back in the restaurant?

18   A    The VIP section, the F section.

19   Q    And how long would he stay there?

20   A    For a while.  I could not say how long.  Maybe one hour,

21   one hour and a half, I don't know.

22   Q    Are any other employees allowed to go into the same

23   space, the same place?

24   A    No.

25   Q    Why not?

1   A    Well, everybody is working so they cannot go there.  I

2   don't know, they don't go there.

3   Q    So, what would Chef Sacardi do after he takes his rest in

4   the room?

5   A    Well, if he doesn't have more cooking to do because the

6   rest of the lunch hour will be very limited from 1 to like

7   maybe 1, 2:00 and then there would not be that much customers,

8   if it wasn't needed to refill any of the stations of the hot

9   buffet he would start to tell people in the kitchen that he

10  need -- that he need to make this ready, that ready so he can

11  start to maybe prepare another dish for the next cook -- the

12  assistant cook, Alberto, when at night he come he have

13  something to get ready to cook when the customers come in for

14  dinner; he was telling -- maybe depending on the day he would

15  check in the kitchen what he need to order, depend of the day.

16  He would talk with John, John Lim to see what is the schedule

17  of the restaurant.  He was doing his thing.

18  Q    Then what, would he go back to cooking?

19  A    Sometimes he was doing some preparation, yes.  Normally

20  he would be -- he would let the assistant to do the job or the

21  helpers or the people in the basement for him.

22  Q    And anything else?

23  A    Well, I believe that was whatever he need to do to get

24  the food ready and he was like for sure things -- like

25  everything was ready, everything was prepared, everything was

1    already told to them in the kitchen, he'd just go home.

2    Q    What time would that be?

3    A    It, depends like sometimes when he's not that busy maybe

4    one hour, two hours earlier.

5    Q    What time would that be?

6    A    Like, for example, if he come in during the week, his

7    schedule is supposed to be nine to four or five, he would

8    leave at 4:00, maybe 3:30, something, depend how much was

9    business.  Maybe in a weekend when he's supposed to be more

10   active at night because the business has more at night, by 9,

11   10:00 he probably would leave to go home.

12   Q    By nine or ten?

13   A    Yeah, he would -- like I think Saturdays he would come a

14   little later, like maybe 2 or 3:00.  I don't know exactly.

15   Q    Let's talk about Saturday for a second.  What time would

16   Chef Sacardi come on a Saturday?

17            MS. GOLDBERG:  Objection.  We've already had this

18   discussion, he's already testified his hours were --

19            THE COURT:  Sustained.

20            MR. BAEK:  Okay.

21            No further questions, Your Honor.

22            THE COURT:  All right.

23            Cross-examination?

24

25   CROSS-EXAMINATION

1   BY MS. GOLDBERG:

2   Q    Mr. Kim, do you recall testifying at your deposition in

3   this case on September 6, 2011?

4   A    Yes.

5   Q    And do you recall swearing to tell the truth before you

6   testified at your deposition?

7   A    Yes.

8   Q    I'm going to read part of your deposition, page 1 --

9   page 187, line 22, and then I'll continue on to page 188:

10          "Question:    Is it fair to say that Mr. Sacardi

11   usually worked till about ten p.m. every night?

12          "Answer:    Not every night but some nights, yes.

13          Would you say most nights?  Depends --

14          "Answer:    Depends on the schedule."

15          THE COURT:  Ms. Goldberg, if you slow down you're

16   more likely to get it right, okay, slow down.

17   Q          "Question:    Would you say most nights?

18          "Answer:    Depends on the schedule but, yes, most

19   of the time."

20          Do you recall saying that?

21   A    Yes, I think so.

22   Q    And you said that Sunday -- Sunday through Thursday the

23   restaurant was open till 11, 11 p.m.; is that correct?

24   A    Yes, correct.

25   Q    Again I'm going to read another part from your

1   transcript, from the transcript of your deposition.

2            (Pause.)

3   Q    This is page 22 -- sorry -- page 22 continuing on to page

4   23:

5            "Question:    John Lim, for what years was he floor

6   and kitchen manager?

7            "Answer:    I'm not sure when he started, he was

8   already there too but until 2010.

9            "Question:    Was he acting as floor and kitchen

10  manager from 2004 through 2010?

11           "Answer:    Yes."

12           Do you recall saying that?

13  A    Yeah, I might say that, yeah.

14  Q    Was James Lee the floor manager?

15  A    He was doing the same thing that John was doing.

16  Q    And do you recall again your at your deposition page

17  24 -- page 24, line six:

18           As the floor manager what were James --

19           THE COURT:  Question.

20  Q        "Question:    As the floor manager what were James'

21  responsibilities?

22           "Answer:    Well, oversee all the waiters, bus, meat

23  runners, everybody who works in the service area, prepare

24  their schedules, prepare their payrolls, oversee the

25  deliveries.  Basically anything regarding the service in the

1    restaurant, he was responsible for that.

2            "Question:   John Lim as the floor and kitchen

3    manager, what were his responsibilities?

4            "Answer:  Same as James, as the floor manager but in

5    the kitchen, he was overseeing like anything that happened in

6    the kitchen, like check if the kitchen is properly clean,

7    check because he had the Health Department certificate so he

8    could oversee those stuff because Nilson never got the health

9    certificate so he could not get the inspection from the Health

10   Department and those things John was the person responsible

11   for in the kitchen."

12           Do you recall saying that?

13   A    Yes.

14   Q    I'm going to read from your deposition, page 79,

15   beginning on line 22, continuing on to page 80.

16           "Question:  --

17           MR. BAEK:  I'm sorry, could you speak a little

18   louder.

19           MS. GOLDBERG:  Oh, sorry, page 79 beginning on line

20   22.

21           "Question:  Did you create work schedules for all

22   the employees?

23           "Answer:   No.

24           "Question:   Did anyone?

25           "Answer:   The manager does, my co-managers.

1              "Question:    Who were those?

2              "Answer:    John Lim and James Lim and lately after

3     James left Gaspar started to do it."

4              Do you recall saying that?

5     A     Yes.

6              MR. BAEK:  Your Honor, under FRE 106, if I'm not

7     mistaken, can I have Ms. Goldberg read the other half of

8     whatever she read.

9              THE COURT:  Any objection?

10             MS. GOLDBERG:  Well, when you say "the other half,"

11    I mean I've read --

12             THE COURT:  What portion?

13             MR. BAEK:  You stopped at page --

14             THE COURT:  Tell her what you want her to read.

15             MR. BAEK:  I want her to read the next question and

16    answer.

17             THE COURT:  All right.  Any objection?

18             MS. GOLDBERG:  Okay.  I'll read the next question

19    and answer.

20             "Question:    How often were the employees'

21    schedules created?

22             Basically --

23             THE COURT:  Answer.

24    Q     "Answer:    Basically almost every week because the

25    kitchen staff was always changing so Gaspar Nilson and John

1    has to sit down, check how the schedule worked for the

2    employees in the kitchen so they have to see what is the best

3    schedule especially in 2002 -- dot, dot, space, space -- we

4    have to let go so many people because the economy was so bad

5    at that time, we have to short the working hours for almost

6    everybody so in that time was almost every month Gaspar, John

7    and Nilson were sitting down to try to figure out schedule."

8              THE COURT:  Was that your testimony at deposition?

9              THE WITNESS:  Yes.

10             Your Honor, but can I  --

11             THE COURT:  No, you can't.

12   Q    Mr. Kim, do you recall that I asked you who the managers

13   were?

14   A    Yes.

15   Q    At your deposition?

16   A    Yes.

17   Q    And do you recall who -- do you recall Mr. Sacardi being

18   present at your deposition?

19   A    Yes.

20   Q    And do you recall him sitting next to me?

21   A    Yes.

22   Q    I'm going to read to you a portion of the -- another

23   portion of the transcript, page 20 beginning with line four

24   and then I will have to read a portion from page 21 as well.

25             MR. BAEK:  I'm sorry, which page, Ms. Goldberg?

1          MS. GOLDBERG:   Page 20.   Page 20 beginning with line

2     four.

3     Q          "Question:    Who were the managers from 2004

4     through 2010?

5          "Answer:    James Lee and John Lee -- John Lim,

6     excuse me, but just be clear, I had other managers, of course,

7     I had Gaspar Allende but he wasn't involved in the payroll, he

8     was more involved in like fixing, doing repairs there, oversee

9     the other employees too and checking supplies too, all those

10    things.

11         "Question:    From 2004 through 2010 aside from

12    James Lee, John Lim and Gaspar, were there any other managers

13    that you had at Green Field?

14         "Answer:    Yes, we had Orlaino Correia.

15    O R L A I N O, C O R R E I A.   We call him Lino (ph).

16         "Question:    So, you mentioned James, John, Gaspar

17    and Orlaino.   Were there any other managers during 2004

18    through 2010?

19         "Answer:    Oh, yes, he wasn't manager, he was more

20    like maitre d' but we considered them managers too because

21    they were responsible to take care of the employees too.   I

22    forget his name.

23         "Question:    We'll leave a space in the deposition

24    and when you think about it, if you remember it you can let us

25    know.

*H. Kim - cross - Goldberg*                              385

1           Page 21, line nine:

2           "Question:  Does Orlaino Correia sometimes go by the

3   name of Leo?

4           "Answer:    No, no, that's another individual.

5   They're the other one, Leo is the other man.

6           "Question:    That was the fifth person that you

7   were thinking of?

8           "Answer:    Yes."

9           Do you recall stating that?

10  A    Yes.

11          MR. BAEK:  Your Honor.

12          THE COURT:  Yes.

13          MR. BAEK:  May I ask Ms. Goldberg to also read on

14  the same page, page 21 starting with line 22.

15          THE COURT:  To where?

16          MR. BAEK:  Just that question and answer, Your

17  Honor.

18          THE COURT:  All right.  Any objection?

19          MS. GOLDBERG:  No, that's fine, Your Honor.

20          Page 21, line 22 you said?

21          MR. BAEK:  Yes.

22          MS. GOLDBERG:  "Question:    John was floor and

23  kitchen manager?

24          "Answer:    Yes, because before that time James and

25  John was working together, John was helping James with the

1   floor and in the kitchen he was helping Nilson.  He was help,

2   basically co-manager for both."

3           MR. BAEK:   Thank you.

4   Q    Your father left the restaurant in 2007; is that correct?

5   A    Yeah, he moved to California.

6   Q    And when he moved to California, is that when you started

7   overseeing the restaurant?

8   A    I started to have more responsibility, yes.

9   Q    And you supervised John Lim and James Lee, correct?

10  A    You can say I supervised, yes.

11  Q    Mr. Kim, from Green Field restaurant in Corona, New York,

12  how many employees have you kept in touch with?

13  A    After I stopped working?

14  Q    After you stopped working at the restaurant how many

15  employees did you keep in touch with?

16  A    Maybe eight, ten.

17  Q    Eight to ten.  And who were those individuals?

18  A    That would be John, Gaspar of course, Leila, Patricio,

19  Luis Nieves, Coco, Luis, the cleaning guy, whenever I need

20  help in my house I give him a call.  Basically that's it I

21  think.  Oh, yes, Cita.

22  Q    So, you've kept in touch with those eight individuals?

23  A    Yeah.

24  Q    How much time would you say you spent in the kitchen on a

25  daily basis?

1    A     That question is so difficult to answer precisely because

2    we are always walking by to the kitchen, we always talk with

3    people, you have to understand we're -- like everybody was

4    very friendly, everybody was talking with each other there so,

5    I don't know, maybe one time I was speaking with Leila for

6    more than normal, maybe I was talking with Nilson a little bit

7    more normal than the work supposed to be doing that but I

8    don't know, I would say maybe, I don't know, maybe ten, twenty

9    percent, I don't know, I really don't know for sure exact

10   numbers.

11   Q     At your deposition didn't you say -- didn't you say that

12   it was about 30 minutes?

13             MR. BAEK:  Can I have the page and line number

14   please?

15             MS. GOLDBERG:  I'm asking him a question, whether he

16   remembers testifying to that.

17   A     I might say that but I don't remember.

18   Q     Again, let me read from your deposition, page 76, line

19   24 -- line 22, excuse me.

20             "Question:   On an average basis how much time

21   would you say you did spend in the kitchen?

22             "Answer:   It's hard to say, I don't know, 30

23   minutes."

24   A     Yeah, probably I say that.

25   Q     And what would be the reasons that you would be in the

1    kitchen?

2    A    Talk to people.

3    Q    What people would you talk to?

4    A    Anybody that have something to say to me, I have

5    something to say to them or just normal conversation.

6    Q    What would you talk about during any of those

7    conversations?

8    A    Like Nilson was saying how my wife was, if my kids are

9    okay, or Leila was asking how is she doing, she's okay,

10   because she's having some problems with her family in Brazil.

11   I would ask Leila if she could prepare some, what you call

12   chicken dumpling because she do that in her house as for

13   catering for business, so I would ask her if she can prepare

14   food for my daughter's birthday or my son's birthday or I

15   could ask Nilson like how was the day, what are you going to

16   do for this weekend, do you have any plans, things like that,

17   just talking.

18   Q    So.  Is it fair to say that it would be -- you'd be

19   talking about personal lives?

20   A    Most of the time, yes.

21          THE COURT:  Ms. Goldberg, where are we going with

22   this?

23          MS. GOLDBERG:  We're moving on, Your Honor.

24          THE COURT:  It is not a deposition, all right, it is

25   a cross-examination, review the points, you make the points,

1   you go on to the next witness.

2   Q    You had grillers at the restaurant, correct?

3   A    Yes.

4   Q    And those grillers were responsible for making the meat

5   that was passed around to the customers, correct?

6   A    Yes, to cook the meat.

7   Q    And --

8   A    Grill the meat.

9           THE COURT:  Mr. Kim, you have to speak up so the

10  reporter can write down what you're saying.

11          THE WITNESS:  Okay.

12  Q    And the butchers were responsible for giving the meat to

13  the grillers to prepare, isn't that correct?

14  A    Yes, actually their task was to cut, skewer the raw meat

15  and leave it ready so the grill guys could go there, if

16  they're busy somebody would bring the meat to them.

17  Q    Again I'm going to read part of your transcript, page

18  145 -- 145, line two:

19          "Question:    Are you aware of any employees that

20  Mr. Sacardi fired?

21          "Answer:    No.  It wasn't direct from him.  I know

22  I had a complaint with one of the assistant one time he asked

23  to Gaspar talk to that person so that person could be fired.

24          "Question:    Did Gaspar follow through and fire

25  that person?

1        "Answer:    Yes, but I don't remember the name of

2   that person, I just remember the circumstance that happened."

3            Do you recall testifying to that?

4   A    Yes.

5   Q    Is it your testimony today that Mr. Sacardi fired Angelo?

6   A    Yes.

7   Q    And it's your testimony today that you personally

8   observed Mr. Sacardi fire Angelo?

9   A    Not personally but my testimony I knew about the firing

10  because Angelo asked me to ask Nilson to give him a second

11  chance.

12  Q    So, it's based on this comment that you're saying that

13  Angelo made to you that you believe Mr. Sacardi fired Angelo?

14  A    Yes, because Angelo was, like I told you, he was working

15  a long time there, we even help him to get his green card so I

16  was kind of surprised that actually Nilson would actually fire

17  him because he had like a very close relationship that he

18  worked so many times but I guess it was very bad because what

19  I heard.

20  Q    Mr. Kim, I'd ask you to answer my question.  Your answer

21  is nonresponsive.

22  A    Oh, yes.

23  Q    Based on Angelo's statement to you, is that your basis

24  for believing that Mr. Sacardi fired Angelo?

25  A    Nilson was the only one who could fire him so I have to

1   believe him.

2   Q    Could John fire individuals?

3   A    Yes.

4   Q    So, is it your testimony today that you would not be

5   introduced to a new kitchen employee until that person

6   actually started working?

7   A    What do you mean introduce, like come back introduce to

8   me a new person?

9   Q    Well, you testified earlier that you'd walk in the

10  kitchen and when you didn't know someone, Nilson would then

11  show you and introduce you to a new employee, is that not what

12  you testified to earlier?

13  A    No, no, no, Nilson would tell me, oh, by the way, Hudson,

14  this is the new guy.  He was telling me this was the new guy.

15            THE COURT:  Mr. Kim, listen carefully.  What she's

16  asking you is this, would you meet kitchen employees -- would

17  you know that a new kitchen employee had been hired before you

18  saw that employee in the kitchen?

19            THE WITNESS:  No.

20            THE COURT:  Would you know that?

21            THE WITNESS:  No, I wouldn't know.

22            Oh, I'm sorry, I would know when I see the payroll

23  because like kitchen work, I have separate cash and ask John

24  who is this person working in the kitchen and John would tell

25  me he's the new guy that Nilson hired.  That's the only way I

1   would know it too.

2   Q    Can you give me any specific names of people you know

3   that Mr. Sacardi hired?

4   A    By name I could say a few but I know for a fact that he

5   hired everybody else in the restaurant.  Should I give the

6   names?

7   Q    Please tell me the names of the individuals you know that

8   Mr. Sacardi hired.

9   A    Alberto, Sergio, Angelo, Simone, Armando, Cita, Leila,

10  Mario, people I remember, yes.

11  Q    Mr. Kim, do you remember -- withdrawn.

12         I'm going to read a portion of your transcript, page

13  142 -- page 142, line 14 -- line 12, excuse me.

14         "Question:   Can you please tell me the names of

15  the individuals who he hired.

16          "Answer:   Yes, basically Leila, the person you

17  just before, Geralda, Alberto.  Well, basically all the

18  staffing.  In my time of management basically everybody was go

19  through Nilson."

20         Page 144, line 12.

21          "Question:   Besides Leila, Geralda and Alberto can

22  you give me any other specific names of people that you know

23  Nilson Sacardi hired?

24          "Answer:   Not specific."

25         So, is it correct to say that at your deposition you

1  couldn't think of any other names besides Leila, Geralda and

2  Alberto that you knew specifically that Mr. Sacardi hired; is

3  that correct to say?

4  A    Yeah, I think so.

5  Q    But yet today at trial you think of several more that, in

6  fact, you know he hired?

7  A    Yes.

8  Q    And, again, it's your testimony that you know he hired

9  those people because Mr. Sacardi introduced them to you?

10 A    Yes.

11 Q    And Mr. Sacardi would introduce them to you in the

12 kitchen after they had already started working?

13 A    Yes.

14 Q    Mr. Kim, isn't it true that Mr. Sacardi's primary

15 responsibility was cooking the hot dishes for the hot bar?

16            MR. BAEK:  Your Honor, objection, that calls for a

17 legal conclusion.  I'm just --

18            THE COURT:  She asked what Mr. Sacardi's primary

19 responsibility was, how is that a legal conclusion.

20            MR. BAEK:  My understanding is the word "primary" is

21 actually the statutory word.

22            THE COURT:  I'm the fact finder, I'm not taking it

23 that way.

24            MR. BAEK:  Okay.  Thank you, Your Honor.

25            THE WITNESS:  Okay.  No, his primary function is to

1   run the kitchen.

2   Q    Mr. Kim, again I'm going to read a page from your

3   deposition, page 138:

4            Is it fair to say that Nilson Sacardi's primary duty

5   was to cook the dishes for the hot bar?

6            "Answer:   Yes.  Is one of his function.  Yes.

7            "Question:   Would you say that -- that was his

8   primary function?

9            "Answer:   Yes."

10           Do you recall giving that answer?

11  A    Yes.

12  Q    So, at trial here today are you now -- is it not fair to

13  say that you're changing your answer from what you testified

14  at deposition?

15           MR. BAEK:  Objection, Your Honor.

16           THE COURT:  Sustained.

17  Q    You testified earlier today, right, that you didn't know

18  that Mr. -- it was your belief that Mr. Sacardi did not

19  interview employees before they started; is that correct?

20  A    Interview, no.  I'm not sure if I understand the last

21  question.

22  Q    You stated that Mr. Sacardi, to your knowledge, did not

23  interview individuals before they were -- before they were

24  hired, correct?

25           MR. BAEK:  Objection.

1          THE COURT:  What is the objection?

2          MR. BAEK:  She's misstating the testimony.

3          THE COURT:  Well, the witness will tell us if that's

4    what he testified to.

5          MR. BAEK:  Okay, Your Honor.

6    A    Well, not in my knowledge, I didn't view personally the

7    interview if that's what you're saying.

8    Q    And Mr. Sacardi never disciplined anyone, isn't that

9    correct?

10   A    Well, Nilson is not like a person to discipline.  The

11   problem is when he get angry he curse a lot.

12   Q    Mr. Kim, I'd ask that you answer my question.

13   A    Yes.

14   Q    Isn't it correct that Mr. Sacardi never disciplined

15   anyone?

16   A    No, he disciplined.

17   Q    And who is it that he disciplined?

18   A    Well, the word discipline, I don't know if it is the same

19   thing but he was cursing somebody to not make something he

20   asked to do and that person basically would do and after he

21   got yelled at.

22         THE COURT:  Let me ask you this, did he ever dock

23   somebody's pay?

24         THE WITNESS:  Cut his payment?

25         THE COURT:  Yes.  Did he ever say:  I'm fining you

1  $50 because of something that you did, for example?

2        THE WITNESS:  No, he always told people like I'm

3  going to fire them if you don't do that, I'm going to find

4  somebody else.

5        THE COURT:  Did he ever change their shift as a

6  punishment?

7        THE WITNESS:  They send them home.

8        THE COURT:  He sent them home?

9        THE WITNESS:  Yeah.

10       THE COURT:  Who did he send home?

11       THE WITNESS:  Like Angelo several times.

12       THE COURT:  You heard him say to Angelo, "Angelo, go

13  home."?

14       THE WITNESS:  He told me I sent Angelo home because

15  he was drunk so I cannot let him cook the food.

16       THE COURT:  Okay.

17  Q    You're saying Mr. Sacardi told that to you?

18  A    Yes.

19  Q    So, you didn't actually witness Mr. Sacardi telling

20  Angelo to go home, correct?

21  A    No.  I wasn't --

22  Q    Again I'm going to read from your deposition, page 139 --

23  A    I'm sorry, I do remember one case.  He was yelling with

24  Armando because Armando didn't do his job, I think it probably

25  was the peeling of the shrimp, and Nilson told him to do it

1    right away or he going to get fired, yeah, and Armando did

2    everything what he asked for.

3    Q    How many times did you hear him do that?

4    A    I heard him screaming with Armando, then I went and

5    checked what happened, yeah.

6    Q    So, you're testifying this is something you heard once?

7    A    The screaming, yes for this matter of discipline or

8    whatever, yes.

9    Q    I'm going to read from your deposition, page 139,

10   line 20:

11            "Is it fair to say that Mr. Sacardi never

12   disciplined anyone?

13            "Answer:    No.

14            "Question:    He never disciplined anyone?

15            "Answer:    No, that was one of the complaints

16   because he was very nice with everybody."

17            Do you recall testifying to that?

18   A    Yeah.

19   Q    Did there come a time when Daniel Lee was introduced to

20   the restaurant as the new owner?

21   A    Yes.

22            MR. BAEK:  Your Honor, objection, that's beyond the

23   scope of the direct.

24            THE COURT:  Well, he's a party witness, she could

25   recall him in her rebuttal case if she wanted to.  We'll

1    eliminate that.  I'm going to let her go ahead with the

2    question.

3              MR. BAEK:  Thank you, Your Honor.

4    Q    And can you tell me when that was?

5    A    End of September 2010 -- no, 2010, yes.

6    Q    And can you tell me who was there when Daniel Lee was

7    introduced as the new owner?

8    A    That's -- he was introduced to me, I came back from

9    California and he was already there.  My father told me that

10   there will be somebody in the restaurant and that person will

11   be the new guy, the new owner.

12   Q    Did your father say to you that he -- withdrawn.

13             Did Daniel Lee fire John Lim?

14             MR. LEE:  Objection, Your Honor, hearsay.

15             THE WITNESS:  I wasn't present.

16             THE COURT:  Overruled.

17             Do you know whether Daniel Lee fired John Lim?

18             THE WITNESS:  Just from John.

19   Q    And do you know -- withdrawn.

20             Did there come a time when you gave Daniel Lee the

21   key to your father's office?

22   A    Yes.

23   Q    And when was that?

24   A    In the middle of October.

25   Q    And why did you do that?

1   A    Because I was ordered to.

2   Q    And who ordered you to do that?

3   A    My father.

4   Q    And who was overseeing the restaurant in October of 2010?

5   A    I guess my father and Daniel.

6   Q    And who was overseeing the restaurant in November of

7   2010?

8   A    Daniel.

9   Q    Is it fair to say that you were overseeing the restaurant

10  through September of 2010?

11  A    Yes.

12       MS. GOLDBERG:  Your Honor, just one more minute but

13  I'm almost wrapping up, if I could have just one more minute.

14       (Pause.)

15  Q    Isn't it true that Mr. Sacardi would make fresh new

16  dishes for dinnertime service?

17  A    Yes.

18  Q    And isn't it true that sometimes Mr. Sacardi would have

19  to make dishes over because the dish would run out at the hot

20  bar?

21  A    Over?  What do you mean?

22  Q    He would have to make it again, he would have to make it

23  another time because the dish ran out at the hot bar?

24  A    Yeah, of course, yeah.

25  Q    And isn't it true that some of Mr. Sacardi's dishes

1   required him to prepare a day or two in advance?

2   A    I could say all the dishes have to be cooked in advance,

3   cooked previous to that day of the actual cooking.

4   Q    Mr. Sacardi ordered from Triunfo once a week, isn't that

5   correct?

6   A    Once, twice, he was always ordering every week.

7   Q    But isn't it true that it was usually once a week?

8   A    Usually, yes.

9   Q    And Mr. Sacardi would order by making a telephone call;

10  is that correct?

11  A    No, he was receiving a phone call, he never called.

12  Q    He would order by receiving a phone call; is that

13  correct?

14  A    Yes.

15  Q    And how long would his phone conversation be?

16  A    Well, sometimes it was very big or sometimes he was just

17  chatting because -- sometimes it was very long conversation

18  because the supplier, Joao, and they were talking.

19  Q    On average would you say it would be approximately five

20  to ten minutes?

21  A    Yeah, it could be.

22  Q    Well, I'm asking would that be a fair average, five to

23  ten minutes?

24  A    I don't know average.  I know that sometimes they were

25  talking, sometimes they were just getting the order.

1  Q    What was the longest phone conversation that you ever

2  observed Mr. Sacardi have with Triunfo?

3  A    Numbers, maybe five, ten minutes, I don't know about

4  that.

5  Q    Isn't it true that the restaurant served approximately

6  the same amount of people every week?

7  A    No, because especially the restaurant in New York through

8  December until May or June or beginning of June we have more

9  business, I mean more customers but through after that, after

10 July 4th Independence Day all the way close to December the

11 business was very slow, so we at least -- it's very drastic

12 amount of people that we receive during the different time of

13 year.

14 Q    So, would you say from December to June it would be

15 somewhat consistent?

16 A    It's not consistent but in overall it was much better.

17 Q    What do you mean overall it was much better?

18 A    I mean if you count like the average of people we get

19 from one month, it would go over the amount of the other

20 month, like from the December to May, June, it would be, what,

21 maybe we can count like maybe 30,000, 20,000 people in a

22 month; the other month, like the slowest month would be much

23 lower, maybe 18, 15, depends, I don't know.

24           THE COURT:  Are we there yet?

25           MS. GOLDBERG:  Very close.  Very close.

1           (Pause.)

2               MS. GOLDBERG:  No further questions.

3               THE COURT:  All right.  Any other questioners?

4               Mr. Lee?

5               MR. LEE:  Yes, Your Honor.

6    CROSS-EXAMINATION

7    BY MR. LEE:

8    Q    My name is Daniel Lee.  I am defending myself on this

9    matter.

10              Hudson, when did we first meet?

11   A    End of September 2010.

12   Q    Is it fair to say that you were at the restaurant five

13   times a week until April 2011?

14   A    April 2011, some weeks yes, some weeks no.

15   Q    Can you recall your deposition that you gave?

16   A    Yeah.

17   Q    I'd like to read from page 173.

18   A    Uh-huh.

19              THE COURT:  Line?

20              MR. LEE:  Let me get it.

21   Q    Page 173, lines 22 to page 174, line two:

22              "Question:   So, until about April of 2011 you were

23   still going to the restaurant five days a week?

24              "Answer:   Yes.  Well, my father wanted me to stay

25   going there until he was sure that Daniel could take over the

1    business without any problem."

2            Is that accurate?

3    A    Yes.

4    Q    Did you show me how the restaurant worked?

5    A    Yes.

6    Q    So, from what period did you show me how the restaurant

7    worked?

8    A    Maybe until November.

9    Q    Of what year?

10   A    2010.

11   Q    Again, I'd like to read from your sworn testimony.

12           Please verify if this is correct, referring to page

13   203, lines two to four:

14           "Question:   So, from September to June you showed

15   Daniel how the restaurant worked?

16           "Answer:   Yes."

17   A    Say it again.

18   Q       "Answer:   Yes."

19   A    No, no, the period of time you're talking.

20   Q    So, from September to June --

21   A    June.

22   Q    Is that an accurate statement?

23   A    Yes, yeah, it would be.

24   Q    If I were to show you some bank statements from the

25   restaurant, would you be able to recognize them?

1  A     Yes.

2              MR. LEE:  Your Honor, can I approach the witness?

3              MR. BAEK:  Your Honor, objection, irrelevant.

4              THE COURT:  I don't know if it is relevant or not.

5  Right now he's just showing him bank statements.

6              They have to be marked as exhibits, Mr. Lee.

7              MR. LEE:  I'd like to mark --

8              THE COURT:  You can't just show documents.  Don't

9  tell me what you want to do, get them marked and then tell the

10 witness I'm showing you exhibits and then you'll show him a

11 number.

12             (Pause.)

13             MR. LEE:  I believe we're at Exhibit G.

14             So, I'm going to mark as Exhibit G, Your Honor --

15 can I approach the witness?

16             THE COURT:  You can.

17             MR. LEE:  (Handing.)

18             (Pause.)

19 Q     Do you recognize those bank statements?

20 A     Yes.

21 Q     Can you explain to the Court what they are?

22             MR. BAEK:  Objection.

23             THE COURT:  I'm sorry, what is the objection?

24             MR. BAEK:  That's for the purpose of refreshing

25 recollection.

*H. Kim - cross - Lee*                                          405

1          THE COURT:  How do we know that?

2          MR. BAEK:  Isn't that what Daniel Lee stated?

3          THE COURT:  No, he didn't say that.  All he said so

4   far is, I'm showing you some bank statements, can you identify

5   what they are.

6          I'll hear in a minute what they are.

7          MR. BAEK:  Okay.  I apologize, Your Honor.

8          THE COURT:  All right.

9          What are they, Mr. Kim?

10          THE WITNESS:  Bank account -- statements from I

11   believe either from the operation account or the payroll

12   account, yeah -- no, payroll accounts.

13   Q    What period are those bank statements?

14   A    November 30, 2010.

15   Q    Whose signature are on those checks?

16          (Pause.)

17   A    That's mine, yeah.

18   Q    Is it true that only managers received one week paid

19   vacation?

20   A    Yes.

21   Q    Who were those managers that received one week paid

22   vacation?

23   A    John Lim, Gaspar Allende, Nilson Sacardi, yes, those are

24   the managers, and I.

25   Q    When I was trying to learn the business, who did I  --

1   who did you tell me the decision makers of the restaurant

2   were?

3   A    Say again the question please.

4   Q    When I was trying to learn the business, who did you say

5   the decision makers of the restaurant were?

6   A    When I met you, you told me that you going to be in

7   control and I'm going to be keeping you --

8           MR. LEE:  Your Honor, that's not the question.

9           THE COURT:  I agree but the question was improperly

10  phrased.

11          It presumes that he told you, Mr. Lee, who the

12  decision makers of the restaurant were.  Maybe he didn't tell

13  you that.  So, you have to first ask him:  Did you tell me who

14  the decision makers were.

15          Did you tell Mr. Lee when you were training him or

16  making him familiar with the business who the decision makers

17  of the business were?

18          THE WITNESS:  Are you talking about managers?

19          THE COURT:  If you don't understand the word

20  "decision makers" I can understand that, just say so.

21  Q    Well, let me --

22          THE COURT:  Stop.

23          MR. LEE:  Okay.

24          THE COURT:  Do you know what he means by the word

25  "decision makers," is that a word you ever used with him?

1          THE WITNESS:  No --

2          THE COURT:  Okay.

3          Next question.

4   Q    When I was trying to learn the business and asked you who

5   the key personnel were, who did you respond?

6   A    The managers and head chef, those are the people know how

7   the restaurant operated.

8   Q    Can you please name their names at the time that I was

9   there, who those managers were as of September 27th, 2010?

10  A    John Lim, Gaspar Allende, Nilson Sacardi.

11         MR. LEE:  Thank you.

12         That's it, Your Honor.

13         THE COURT:  All right.

14         MS. GOLDBERG:  I have two more questions.  Can I be

15  permitted to ask him two more questions?

16         THE COURT:  Yeah.

17         MS. GOLDBERG:  Thank you, Your Honor.  Sorry.

18         THE COURT:  Really, I mean the cross-examination was

19  so protracted before, I really should not allow you to do this

20  but if it is really two questions, you can have those.

21         MS. GOLDBERG:  It is two questions, Your Honor.

22  CROSS-EXAMINATION (CONT'D.)

23  BY MS. GOLDBERG:

24  Q    Mr. Kim, during the course of this litigation did you

25  write a note to Leila in which you said:  Leila, I hope all is

1   well with you.  Thanks for all the years of hard work and care

2   that you gave for the work in the restaurant for me

3   personally.  Remember that the door is always open if you

4   need.

5            Did you write such a message to Leila?

6   A    Yes.

7            MR. BAEK:  Objection, Your Honor.

8            THE COURT:  Sustained.

9            MR. BAEK:  Also I ask the Court to strike.

10           THE COURT:  Why?  Questions are not evidence.

11           MR. BAEK:  Thank you, Your Honor.

12  Q    Does your father own the Green Field Churrascaria in

13  California?

14  A    Yes.

15           MR. BAEK:  Objection, Your Honor.

16           THE COURT:  Where is this going?

17           MS. GOLDBERG:  That's it, Your Honor.

18           THE COURT:  I think I knew that.  All right.

19  Overruled.  I have the answer.

20           MS. GOLDBERG:  Thank you.

21           THE COURT:  Any redirect?

22           MR. BAEK:  Yes, Your Honor.

23           THE COURT:  Okay.

24           THE WITNESS:  Excuse me, I have this (indicating.)

25           THE COURT:  What is that, the bank statements?

1           THE WITNESS:  Yes.

2           THE COURT:  Mr. Lee, come get the bank statements

3    you gave him.

4           (Pause.)

5    REDIRECT EXAMINATION

6    BY MR. BAEK:

7    Q    Ms. Goldberg asked you the following question during the

8    cross-examination:  Can John Lim fire individuals?  And your

9    answer was:  Yes.

10          Let me ask you another question.  Can John Lim fire

11   the individuals in the kitchen?

12          MS. GOLDBERG:  Objection.

13          THE COURT:  What is the objection?

14          MS. GOLDBERG:  Your Honor, I believe this question

15   is leading.

16          THE COURT:  I don't think so.

17          You may answer.

18   A    No.  The only thing he can do --

19          THE COURT:  Excuse me, there's no question pending.

20          Next question.

21   Q    At the deposition you testified that Orlaino was one of

22   the managers.  What is the exact title of Orlaino?

23   A    We actually -- I never call Orlaino as a manager until

24   this day in court, we only call him as a maitre d'.

25   Q    What is the difference between maitre d' and manager?

A     Well, the maitre d', his only concern is to make the

customers be welcome.  He has to spend time with the customers

talking, receiving those people and plus organize the waiters

and the meat runners, whenever they have to sing Happy

Birthday to the customers, things related to the serving of

the customers.

Q     But would you consider Orlaino as a manager?

A     Well, the closest definition we can say is manager.

Q     Would you call -- withdrawn.

I would ask you a question like who are the managers

and your answer would include Chef Sacardi; would you call

Chef Sacardi manager?

MS. GOLDBERG:  Objection.

THE COURT:  What is the objection?

MS. GOLDBERG:  Again leading.

I mean clearly Mr. Baek here is just wanting to ask

questions to feed him yes or no answers, that's what's going

on here, rather than the way a redirect should be done.

THE COURT:  I agree.

I also consider it of no probative value that this

witness would put a label manager on Mr. Sacardi.  Obviously I

know that's his position.  I don't need to hear him express an

opinion.

Go ahead.

MR. BAEK:  Okay.  If I may have just one moment, I'm

1   just trying to clarify that during the cross-examination she's

2   trying to impeach my client's credibility for not including

3   Orlaino as the manager and also including Chef Sacardi as a

4   manager where at the deposition he didn't.

5          MS. GOLDBERG:  Your Honor --

6          MR. BAEK:  He didn't ask (sic) Chef Sacardi as

7   manager.  I'm trying clarify during my redirect why he would

8   do such a thing.

9          THE COURT:  Ask him why did you characterize him

10  this way in the deposition.

11         MR. BAEK:  Okay.

12         THE COURT:  Ask him that.

13         MS. GOLDBERG:  Your Honor, I would also say that a

14  long speech to Your Honor like that is clearly a way of --

15         THE COURT:  I don't know, most --

16         MS. GOLDBERG:  -- leading the witness as well.  So,

17  I would ask again that next time the witness be permitted or

18  be asked to step out.  Clearly it's obvious what Mr. Baek is

19  trying to get from his witness.

20         THE COURT:  Look, obviously one thing I have to do

21  is evaluate the credibility of a witness.  Let me assure you I

22  have the ability to discern when a witness has been fed his

23  answers, all right.

24         MS. GOLDBERG:  Thank you, Your Honor.

25         THE COURT:  Understand that.  Any more questions,

*Proceedings*                                                    412

1  Mr. Baek?

2          MR. BAEK:  No, Your Honor.

3          THE COURT:  Thank you.

4          MR. BAEK:  Thank you.

5          THE COURT:  All right.

6          You may step down, sir.

7          (Witness steps down.)

8          THE COURT:  Mr. Baek, any further witnesses?

9          MR. BAEK:  Your Honor, not at this moment.

10         On the witness Leila Soares, if I may discuss just

11 for a minute?

12         THE COURT:  Okay.

13         Well, I'm not sure what you mean discuss.  You have

14 an application?

15         MR. BAEK:  Application, Your Honor.

16         May we conduct a deposition in America

17 telephonically?  That's how we did it for Mr. Gaspar

18 Allende since he's from California, in case she's unable to

19 travel.

20         The only reason why I'm making that application is

21 that -- it's the similar application I make before as to the

22 cost.  Mr. Hudson Kim and I are in a unique financial

23 situation and I understand Ms. Leila is Mr. Hudson Kim's

24 witness but it's really for the benefit of the other

25 defendants and, therefore, I respectfully make an application

*Proceedings*                                                      413

1   to conduct her deposition in America telephonically.

2         THE COURT:  I'm not sure I understand what you mean.

3   She would come to America?

4         MR. BAEK:  Telephonically we would call Leila and

5   Ms. Goldberg would be present and all the counsel and

6   defendants would be present and we would ask -- we'll conduct

7   our deposition accordingly and -- yes.

8         THE COURT:  What is your response to that?

9         MS. GOLDBERG:  Your Honor, I completely object to

10  that.  Again, I won't even know who is on the other end of the

11  line.  I would --

12        THE COURT:  You'll know.  You can have Mr. Sacardi

13  there.  He can tell you if it is Leila or not.

14        MS. GOLDBERG:  But, Your Honor, she -- obviously

15  there would be no sworn testimony.

16        THE COURT:  Why?

17        MS. GOLDBERG:  And, Your Honor, in the way that

18  Mr. Baek has conducted the depositions, I also have a concern

19  that he basically would give one leading question after

20  another.

21        THE COURT:  But then you'll have objections to form.

22  I won't let any of those questions in and he will have wasted

23  his time.

24        You know --

25        MS. GOLDBERG:  Your Honor, I would just -- I would

1    submit as he's proposing it, it is completely unreliable to be

2    submitted as credible evidence for the Court.

3          THE COURT:  That may be.  I may well find that and I

4    see your point in that regard, particularly if I get a lot of

5    conclusions which seems to be a lot of what I've gotten in

6    this case rather than actual factual testimony.

7          MS. GOLDBERG:  Your Honor, if I also might add, you

8    know, when we discussed this and we did discuss this at the

9    pretrial conference and actually I do have, if Your Honor

10   would like, I do have it on my phone, the transcript, and we

11   can review the language, it was discussed among counsel at

12   that meeting and Your Honor said:  "Is there -- I don't want

13   to quote your exact words but you asked whether there was any

14   objection to doing the testimony via video conference.  There

15   was no objection so you said okay.

16         I -- again, I instructed my client it was a heavy

17   financial burden for them, it took them an extremely long time

18   to arrange it.  Just because it was inconvenient or it was a

19   two hour trip should not excuse -- should not be a reason why

20   they didn't have to carry the same obligation and, moreover,

21   they didn't even raise it until the day of trial.

22         Maybe it might have been one thing if we had

23   discussed it prior but I believe any which way it's completely

24   unreliable and should not be permitted.

25         MR. HONG:  Your Honor, if I may, I'd like to join

*Proceedings*                                            415

1   Mr. Baek's application, and use the telephonic deposition of

2   my witness, Gaspar Allende, as an example.

3            Mr. Allende was in California, there was a very

4   probable chance that he would be unable to be here to testify

5   at trial which is why we conducted his deposition

6   telephonically.  Ms. Goldberg was there, I was there, Mr. Baek

7   was there and a court reporter was here in New York to

8   administer the oath and every counsel for all the parties had

9   ample opportunity to question Mr. Allende in California and to

10  analogize that to what Mr. Baek is asking for, I would see no

11  problem and ask Your Honor to consider his request.

12           MR. BAEK:  Your Honor, at the risk of sanction, it

13  is my --

14           THE COURT:  You're at no risk of sanctions,

15  Mr. Baek, go ahead.

16           MR. BAEK:  Not only did I put on page six in JPTO, I

17  recall reading the exact language and we -- Your Honor, did

18  not rule on the telephone issue.

19           THE COURT:  No, I agree with you, I did not rule at

20  that time.  What I ruled was that video deposition -- video

21  testimony would be okay.

22           MR. BAEK:  That's right, Your Honor.  So, I thought

23  I had the two options and it was for me to speak with --

24           THE COURT:  No, I did not rule that two options were

25  okay.  I ruled that video was okay.  You then jumped to the

*Proceedings*                                                    416

1    conclusion that, well, if the judge said video, then telephone

2    must be okay too.  That was an unjustified conclusion.

3               Here's what I'm going to do, if you want to do this

4    testimony you've got to get a court reporter that is

5    authorized to administer oaths under the laws of Brazil with

6    the witness in Brazil.  You'll have a U.S. court reporter

7    here.  The oath will be administered again under U.S. law

8    here.

9               Then Ms. Goldberg is going to give you a bill for

10   the cost of the video deposition that she took of her

11   witness -- I'm sorry, the video testimony that she took of her

12   witness.  You're going to pay her half the cost of that video

13   deposition.  That has to occur within 30 days.  I will then

14   take designated portions of that deposition into this record.

15              All right.  Anything else?

16              MR. LEE:  Your Honor.

17              THE COURT:  Yes, Mr. Lee.

18              MR. LEE:  I'd like to make a motion to dismiss me

19   from this case.  It doesn't seem to be adequately proven --

20              THE COURT:  This is not the time for that.  You

21   waived your right to move for dismissal of yourself from the

22   case at the close of the plaintiff's case.  You can make

23   another motion when you've concluded your case.

24              First, though, I'm asking Mr. Baek, subject to the

25   deposition ruling I've just made, are you resting?

*Proceedings*                                                      417

1          MR. BAEK:  If I may make an application on cost, can

2     the defendants split the cost?

3          THE COURT:  No, I will not require that.  That's up

4     to the defendants.

5          MR. BAEK:  Okay.

6          Thank you, Judge.

7          THE COURT:  Any further questions?

8          MR. BAEK:  No, Your Honor.  Defendant rests.

9          THE COURT:  Okay.

10         Mr. Lee, any evidence from you?

11         MR. LEE:  No, Your Honor.  I'd like to just have the

12    opportunity for a closing statement.

13         THE COURT:  All right.

14         I just want to make sure you understand because

15    you're pro se, you don't have to testify in your own behalf if

16    you don't want to but if you don't, there's not sworn evidence

17    from you in the case.

18         It's completely permissible for you to rely on the

19    sworn evidence that has come in through other parties and

20    through your own cross-examination, that's fine.  I don't want

21    you to think that the opening statement you made is evidence.

22    It's not evidence.  Okay.

23         If you want to tell your story under oath, I'll

24    swear you in and you can tell your story under oath.  I'll let

25    you tell it in narrative form.  Then you will be subject to

*Proceedings*                                                    418

1   cross-examination.

2        You don't have to do that, you can rest on the

3   record as it is but I just didn't want you to think that by

4   giving me your opening statement, you've told me your story.

5   The opening statement is just an outline of the proof.  It is

6   not evidence.

7        So, now do you want to rest or do you want to

8   proceed?

9        MR. LEE:  Your Honor, I feel there's enough evidence

10  that was revealed during these testimonies and I'd like to

11  decline and just have an opportunity to do a closing

12  statement.

13       THE COURT:  Okay.  That's fine.  Anybody else want

14  to do closing statements?

15       MS. GOLDBERG:  Your Honor, if you are permitting

16  closing statements -- closing arguments, I would like to do a

17  closing argument.

18       THE COURT:  One way to do it, and I'll do this only

19  if everybody is agreed, is I'll take a closing statement from

20  Mr. Lee and the rest of you can brief it.

21       You are obviously at an advantage over him briefing

22  the case but if you feel the need -- you could this way hear

23  his closing statement and still put in your briefs and address

24  it there if you want but, like I said, I'll do it however you

25  want.

1        If Mr. Lee closes, Ms. Goldberg, you're sure you

2   want to make a closing statement?

3        MS. GOLDBERG:  Well, I certainly would like to do a

4   post-brief so I'm not -- I'm not --

5        THE COURT:  I'm going to be very flexible with this

6   on the parties.  We have the variable of Mr. Lee who's not a

7   lawyer and, therefore, I think should have the right to make a

8   statement and having given him the right to make a statement,

9   I feel obliged if the parties really want to, and I'd ask you

10  to consider whether it's necessary in light of the fact that

11  you're going to give me post-trial briefs, to make your own

12  closing statements but if you want to, I will hear them

13  because I'm going to hear from Mr. Lee.

14       So, what do you want to do?

15       Mr. Lee is going to close.  What does the plaintiff

16  want to do?

17       MS. GOLDBERG:  Your Honor, I would like to close and

18  obviously I'd like to do a post-brief.

19       THE COURT:  Okay.

20       The other defendants?

21       MR. HONG:  Your Honor, I'll waive the closing

22  statement and just submit the post-hearing brief.

23       THE COURT:  Okay.

24       Mr. Baek?

25       MR. BAEK:  I would respectfully submit on the brief.

1           THE COURT:  Okay.

2           Mr. Lee, let's hear your closing statement.

3           Mr. Lee, why don't you do it up here so the court

4    reporter can get it down better.

5           MR. LEE:  Your Honor, I'd just like to say this

6    case, as you know, has dragged on for close to thirteen months

7    and on.  I can't -- I've lost count of the days and personally

8    it's been going to hell and back.

9           There was a lot of back stories going on with this

10   trial.  The bigger thing was there are people in the parties

11   on the defendants' side trying to pin me as the owner and

12   that's why in the JPTO you had so much evidence stating the

13   opposite, such to the fact that on the -- they all stipulated

14   they all understood, during discovery it was revealed that I

15   was not the owner or was I never -- I was never the owner but

16   that did not preclude, did not prevent, particularly on the

17   defendants' side, on their own side trying to make me the

18   owner and stick me with a one million dollar IRS tax bill and

19   so the hell that put my family under was unbearable but,

20   thankfully, we are able to overcome that first part.

21          MS. GOLDBERG:  Your Honor, I --

22          THE COURT:  I'm going to give him some leeway.

23          MS. GOLDBERG:  Okay, Your Honor, go ahead.

24          MR. LEE:  We were able to overcome that first part

25   and now we're stuck with this.  The reality of the matter, and

*Summation - Lee*                                                 421

1    it was revealed during this, during the case, I was never the

2    owner and I was never the manager when Nilson Sacardi was

3    there and timing is everything.

4            I had come to the restaurant on September 27th,

5    2010.  Nilson Sacardi left a little less than a month later.

6    We literally had 18 days, and that's a conservative estimate,

7    together, 18 days, and those 18 days have been a living hell.

8            During that time I had gone to the restaurant when

9    Nilson was there maybe five to six times.  Nilson was there

10   about five to six times.  We barely overlapped.

11           THE COURT:  Mr. Lee, I feel obliged to just caution

12   you again, you're giving me a whole bunch of facts in your

13   closing that I cannot take into account in reaching a decision

14   because they've not been introduced into the record.

15           Just like your opening statement is not evidence,

16   this closing statement is not evidence.  Evidence only comes

17   in through sworn testimony.  So, these things you're saying,

18   you know, if you give me argument about why what I heard is in

19   your favor, I can consider that argument, but if you're

20   telling me additional facts like, you know, how many times you

21   came into the restaurant, if there isn't something in the

22   record in sworn testimony that already shows that, I can't

23   take any account of that in reaching a decision.

24           Do you understand that?

25           MR. LEE:  Okay, Your Honor.  Well, let's go to the

1   case then and go to the participants of the case.

2          John Lim on record has said that I made no changes

3   to the restaurant.  He furthermore said I was gathering

4   information which is fair, which is a fair statement, because

5   I came from corporate America and was trying to learn the

6   restaurant business.

7          No one in these testimonies ever mentioned my name

8   as a manager and that is very, very important.  I never ever

9   managed Nilson Sacardi or any part of the restaurant when

10  Nilson Sacardi was there and left the restaurant and this

11  whole time explaining this to my wife is a mystery why I'm

12  even here because 18 days of just observing has led me dragged

13  into a thirteen month lawsuit.

14         The reality is I would have loved to had a lawyer to

15  defend myself and to -- I mean obviously I'm not well versed

16  in semantics.  The reality is lawyers are expensive and I

17  can't afford it and that's why I am pro se but I feel that

18  over the time, over this case the truth has been revealed and

19  there's no way I could have managed a big operation of that

20  size in one month.

21         The evidence showed with the bank statement who was

22  still signing the checks of Green Field Churrascaria, Inc. and

23  that was Hudson Kim.  Hudson was teaching me the restaurant.

24  I was learning the restaurant to see if I would eventually

25  purchase the restaurant subsequent to, there were a lot of

*Summation - Lee*                                           423

1  obviously provisions, one being the huge outstanding tax bill

2  that was there that was overhanging the whole corporation but

3  I never purchased the restaurant and that was stipulated as a

4  fact.

5           I never managed the restaurant during the time

6  period that Nilson Sacardi was there.

7           MR. BAEK:  Your Honor.

8           THE COURT:  Yes, Mr. Baek.

9           MR. BAEK:  Mr. Daniel Lee is misstating the facts as

10 to the stipulation.

11          THE COURT:  So what?  It is closing argument.

12          MR. BAEK:  But he's misstating what was stipulated

13 to.

14          THE COURT:  It doesn't matter, it is closing

15 arguments.  I'll be governed by the stipulations.  I'm not

16 governed by closing argument.  Closing argument is only to

17 persuade, it is not to offer any facts.

18          I'm not going to be persuaded by something that is

19 contrary to a stipulation.

20          MR. BAEK:  All right.  Thank you.

21          MR. LEE:  But despite my distaste, and I don't know

22 if that's the right word, for the Kims and all that they have

23 put me through, I will not take revenge and I will not lie on

24 the record.  I will tell the truth.  During my due diligence

25 and everything I observed Nilson Sacardi was the head chef.

1   It was undeniable.  Any layperson could have observed that.

2          A restaurant that big doesn't run itself.  When you

3   have 500 guests to feed on a particular night, somebody has to

4   man the ship and that man was Nilson Sacardi and I observed

5   that.  He had assistants, Alberto, Alejandro, Sergio, Leila,

6   and I observed him giving orders, that's a fact.

7          And I'm not here to go back to take vengence on the

8   Kims and tell a lie.  I will tell the truth.  Because I was

9   subjected to a lot through the thirteen months and I've heard

10  lies during these days of week depositions but I will not take

11  vengeance, I will tell the truth, the time I was there and

12  everything I observed learning the operations of the

13  restaurant Nilson Sacardi was the head chef.

14         Your Honor, I hope you have mercy and just end this

15  thirteen months of hell so I can move on with my life and find

16  a job and support my growing family.

17         Thank you, Your Honor.

18         THE COURT:  Thank you, Mr. Lee.

19         Ms. Goldberg, are you sure you don't want to save it

20  for a brief?

21         I'll let you go, I'll let you do it if you want.

22         MS. GOLDBERG:  Your Honor, I'll put it in a brief.

23         THE COURT:  Okay.

24         Let's talk about timing.  I'd like to have the

25  briefs within 21 days.  How does that grab people?

*Proceedings*                                                    425

1          MR. HONG:  Your Honor, there is the concern about

2     when the trial transcript will come out because we're going to

3     need that to actually write and submit the brief.  So, if it

4     doesn't come out, if it's not available to all the parties as

5     early in that 21 day period, we may not have time to actually

6     make our submissions.

7          THE COURT:  Okay.

8          MS. GOLDBERG:  Your Honor, I would also say if

9     Mr. Baek does intend to go forward with Leila Soares'

10    testimony, that could also be problematic.

11         THE COURT:  Okay.  Let's go off the record a

12    minute.

13          (Off the record discussion.)

14         THE COURT:  So, if the parties have the trial

15    transcript in a week, what's wrong with 21 days after

16    that?

17         MR. HONG:  21 days from the time it's made available

18    I have no problem with.

19         THE COURT:  Anyone have a problem?

20         MS. GOLDBERG:  Your Honor, I don't have a problem,

21    I'm just not quite sure if Ms. Soares' deposition is going to

22    go forward and how that would play into including that

23    testimony into an argument.

24         THE COURT:  We don't know what Mr. Baek is going to

25    do.  He's going to let us know by Friday.  If an adjustment of

*Proceedings*                                                426

1   the schedule is necessary because he goes forward with Soares,

2   then I'll make an adjustment but for now let's have post-trial

3   briefs in by February 27th.

4            MS. GOLDBERG:  I'm sorry, did you say February 27th?

5            THE COURT:  Yes.

6            And let's have reply briefs in by March 12th.  All

7   right.

8            MS. GOLDBERG:  Your Honor, is there a page limit on

9   the post-trial brief?

10           THE COURT:  No, I'm not going to impose a page

11  limit.

12           I am going to tell you that I'm a pretty quick

13  study.  You don't have to beat me over the head with anything.

14  I have a familiarity with the law in this area so I don't need

15  pages and pages of boilerplate legal principles and I'll just

16  remind you of the generally applicable adage that more is less

17  when it comes to briefing before a judge who is focused on and

18  familiar with the case.

19           I understand lawyers never want to take a chance

20  what if the judge doesn't appreciate this or that or this

21  particular case, I understand that risk, I've been a

22  practitioner but I've been following this case closely, I know

23  the law and the effort I believe should be to persuade me, not

24  to educate me.

25           Having said that, if somebody wants to give me a 50

1    page brief, you know, that's fine.  I would say particularly

2    it's in the plaintiff's interest to keep the briefing as short

3    as possible because the plaintiff is not going to get paid if

4    at all until the case is decided.

5            MS. GOLDBERG:  And Your Honor, the post-trial brief

6    and the reply are to be submitted on ECF, correct?

7            THE COURT:  Yes, everything is on ECF but I would

8    like a courtesy copy of the briefs as well.

9            MR. LEE:  Your Honor, I guess I'm not subject to

10   this?

11           THE COURT:  You're welcome to put in a brief, Mr.

12   Lee, if you'd like to, you're under no obligation to.

13           MR. LEE:  So, by February 27th some sort of written

14   statement?

15           THE COURT:  That's correct.

16           MR. LEE:  Does that entail in terms of putting

17   quotes from the transcript in evidence into that?

18           THE COURT:  Usually you don't quote unless it's

19   something really significant.  Usually you just cite me to the

20   page of the transcript, okay, and I will then consult the

21   transcript and see if it says what you say it says.

22           MR. HONG:  Your Honor.

23           THE COURT:  Yes.

24           MR. HONG:  Would you require the submissions to be

25   bound by a particular service or professionally bound?

*Proceedings* 428

1    THE COURT:  I don't care if they're heavy duty

2  stapled as long as they don't come apart, okay.

3    MR. HONG:  Okay.

4    THE COURT:  I want them in a manner where I don't

5  get a bunch of loose pages.

6    MS. GOLDBERG:  And Your Honor has a copy of the

7  exhibits?

8    Should we also attach a copy of the exhibits that

9  the Court already has?

10    THE COURT:  No, you can simply refer me to the

11  exhibits.

12    You should make sure I have all the exhibits.  I

13  think I do but if I'm missing any --

14    Mr. Lee, those are not in evidence.  If you're

15  talking about the bank statements, they were not offered and

16  they were not received in evidence.

17    So, the parties should make sure I have everything

18  that was admitted into evidence.

19    Anything else?

20    MS. GOLDBERG:  No, Your Honor.

21    MR. BAEK:  Your Honor, I just want to make sure, I

22  think defendant Hudson Kim admitted one exhibit into evidence,

23  that's the Kitchen Employee Schedule.

24    THE COURT:  Yes, that's Exhibit G.  I have that.

25    MR. BAEK:  Okay.  Thank you.

*Proceedings*                                                      429

1          THE COURT:  Okay.  All right.

2          Thank you all very much for your efforts.  No doubt

3     we will hear from each other again.

4          Thank you.

5          (Time noted:  11:55 a.m.)

6          (End of proceedings.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

430

1                          I  N  D  E  X

2   WITNESS                                          PAGE

3

4

5        H U D S O N    K I M                        352

6        DIRECT EXAMINATION                          353

7        BY MR. BAEK

8        CROSS-EXAMINATION                           378

9        BY MS. GOLDBERG

10       CROSS-EXAMINATION                           402

11       BY MR. LEE

12       CROSS-EXAMINATION (CONT'D.)                 407

13       BY MS. GOLDBERG

14       REDIRECT EXAMINATION                        409

15       BY MR. BAEK

16

17                    E  X  H  I  B  I  T  S

18                                               PAGE

19

20       Defendant's Exhibit E                       360

21

22

23

24

25